IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


JEFF BOARDMAN, et al.,          )

                Plaintiffs,     )

     v.                         )No. 1:15-cv-00108-MC

PACIFIC SEAFOOD GROUP, et al,   )

                Defendants.     )




BEFORE THE HONORABLE JUDGE MICHAEL MCSHANE


ORAL ARGUMENT

May 26, 2017

Friday

11:05 A.M.




FOR PLAINTIFFS:  MR. MICHAEL HAGLUND

                 MR. ERIC BRICKENSTEIN

                 (Appearing by telephone.)


FOR DEFENDANTS:  MS. RACHEL LEE

                 MR. TIMOTHY W. SNIDER

                 (Appearing by telephone.)

```
1                    FRIDAY   MAY 26, 2017   11:10 A.M.

2

3                    THE COURT:  Hi, folks.  This is Judge

4    McShane.  Thanks for joining me.  Why don't I have

5    the attorneys introduce themselves for the record,

6    starting with plaintiffs' counsel.

7                    MR. HAGLUND:  Mike Haglund and Eric

8    Brickenstein for plaintiffs, Your Honor.

9                    THE COURT:  Thank you.

10                   MS. LEE:  Rachel Lee and Tim Snider

11   for defendants, Your Honor.  And with us is -- I

12   understand in-house counsel for Pacific Seafood is

13   also on the line.

14                   THE COURT:  Who is that again?  Do we

15   have that person on the line?

16                   MR. OCCHIPINTI:  Yes, Your Honor.

17   Daniel Occhipinti, in-house counsel for Pacific.

18                   THE COURT:  Great.  Thank you.  All

19   right.  Sorry about the delay a little bit this

20   morning.  We share a court reporter down in Eugene,

21   and we had to wait for the court reporter.  But I

22   did want to go ahead and put this on the record.

23                   And I'm sorry that I did not make it

24   to Portland.  I know we were going to do it in

25   person there.  But I've read your briefings.
```

1    I've gone back through a lot of the filings in the

2    case to kind of remind myself of where we're at.

3              I guess -- I don't want to spend a lot

4    of time arguing basically whether we should be going

5    forward or whether the plaintiffs have waived their

6    objections by the delay in responding to the request

7    for production.  I guess I would like to really talk

8    more about where we are going with this case.

9              I guess from my perspective this case

10   just doesn't -- it's really a bench trial that's

11   going to rely primarily on experts who are familiar

12   with the market.  And we seem to be getting into

13   some minutia of individual information by individual

14   fishermen that I just -- I'm having a hard time

15   understanding how helpful that's going to be

16   ultimately to me at a bench trial to determine

17   whether there's a violation of monopolistic

18   practices under the Sherman or Clayton Act.

19             Maybe I can start with the defense in

20   maybe helping me understand why we need the level of

21   information -- navigational records, individual

22   sales records, those kinds of things for experts to

23   really analyze broadly this market.

24             MS. LEE:  Certainly, Your Honor.

25   This is Rachel Lee.  And so if Your Honor is already

```
 1    familiar with the general outlines in this case, it
 2    certainly is true that the documents that we've
 3    requested here are necessary and relevant to the
 4    analysis and the issues in this case.
 5              I'll begin just with what you first
 6    pointed to which was -- I believe you said the
 7    navigational analysis.  So one of the issues in this
 8    case is whether the Ocean Gold acquisition would
 9    have given Pacific Seafood too much market power.
10    And that depends on what -- you know, obviously a
11    central question for that is:  What is the market
12    definition?  How narrow or how broad is the relevant
13    market?
14              And so in order to get into that, you
15    need to know where the fishermen were fishing and
16    how far they traveled to deliver their catch,
17    because one of the allegations that the plaintiff
18    has made here is that fishermen don't travel more
19    than 50 to 100 miles from the spot where they fish
20    to the spot where they deliver, and that influences
21    how they are describing the relevant markets.  And
22    so we need access to information about how far, in
23    fact, fishermen do travel.  That's information the
24    experts will need and that is not contained within
25    the PacFIN or AKFIN databases.
```

1              And we also need information about

2    what the fishermen -- not just what the fishermen,

3    in fact, fished for and sold, but what their other

4    options were in terms of other seafood products that

5    they could have substituted for fishing in these

6    markets or fishing for the types of seafood that

7    plaintiffs are arguing Pacific Seafood had

8    monopolized.

9              So we need information about what

10   other types of permits they had, where they could

11   have fished, what kinds of things they could have

12   fished for, where they could have sold, their

13   communications about these things -- that's all

14   directly relevant, and it's information that we

15   can't get except by getting it in discovery from the

16   plaintiffs themselves.

17             Another issue here specifically is the

18   issue of antitrust standing and antitrust injury.

19   We think that some of these plaintiffs don't even

20   fish in the markets they claim will be harmed by the

21   acquisition or don't even do business with Pacific

22   Seafood or Ocean Gold.  And that creates a standing

23   problem for them, and it specifically implicates a

24   rule about what's called antitrust standing or

25   antitrust injury.  And so we need the documents

Oral Argument

1    about where these plaintiffs are fishing, what they

2    are fishing for and --

3                    THE COURT:  Have you deposed the

4    fishermen yet?

5                    MS. LEE:  Your Honor, we have not

6    deposed the fishermen yet because we don't have any

7    documents from the fishermen to date.  We issued

8    these requests for production almost two years ago.

9                    THE COURT:  I know.  We don't need to

10   go there.  I know that.  I got that.  I know it was

11   a long time ago.

12                    MS. LEE:  Yes, Your Honor.  And what I

13   was going to cap that with is to date, even on the

14   RFP where the plaintiffs served up a response saying

15   they would produce documents, they have not to date

16   produced a single document.  We have zero documents

17   from them.

18                    So we have not yet deposed the

19   plaintiffs, but obviously that's something we need

20   to do -- and quite soon because our expert reports

21   are due on September 1st.  In fact, discovery will

22   be closing at the end of September.  Once we get

23   document discovery, then we'll do depositions of the

24   plaintiffs here.  We'll need the Court's assistance

25   to compel production of the responsive documents.

```
1                    THE COURT:  All right.  Mr. Haglund,
2       let me hear from you.
3                    MR. HAGLUND:  Yes, Your Honor.  I
4       would like to emphasize first that this is a case
5       that, on the plaintiffs' side, seeks strictly
6       injunctive relief.
7                    THE COURT:  Can I interrupt for a
8       moment?  That reminds me that I did wish to ask the
9       defense a question.  Is the defense asking for a
10      jury trial on your tort style claims?
11                   MS. LEE:  Your Honor, we have not
12      served a jury trial demand, I don't believe.
13                   THE COURT:  Okay.  So is that no, you
14      are not going to be seeking one?
15                   MR. SNIDER:  Tim Snider.  I don't know
16      if the deadline has passed yet to serve a jury
17      demand.  And to be honest with you, I don't recall
18      if one's been served yet or not.  It's something we
19      want to talk about with our client.  If Your Honor
20      is curious about that, we can promptly supplement
21      with an answer on that.
22                   THE COURT:  I guess I'm only curious
23      in that if you do wish to have a jury trial on your
24      tort claims, it's going to be a separate proceeding
25      from the bench trial on the Sherman and Clayton Act
```

1    claims.

2                        Quite frankly, I think that may,

3    depending on how I decide the case -- if I decide it

4    in favor the plaintiffs at the bench trial -- I'm

5    not saying I am, but if I did, we might have to

6    rethink when you are going forward on a malicious

7    prosecution case.

8                        So they will be severed if we go

9    forward with a jury on the tort claims.  I want the

10   parties to know my thinking on that.  Not trying to

11   dissuade you from doing that, but I don't see us

12   trying the case while a jury sits and listens for a

13   week to experts talking about monopolistic power.

14   We might as well shoot them all in the head.  They

15   are going to kill us by the time we're done with

16   that.  So it's going to be a separate event, and

17   we'll go from there.

18                        But if we were trying it all together,

19   that's fine, to the Court.  But I do want the

20   parties to know what my thinking is on how we are

21   going to proceed if we have a jury trial on the tort

22   claim.

23                        I interrupted you, Mr. Hagland.

24   Please go ahead.

25                        MR. HAGLUND:  Yes, Your Honor.  Our

1     case on the plaintiffs' side is strictly for an

2     injunction or a permanent injunction -- strictly

3     injunctive relief.

4               And it's going to be expert --

5     virtually all of our testimony is going to come from

6     experts.  And the expert reports are due -- our

7     expert reports are due June 30th.  We anticipate

8     getting many rounds of documents, those documents we

9     said we would provide, responsive documents, to

10    defendants within the next couple of weeks by June

11    16.

12              However, the category of documents

13    they've asked for, many don't make any sense to be

14    required to be produced, especially when one takes

15    into account the fact that there is a database that

16    all the states -- or Oregon, Washington, and

17    California, which are the three states that make up

18    the West Coast seafood input markets we are

19    concerned about in this case, all have very

20    comprehensive fish ticket systems that have the data

21    from the fish tickets going into a database that is

22    available to the defense and to us.  And it -- you

23    can easily run data sets where -- for the

24    plaintiffs' vessels that are in this case -- and

25    this is the subject of an interrogatory that we are

1    going to respond to.  We are assembling that data

2    now.  We are going to be listing from the PacFIN

3    database the date, the catch, the delivery point --

4    all that data is going to be available to them in

5    the interrogatory answers that we are trying to

6    complete here in the next couple of weeks.

7                    So they want to go way beyond that

8    sort of data and want for example the -- the

9    documentation of all of our Coast Guard licenses and

10   permits.  They want all the information, in number

11   9, about how the captains and crew are paid.  That

12   has no relevance to anything we're seeking.  We

13   don't seek any damages.  It would be relevant from

14   an antitrust standing perspective if we were seeking

15   damages in this case for price suppression, but we

16   are not.

17                    Number 10, they seek all of the

18   surveys, appraisals, or valuations of our fishing

19   boats.  We can't imagine what that's relevant to.

20                    They seek -- multiple requests are

21   devoted to what have we done in terms of holding or

22   transferring quota share.  That's not an issue in

23   this case.

24                    And then they want all of our

25   financial statements.  We are not seeking any

```
1    damages.  It makes no sense for my clients to be
2    subjected to these types of overbroad document
3    requests.
4                   THE COURT:  All right.  Thank you,
5    Mr. Haglund.  Any final word by defense?
6                   MS. LEE:  Yes, Your Honor.  Thank you.
7    So I think I have three points in response to what
8    Mr. Haglund said, beginning with his argument that
9    plaintiffs will be putting on their case solely
10   through expert testimony.  And that's plaintiff's
11   prerogative if they want to put on their case solely
12   through experts.  But we are entitled to have
13   testimony from the plaintiff and entitled to records
14   and discovery from the plaintiff.  That's my first
15   point.
16                   The second point is Mr. Haglund argued
17   that it doesn't make sense to require production of
18   documents beyond what's in PacFIN and AKFIN.  We are
19   of course entitled to impeach whatever may be the
20   records entered into the database.  But in addition,
21   as explained in our reply, the PacFIN database
22   doesn't record all the relevant information that's
23   on fish tickets.  And we are seeking many, many
24   relevant documents beyond what's on the fish ticket
25   info, as we listed in our reply, and we are seeking
```

1     communications and statements by plaintiffs about

2     prices, testimony about payments, quotas, and

3     finances of its fishing operations.

4                    And so we are entitled to both the

5     level of detail that's actually in plaintiffs'

6     records, information about where they are fishing,

7     and these additional items.  Those are definitely

8     relevant to key issues in this case speaking to both

9     market definition and the other options that

10    plaintiffs have for selling their fish.

11                   It's also relevant to a theory of how

12    they've been harmed in this case.  Their argument is

13    ex-vessel prices are being suppressed by Pacific

14    Seafood below the levels of what pricing would be in

15    a less concentrated market.  So we are entitled to

16    inquire into the prices and the effects of those --

17    the prices for those seafood products are having on

18    the finances of a fishing operation and on the

19    valuation of the vessels and the equipment and the

20    fishing permits and the quota.  We are entitled to

21    have -- our experts would be able to get into the

22    level of detail that allows them to compare the

23    finances and profits of the plaintiffs fishing for

24    these types of seafood as opposed to the finances

25    and profits that fishermen are earning in less

1    concentrated markets or as to other types of

2    seafood.

3                     So the PacFIN database is absolutely

4    not a substitute for the discovery that we are

5    seeking here.

6                     And then finally as to some of the

7    specific kinds of document requests that he is

8    pointing to here -- we go through some of this in

9    our reply brief -- but he objects to producing

10   information about the Coast Guard licenses and

11   permits.  As I alluded to earlier, those are

12   relevant to the question of what other options

13   plaintiffs have in terms of where they fish.  And

14   that is directly tied into where they fish and what

15   they fish for and their options, directly tied into

16   the relevant market analysis.

17                     Mr. Haglund argues that the question

18   of compensation is not relevant because damages are

19   not at issue.  We understand that plaintiffs are

20   seeking injunctive relief.  But their theory of harm

21   here and their theory of anti-competitive conduct

22   rests on the economics and finances of how this

23   market operates and what its effect is on fishing

24   operations.  So it is definitely relevant and

25   something that our experts want to look into to

1  investigate how these fishing businesses operate,

2  what they take in, how they compensate their crews,

3  how those (inaudible).

4           THE COURT:  That seems like such a

5  stretch because, you know, the success of the

6  individual fishermen isn't at issue.  The question

7  is whether competition is being suppressed and they

8  could be more successful.  It doesn't matter if they

9  are in default on loans or their boats are paid off.

10  I don't know how that is possibly going to impact

11  the decision I'm going to make or, quite frankly,

12  what your experts are going to say.

13           MS. LEE:  Your Honor, we think that it

14  is relevant here because the fishermen may be

15  fishing for different kinds of seafood other than

16  the three -- so here they've alleged there are three

17  seafood products where there is suppressed ex-vessel

18  pricing -- groundfish, onshore whiting, and cold

19  water shrimp.  What plaintiffs are earning on those

20  products and how that affects their operations as

21  opposed to what the dynamics are of markets that are

22  less concentrated goes to the question of whether or

23  not Pacific Seafood is in fact squeezing these

24  fishermen unfairly and acting to the detriment --

25  the financial detriment of the fishermen, Your

1    Honor.

2              THE COURT:  Again, I just don't think

3    that's the issue.  I think you are misstating the

4    issue that I have to find in this case.  That's not

5    the issue under the Sherman and Clayton Act, that

6    they are squeezing somebody.  It has do with unfair

7    competition practices.  It's broader than that.

8              MR. HAGLUND:  Your Honor, this case is

9    at a different level.  It's all about competition in

10   a broad and more generic way.  It doesn't get down

11   to the level of detail of individual fishermen

12   that's being argued.

13             THE COURT:  With regard to the issue

14   of whether the plaintiffs waived their objections to

15   the RFP by waiting nine months, I'll look at the

16   factors involved.  Nobody's been knocking themselves

17   out to get this issue resolved.  I think it was the

18   defense that asked for a stay that lasted a year so

19   that they could get through their appeal rather than

20   conduct discovery.

21             Nobody mentioned this at the status

22   report that I requested, that there were -- there

23   had been outstanding discovery issues for a long

24   period of time.  This is something that should --

25   should have been brought to my attention seven or

1    eight months ago.  Nine months is clearly a long

2    time.

3              The plaintiffs haven't given any great

4    reason for the delay, but on this record I don't see

5    there's any evidence of bad faith.  I don't see any

6    great prejudice to the defense.  We have plenty of

7    time.

8              This is also -- we have to keep in

9    mind this is also a bench trial.  It is not as if we

10   can't get more information.  Quite frankly, if

11   during trial I don't feel like I have all of the

12   information necessary to make the right decision --

13   I mean, we can carry the matter and get more

14   information, get more information to the experts if

15   necessary and, you know, get the facts that I need

16   to make the right decision.

17             So I don't see that anybody's going to

18   be prejudiced by going forward with the objections

19   the plaintiffs have made to the requests for

20   production, especially in light of the fact that at

21   least from my perspective many of the requests are

22   overbroad.

23             The defense, of course, I know

24   disagrees with me on that, but many of these

25   requests do appear to me to be overly broad and only

```
 1   tangentially relevant -- sometimes just not relevant
 2   in my view of where this case stands.  Some of them
 3   are just vague, and many of them I think just
 4   ultimately are not proportional to the needs of the
 5   case.
 6                So I'm going to consider the
 7   plaintiffs' objections despite their tardiness.
 8                Let's look first at requests 4 through
 9   7.  These are where defendants are seeking logbooks,
10   electronic and navigational data, and other
11   information.  I mean, I guess I would say in general
12   to all these requests -- in deciding this case I can
13   just tell you my interest in deciding this case is
14   going to be based on really an analysis of experts
15   in the field based on market data and their
16   experience with the fishing industry.
17                I just don't see this case turning on
18   the navigational data of an individual fisherman on
19   an individual day.  I don't see it turning on the
20   individual sale of a particular catch by an
21   individual fisherman on a particular day.
22                And again, if the experts convince me
23   that that kind of data is germane to the decision I
24   have to make about the markets and whether there is
25   a violation of the Sherman or Clayton Acts, then
```

1     we'll get the information.  But right now it seems

2     disproportionate to what I believe are going to be

3     the ultimate issues in the case.

4                    I'm going to sustain the objections to

5     requests 4 through 7 finding that they have little

6     relevance and they are not proportional to the needs

7     of the case.

8                    And again, I suspect there will be

9     questions about some of these issues in depositions

10    and some of this information is going to be

11    gathered.

12                    With regard to requests 1 through 3,

13    29, and 32, these seek documents summarizing all

14    seafood sales from January 2010 to present.  Again,

15    I'm going to find that they do not have sufficient

16    relevance and are not proportional to the needs of

17    the case.

18                    Request number 8 which seeks

19    information about regulatory constraints such as

20    Coast Guard and other fishing licenses for

21    plaintiffs, I'm having a hard time understanding the

22    relevance.  And I think in deposition -- I mean,

23    certainly the parties know what regulatory

24    constraints exist.

25                    If after depositions it appears that

1   we need more information regarding specific

2   regulatory constraints, we can look further at

3   production of documents.  But it seems like

4   something fairly easy to ferret out in depositions

5   with some questions.

6               Requests number 9, 10, and 14 have to

7   do with plaintiffs' profits and valuations of the

8   vessels it uses.  I'm sustaining the objection on

9   grounds of relevance.

10               Requests 11 through 13, these have to

11   do with the plaintiffs' Individual Fishing Quotas

12   and Individual Transfer Quotas.  Again, I'm

13   sustaining the objection on grounds of relevance and

14   proportionality.

15               Request number 17 which seeks

16   communications related to prices relevant to

17   ex-vessel pricing, it's a very broad request.  I

18   don't know how to begin to determine what this is --

19   how broadly -- I mean, communications related to

20   prices is broad.  Again, at this stage I'm finding

21   that the defense has not made a requisite showing

22   that it's relevant given the needs of the case.  If

23   at a later time when we look at the expert reports

24   it appears that this particular type of information

25   becomes relevant, we can revisit the matter at that

```
 1    time.
 2                     Request 15 and 16, countervailing
 3    power documents, I'll overrule the objection to
 4    that.  It may have some relevance to determining the
 5    markets.
 6                     Request number 24, communications
 7    about this lawsuit, I'll grant with regard -- I
 8    guess this goes towards what ultimately is the tort
 9    claims, whether there was some malfeasance in
10    bringing the prosecution.  So it seems the plaintiff
11    is willing to turn over any non-privileged,
12    non-work-product related documents that are related
13    to the lawsuit.  That seems appropriate.  I'm not
14    going to get into an argument about whether the
15    appropriate word is "about" or "related".  I can see
16    no difference.
17                     What I'm ordering the plaintiffs to
18    do, if they are in possession of documents that are
19    not privileged, not work product, containing
20    communications relating to the lawsuit, that needs
21    to be turned over.
22                     Request 33 to 34, this is generally
23    seeking documents relevant to the existence of
24    economically distinct geographic markets.  This is
25    going to be in the expert reports, so I'm going to
```

1    grant -- I'll sustain the objection to requests 33

2    through 34.

3                    Is there anything I'm missing in terms

4    of a request that hasn't been responded to from

5    plaintiff?

6                    MR. HAGLUND:  Not that I'm aware of,

7    Your Honor, looking at it.

8                    THE COURT:  From defense?

9                    MS. LEE:  Your Honor, I'm trying to

10   look through here.

11                   THE COURT:  We'll get a minute order

12   out just outlining specifically which have been

13   sustained, which have been overruled.  I think I've

14   covered all the ones that you've mentioned in your

15   briefing.  If I haven't -- if I've missed one, just

16   simply send an email to Ms. Pew.  I'll take a look

17   and issue a ruling on it.  I think that's the

18   easiest way to do that.

19                   Let's get the minute out order out.

20   If there's something we missed, we can deal with

21   that.  We've got expert report deadlines.  I assume

22   you are moving forward on scheduling depositions.

23   Is there anything else that I can help you with

24   today?

25                   From the plaintiff first.  Anything?

1           MR. HAGLUND:  No, Your Honor.

2           THE COURT:  All right.  From defense?

3           MS. LEE:  No, Your Honor.  Thank you.

4           THE COURT:  Okay.  Thank you very

5    much.  We will go off the record.

6                (The hearing was concluded

7                 at 11:38 a.m.)

```
 1    State of Oregon    )
                         )       ss.
 2    County of Lane     )

 3

 4       I, Eleanor G. Knapp, CSR-RPR, a Certified

 5    Shorthand Reporter for the State of Oregon, certify

 6    that the witness was sworn and the transcript is a

 7    true record of the testimony given by the witness;

 8    that at said time and place I reported all testimony

 9    and other oral proceedings had in the foregoing

10    matter; that the foregoing transcript consisting of

11    22 pages contains a full, true and correct

12    transcript of said proceedings reported by me to the

13    best of my ability on said date.

14       If any of the parties or the witness requested

15    review of the transcript at the time of the

16    proceedings, such correction pages are attached.

17       IN WITNESS WHEREOF, I have set my hand and CSR

18    seal this 12th day of June 2017, in the City of

19    Eugene, County of Lane, State of Oregon.

20

21

22    Eleanor G. Knapp, CSR-RPR

23    CSR No. 93-0262

24    Expires:  March 31, 2018

25
```