1                UNITED STATES DISTRICT COURT

2                    DISTRICT OF OREGON

3         THE HON. MICHAEL J. McSHANE, JUDGE PRESIDING

4

5

6   JEFF BOARDMAN, et al.,            )
                                      )
7                    Plaintiffs,      )
                                      )
8            v.                       ) No. 1:15-cv-00108-MC
                                      )
9   PACIFIC SEAFOOD GROUP, et al.,    )
                                      )
10                   Defendants.      )
    _____)

11

12

13            REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                     EUGENE, OREGON

15               MONDAY, AUGUST 28, 2017

16                    PAGES 1 - 40

17

18

19

20

21                     Kristi L. Anderson
                       Official Federal Reporter
22                     United States Courthouse
                       405 East Eighth Avenue
23                     Eugene, Oregon 97401
                       (541) 431-4112
24                     Kristi_Anderson@ord.uscourts.gov

25

1    APPEARANCES OF COUNSEL:

2    FOR THE PLAINTIFFS:

3    Michael E. Haglund
     Haglund Kelley LLP
4    200 SW Market Street
     Suite 1777
5    Portland, OR 97201
     503-225-0777
6    Fax: 503-225-1257
     Email: mhaglund@hk-law.com

7

8    FOR THE DEFENDANTS:

9    Timothy W. Snider
     Stoel Rives LLP
10   900 SW 5th Avenue
     Suite 2600
11   Portland, OR 97204
     503-294-9557
12   Fax: 503-220-2480
     Email: timothy.snider@stoel.com

13
     Rachel C. Lee
14   Stoel Rives LLP
     900 SW 5th Avenue
15   Suite 2600
     Portland, OR 97204
16   503-294-9403
     Fax: 503-220-2480
17   Email: rclee@stoel.com

18

19

20

21

22

23

24

25

1                          PROCEEDINGS

2                     MONDAY, AUGUST 28, 2017

3              THE COURT:  Okay.  Why don't we have Ms. Pew call

4       the case.  We are on the record.

5              THE CLERK:  Now is the time set for Civil Case

6       15-00108, Boardman, et al. versus Pacific Seafood Group, et

7       al., oral argument on motions to compel.

8              THE COURT:  Okay.  Well, why don't we try to take

9       things up in some order.  And why don't we start with the

10      motion to compel overdue production of documents.

11             My understanding is the Request 15 and 16 have

12      been resolved; is that correct?  Let me check with defense

13      on that.

14             MR. SNIDER:  Your Honor, you did order those

15      produced on the last motion to compel.

16             We don't have any documents, which is the reason

17      for this motion to compel.

18             THE COURT:  With Request 15 and 16, those haven't

19      been turned over?

20             MR. HAGLUND:  This is Mike Haglund.

21             MR. SNIDER:  That's right.

22             MR. HAGLUND:  This is Mike Haglund, Your Honor.

23             We have not produced all of those documents, as

24      some of the appointments we had to -- we don't believe that

25      there are very many documents, but our fishermen clients

1   don't know how to properly or completely access their

2   computers, and we have had some difficulty with vacations

3   and forest fires getting -- some appointments had to be

4   canceled.

5         We now have those scheduled for Thursday, Friday,

6   and next Wednesday.

7         So we'll have those all assembled by the end of

8   next week and produced.

9         The other request that was outstanding, No. 24,

10   those documents were produced today.

11         THE COURT:  Today?

12         MR. HAGLUND:  Yes.

13         THE COURT:  Okay.  So I maybe misunderstood.

14         So 15 and 16 will be produced by the end of next

15   week.  If they are not, I mean, we are getting to the point

16   where I have already ordered it once, so it has to be done

17   by the end of next week.

18         Now, 19 to 24 are specific documents, you know,

19   having to do with -- those are the documents dealing with,

20   you know, potential third-party buyers of Ocean Gold.  And I

21   guess I am not clear.

22         Mr. Haglund, are you claiming that those are

23   privileged or that you don't have them?

24         MR. HAGLUND:  I believe 19 to 24 were -- included

25   those that -- well, 19 to 24, we have -- there were multiple

1    categories where we originally said that responsive

2    documents, if any, will be produced at a mutually convenient

3    time and place.

4          Then when we had actually worked with our clients

5    to determine whether there were any documents in those

6    categories, there were none.  And so we -- it was

7    subsequently pointed out to me that as to No. 24, our firm

8    would have some materials that -- that were similar to what

9    was produced by the third parties pursuant to subpoenas.

10   And we have now produced those documents that are not

11   privileged that our law firm had in its system.

12         But as to 19 through 23, those are categories of

13   requests -- none of the plaintiffs have done business with

14   Ocean Gold, so it should not be a surprise that they don't

15   have any documents that pertain to Ocean Gold.

16         THE COURT:  Okay.  From the defense.

17         MR. SNIDER:  Yeah.  Your Honor, I am just terribly

18   frustrated with this process because we file motions to

19   compel and fight over these things.  Then we are told after

20   winning motions to compel that there are in fact no

21   responsive documents.  So we waste our time going after

22   them.

23         Then we get third party productions revealing that

24   there apparently are responsive documents, which we receive

25   over the noon hour on today's hearing date.

```
1              And I just don't have a lot of confidence -- I

2    mean, I just don't have a lot of confidence that we are

3    getting responsive documents to our requests.  These were

4    promised back in June.  They were promised again on

5    August 21st.  It's August 28th.

6              You know, we are not getting the most basic

7    documents that you have both ordered and that they haven't

8    objected to being produced.

9              And I don't know what to do at this point other

10   than we keep filing motions to compel and keep hearing that

11   they are coming.

12             THE COURT:  Okay.  Well, I mean, does it --

13             MR. HAGLUND:  Your Honor, that's not a fair --

14             THE COURT:  Let me just talk to the defense.

15             I mean, it doesn't necessarily surprise me that

16   the plaintiffs themselves would not have documents

17   regarding, you know, the interests of third parties'

18   purchase of Ocean Gold.

19             It does appear that Mr. Haglund has had some

20   discussions with folks regarding the purchase of Ocean Gold.

21             Are you satisfied that he's turned over everything

22   he has that would be considered non-privileged?

23             MR. SNIDER:  Well, we actually are the ones who

24   identified for Mr. Haglund because we subpoenaed third

25   parties what they were producing when he was reaching out to
```

1   potential third-party buyers about the transaction.

2          But I don't know if the plaintiffs themselves

3   would have similar communications.

4          Our counterclaim is premised on an idea and a

5   theory that one of the plaintiffs, at least, had reached out

6   to Ocean Gold and articulated ulterior bases for the filing

7   of this lawsuit.  Whether that would have been coupled with

8   e-mails, we don't know.

9          At some level do I have to accept Mr. Haglund, if

10  he talked to his clients, diligently searched their e-mails?

11  We don't know if that's happened.  I will take Mr. Haglund's

12  word if he says he's done that.

13         But I also know that with respect to documents

14  that clearly fall within this, we are the ones who found

15  them because other people produced them, and now Mr. Haglund

16  has produced the same documents again today over the lunch

17  hour.

18         MR. HAGLUND:  It's not accurate to say that they

19  are the same documents.  We produced all that were -- all

20  the third-party communications that were not with clients

21  that are privileged today, and there are more documents than

22  I believe were produced pursuant to subpoenas to some third

23  parties.

24         THE COURT:  Okay.  Well, the best I think I can do

25  is order that the plaintiffs, again, search for any

1    documents in their possession that are responsive to

2    Requests 19 through 24 and that that also include those in

3    possession of plaintiffs' counsel.

4            And if there are documents that plaintiffs claim

5    are privileged, whether they are in possession of any

6    individual plaintiff or plaintiffs' counsel, that they be

7    sent sealed to the court for in camera review within 14

8    days.

9            So, again, my concern is there may be some

10   e-mails, some documentation where one of the plaintiffs have

11   had some kind of conversation with a third party about

12   acquisition of Ocean Gold.

13           And Mr. Haglund, I'd just like you to direct the

14   plaintiffs very carefully about what and how to search for

15   those documents, you know, having them review e-mails with

16   certain search terms that would adequately produce them and

17   within 14 days have a response.

18           If there are materials that either your firm is in

19   possession of or a plaintiff is in possession of that you

20   believe is privileged that those are to be sent sealed to

21   the court for in camera review.

22           So that is all due within 14 days.

23           MR. HAGLUND:  Okay.  Just so I understand, so if

24   my office had a communication with a client that pertains to

25   a purchaser for Ocean Gold, I need to submit that in camera?

1          THE COURT:  Yes.  I mean, I am assuming --

2          MR. HAGLUND:  Okay.

3          THE COURT:  -- and I guess -- you know, it's hard

4   for me to determine, without seeing something, you know,

5   what is a client being a plaintiff of in this case or

6   whether it's a third party, whether you want to call them a

7   client or just a third party of interest.

8          It's hard for me to actually understand the

9   relationships until I think I see the documents.  So if you

10  do have documents that you are claiming privilege, the court

11  will review them.

12         MR. HAGLUND:  Okay.

13         THE COURT:  Okay.  Motion to compel answers to

14  interrogatories.  Let me ask --

15         MR. SNIDER:  Your Honor.

16         THE COURT:  Yes.

17         MR. SNIDER:  Oh, I'm sorry.

18         THE COURT:  Go ahead.

19         MR. SNIDER:  Before we switch off the documents,

20  Mr. Haglund, in his response to the motion to compel

21  documents, indicated that he was also voluntarily producing

22  other documents.  These documents were documents you

23  sustained their objection on a motion to compel.

24         We went back to Mr. Haglund and said, look, we are

25  going to move to reconsider because we have the expert basis

1  I think you were looking for on some of the requests in the

2  last motion to compel.

3          We have reached an agreement on the scope of what

4  he would produce to avoid a motion for reconsideration.

5          THE COURT:  Okay.

6          MR. SNIDER:  He indicated, I believe in his

7  filings, he was going to produce those small set of

8  documents by August 21st as well.  That didn't happen.

9          And I'd like to tag on so we don't have to come to

10  you again that those documents we have already agreed and

11  documented between Mr. Haglund and I also be part of this

12  production due next week.

13          THE COURT:  And I probably misunderstood in the

14  filings.  I thought these August 21st documents were already

15  turned over and things had been resolved.

16          But Mr. Haglund, with regard to the documents that

17  you had agreed would be turned over August 21st, can we also

18  agree, then, that those be turned over within -- by the end

19  of next week?

20          MR. HAGLUND:  Yes, with one clarification.  We

21  agreed to produce financials and fish ticket or -- not fish

22  ticket, but settlement -- when a fisherman sells a catch to

23  a processor, there's the fish ticket that gets generated by

24  the processor that goes into the fish ticket database,

25  PacFIN.

```
 1            THE COURT:  Um-hmm.
 2            MR. HAGLUND:  But there's also twice a month
 3    fishermen are paid by the processor with a settlement sheet
 4    that shows more information regarding pricing.
 5            And we have agreed to provide that.  That will all
 6    be assembled as well by next Friday.
 7            The one thing that I assume we might get into
 8    today but relates to the logbook information, and I was not
 9    as knowledgeable as I am now about the concerns that the
10    states have about logbook information being provided.
11            I will be seeing that or somebody from my office
12    will be seeing that once the -- we have these -- once these
13    rescheduled appointments occur in the next week, and we may
14    have to redact some of that depending upon what concerns
15    the -- hopefully we don't have to do that, but I need to
16    address this issue with the clients.
17            THE COURT:  Okay.
18            MR. HAGLUND:  Specifically, to give you a little
19    more background, the problem with the PacFIN database is
20    that the states have -- especially Washington and Oregon,
21    have raised some concerns about the experts accessing the
22    logbook component of the database, which does not address
23    all fisheries.  It only addresses the groundfish trawl
24    component.  So it doesn't cover shrimp or crab.
25            And our expert to date has not accessed that
```

1    component of the PacFIN database.

2          And we understand why the states are concerned

3    about turning over access to essentially what is considered

4    to be proprietary trade secret information, i.e., because

5    this data shows exactly where a fisherman is fishing with

6    GPS info --

7          THE COURT:  Um-hmm.

8          MR. HAGLUND:  -- exactly where a net is let down,

9    exactly when it comes up.

10          There's an awful lot of data that they don't want

11   the states -- or they don't want accessed in this

12   litigation.

13          We are fine with that, but it's an issue that has

14   caused a delay in Pacific Seafood getting access to this

15   data.

16          And we have some concerns about it.  I haven't yet

17   seen it.  Hopefully we are not going to have to redact the

18   plaintiffs in any fashion, but I just wanted to alert the

19   court as to that issue.

20          THE COURT:  Okay.  I know we are kind of jumping

21   into the PacFIN issues, but what's the defense position on

22   this -- specifically this logbook information?

23          MR. SNIDER:  Well, so -- and I agree, that's a

24   bigger issue on our motion to strike the extended case

25   schedule, and I am prepared to talk about that, but for

purposes of this narrow issue that we are talking about

right now, all we are asking for is for the plaintiffs

themselves to produce their own logbook data showing where

they fished.  And that's what I thought we had reached an

agreement on, Mr. Haglund and I, with a few years worth of

that level of data.

I am not asking him to produce other fishermen's

data.  That's a PacFIN issue.

THE COURT:  Right.

MR. SNIDER:  Has to be addressed with the

entities, the government.

So I understand -- I agree with Mr. Haglund saying

that this is an issue with the states.  It is.  But it

shouldn't be an issue, I don't think, with respect to our

request of his individual plaintiffs.

THE COURT:  Yeah, I agree with the defense on

that.  It doesn't make much sense to me -- you know, yes,

PacFIN looks at it as privileged material, and they

certainly have explained why in their motion to quash the

subpoena.

But that's different than the individual litigants

providing the information of where they fished and their

logbook information.  It's under a protective order, so it

is -- I mean, I don't think they can assert a privilege in

the same way the state can in terms of overall PacFIN data

1    of all fishermen.  But with respect to the individual

2    plaintiffs, I think that information needs to be turned

3    over.

4              MR. HAGLUND:  Understood.

5              THE COURT:  Okay.

6              With regard to the interrogatories, let me ask the

7    defense, we have these specific questions in Interrogatory

8    1, 2 through 4, 11, 12, and 19 regarding geographic markets.

9              Does it make more sense to first allow you to

10   depose the plaintiffs' experts?  And I will -- although I

11   may have told you I don't typically allow depositions of

12   experts, if I have told you that, I will in this case.

13             But if you could depose the experts, the

14   plaintiffs have to determine whether these interrogatories

15   can actually be answered by the experts.  And if they aren't

16   adequately answered by the experts, then resubmit the

17   interrogatories even though it would be past the deposition

18   deadline, or excuse me, the discovery deadline.

19             MR. SNIDER:  So that's an interesting proposal,

20   and I appreciate Your Honor allowing us to take depositions

21   of experts in this case.  I think that in a case like this

22   that's appropriate.

23             I would say, though, that our interrogatories --

24   maybe just to back up for a second, our interrogatories,

25   these ones that are at issue here, and I have actually

1    narrowed it down to a few less than you said given the

2    supplemental response we received earlier in August --

3              THE COURT:  Okay.

4              MR. SNIDER:  -- to the interrogatory responses.

5              But this kind of goes to -- I mean, you know, this

6    case is about, at least initially, what is the market and

7    who are the participants in the market and what are the

8    market shares of the participants in the market.

9              And even more fundamentally, do the plaintiffs

10   have any participation in any of this market.  And that's

11   what we are trying to get at through the Interrogatory 1, 3,

12   4 and 9 is we are basically saying identify the market,

13   identify the participants, both the buyers, in this case the

14   processor, and the sellers, the fishermen.  And are the

15   plaintiffs themselves participants in which market and which

16   markets are they participants in.

17             And as you can see from our briefing and the

18   answers and the portions of Dr. Radtke's report, they are,

19   in my opinion, just bobbing and weaving around identifying

20   in a straightforward way what is the market.  Is it five

21   ports?  Is it six ports?  We have got interrogatories saying

22   five.  We have got Radtke saying it's six.  We have got

23   Radtke talking about the entire West Coast.

24             But then at times we have him identifying these

25   smaller port markets.  And we have no indication whether the

1    plaintiffs contend they participate in these markets.

2           And what I think is going to happen is we are

3    going to get these answers and we'll realize that we have

4    been pursuing a case for two years where the remaining

5    plaintiffs, two have agreed to drop their claims, but the

6    remaining plaintiffs don't participate in any market

7    anywhere close to any market that we impacted by the Ocean

8    Gold transaction, which goes to antitrust standing, do these

9    plaintiffs have any standing to complain about this to begin

10   with.

11          And so these interrogatories are pretty basic.  Do

12   we need to depose Mr. Radtke -- or Dr. Radtke to understand,

13   well, how did you arrive at that conclusion, which is the

14   response to Interrogatory No. 1, what is the relevant

15   market --

16          THE COURT:  Right.

17          MR. SNIDER:  -- how did you calculate market

18   share, who did you consider were market participants.  Those

19   are deposition questions, and absolutely the deposition is

20   the right place to drill down on those.

21          But with the basic questions, identify the

22   markets, who the participants are in the market share, I

23   think that's appropriate on an interrogatory.

24          And I can, if you would like, point out, take you

25   through a few of these and point out what we have gotten and

1     why, in our view, it doesn't answer the question -- these

2     very straightforward questions.  I am happy to do that.

3          But I think the deposition is appropriate, but I'd

4     like to start the deposition with an actual articulation of

5     what is the market, and then we can figure out how he got to

6     that conclusion.

7          THE COURT:  Okay.  Mr. Haglund, I would like to,

8     you know, clarify the markets before, you know, a pretrial

9     order.  I mean, either you are going forward with this

10    complaint knowing what the markets are, what the geographic

11    locations are, who's involved.  It just seems like we are

12    spending a huge amount of resources to figure that all out

13    after discovery and at the pretrial order.  There is some

14    burden on you to identify these things as, you know, what is

15    it you are talking about in your complaint.

16         MR. HAGLUND:  Right.  Yes.  And let me just lay

17    out a little background here, Your Honor, which I think is

18    very relevant.

19         Now, it's true that when we answered these

20    interrogatories initially that was in May.  That was before

21    the deadline of June 30 that we had for our expert witness

22    disclosures, which varied somewhat from those interrogatory

23    answers, and we submitted to Pacific supplemental

24    interrogatory answers which are in the record.

25         And for example, when it comes to the -- to No. 1,

1    detailing the relevant markets, including product and

2    geographic limitations, we referred Pacific to Pages 4

3    through 12 in that expert witness disclosure.

4            And with one exception, and I have told counsel in

5    a telephone call that came in just before they replied that

6    we are willing to clarify one apparent discrepancy in that

7    eight pages of discussion.

8            But it -- otherwise, once we make that

9    clarification, it is a very precise recitation of what the

10   relevant markets are and the relationships among them in

11   the -- and part of that's covered in the balance of the 38

12   pages plus 30 some pages of appendices.

13           So there were a couple items that warrant

14   clarification, but we are -- we are in a -- we are very

15   close to, in my view, where we would be in terms of

16   Dr. Radtke's expert witness disclosure, which you don't have

17   in front of you, I don't believe --

18           THE COURT:  No, I don't.

19           MR. HAGLUND:  -- to the quality of and final

20   expert witness disclosure in terms of the opinions expressed

21   and the data.

22           So I think they are greatly exaggerating the issue

23   as it pertains to the interrogatories.  But we are willing

24   to supplement that discrepancy that Ms. Lee identified the

25   other day.

1                There are problems, though, with their contention

2      as to No. 3.  No. 3 is "Identify and detail all of the

3      market participants, including sellers and buyers, in each

4      relevant market."

5                Now, what we did is every seller is -- or every

6      buyer is any processor.  And if you take the whole West

7      Coast and list all of the buyers, you are talking about, you

8      know, several hundred.

9                What we did was provide them with a list of the

10     top 20 in each of these markets.

11               Now, we can go back to PacFIN and give them a list

12     of all processors by market if the court thinks that's

13     necessary.  But they are going to get access to PacFIN.  We

14     haven't done that supplementing because of the -- to this

15     point because of the big issue that arose over whether they

16     are trying to -- their effort to strike our expert reports

17     on the grounds that one of our -- that the expert who

18     actually accessed the data didn't have proper access.  We

19     filed today a copy.  He was on vacation.  I didn't get it

20     until this morning, but he did not have --

21               THE COURT:  I saw it.

22               MR. HAGLUND:  -- it wasn't unauthorized.

23               The other thing they have asked for is list every

24     seller.  Well, every seller is every fisherman.  Why should

25     we have to reproduce a list of every single fisherman that's

1    participated in these markets when they are going to have

2    that access through PacFIN?

3            THE COURT:  Okay.  I do think having the

4    plaintiffs detail every seller is getting unduly burdensome

5    if in fact the defendants can get access to PacFIN.

6            But in terms of defining the markets and the

7    participants and the plaintiffs' actual transactions with

8    Pacific Seafood and Ocean Gold, there needs to be more

9    detail.

10           So I am going to grant the defendants' motion to

11   compel --

12           MR. HAGLUND:  Well, Your Honor, in response to

13   another interrogatory, we have provided a huge spreadsheet

14   that for an entire period through the end of 2016, and the

15   2017 data isn't in PacFIN at this point, we provided, for

16   each one of the vessels that one of the plaintiffs owns or

17   operates, a complete listing for multiple years of the date

18   of a voyage, the date -- you know, the port of delivery, the

19   purchaser for that catch and the poundage and the price.

20           So we have -- as to what our individual plaintiffs

21   were doing during the relevant period except for 2017 where

22   the PacFIN data is not available at this point because of

23   the time lag for the states getting it to the Pacific States

24   Fisheries Information Commission, we have provided all that.

25           What we can provide, if the court requires it, is

1   a list of all of the processors and their market shares for

2   2016 per PacFIN.  But, again, that's available to Pacific

3   once the outstanding issues with the states are resolved.

4            MR. SNIDER:  Your Honor, may I respond to a couple

5   of these things briefly?

6            THE COURT:  Yes.

7            MR. SNIDER:  So this notion that it's all

8   available on PacFIN, some of this data is available on

9   PacFIN.

10           What's not available is how their expert and how

11  the plaintiffs are putting people into different market

12  buckets.  So, for example, Interrogatory No. 1, what are the

13  ports in the, quote, central Oregon market?  List them,

14  state what they are, and then identify the processors who

15  you contend are purchasers in these three seafood markets in

16  this one geographic market.

17           You have identified six.  We'd like that on each

18  one.  Identify who the buyers are, what's the market share.

19  We can crunch our own numbers.  We can look at that, and our

20  experts are hopefully going to be able to do that at some

21  point soon.

22           But we need to know what choices they are making.

23  And particularly, where are the plaintiffs -- what markets

24  do the plaintiffs say they are participating in?

25           And that's Rog 1, 3, and 4.

1           On Rog 9, this is the list of sales the

2    plaintiffs -- where they delivered.  But the problem with

3    that response is they've identified only the delivery port.

4           We have asked for two other pieces of critical

5    information.  What port did they leave from and where did

6    they fish on that fishing trip.  And that's critical to this

7    60- to 100-mile radius argument.  Plaintiffs say that

8    fishermen can't fish more than 60 to 100 miles from where

9    they catch or from their home port.  We have seen data

10   suggesting that even the plaintiffs fish in different ports

11   than their home port.

12          But we would like to know that piece of data on

13   Rog 9.  Two more pieces of information that are critical.

14          And then 17 and 18 are the ones that say dealings

15   with Pacific and Ocean Gold.  So far we have seen zero

16   dealings between Pacific Seafoods and the plaintiffs because

17   we know that -- or Ocean Gold and the plaintiffs.  There's

18   none.

19          So then you go why are these plaintiffs here since

20   they don't deal with us.  And we'll deal with that on a

21   summary judgment motion.

22          But we need clear responses to 1, 3, 4, 9, 17, and

23   18.  It's not too burdensome.

24          THE COURT:  All right.  Mr. Haglund, you are going

25   to have to clarify 1, 3, 4, and 9 by -- I mean, certainly

1    which species exist in each geographic market, which ports

2    are included in each market, these are -- this is your

3    complaint defining the markets.  You need to be more

4    specific.  And I don't think you can just say it's in our

5    expert disclosures.  It's going to be found in PacFIN.  I

6    think you need to be more specific.

7              So you have two weeks to submit a more detailed

8    answer to those Interrogatories 17 and 18, and your clients

9    know what kind of transactions they have had with Pacific

10   Seafood and Ocean Gold up until the present.

11             MR. HAGLUND:  Well, you know, we have explained

12   that -- well, okay.  Understood, Your Honor.  We'll -- a lot

13   of this is just reproducing what's in the reports already

14   with some clarifications.  We'll do it.  No problem.

15             THE COURT:  I know.  You just keep saying look at

16   PacFIN.  Well, you know there's a problem with the

17   defendants looking at PacFIN.

18             MR. HAGLUND:  Okay.  I understand.

19             THE COURT:  Okay.

20             So with regards, then, to the motion to strike

21   plaintiffs' experts or extend discovery, I did review the

22   submissions that just came in from the plaintiffs, including

23   the -- I am not sure what you call it.  It's some sort of

24   agreement or understanding of confidentiality that I believe

25   it was your expert Davis signed with NOAA where he or she

1    was granted access to the PacFIN data, it looks like

2    specifically for this case.

3         So I guess for the defense, my thought is I am

4    having a hard time taking the DOJ's motion to quash -- you

5    know, obviously I want to hear from them, but it's hard to

6    take that too seriously when they have allowed one side

7    access to PacFIN data.

8         It seems to me that either -- I am going to find

9    in the future that that motion to quash is not appropriate.

10   That by granting one side access to the PacFIN data, you

11   know, they have waived their ability to object to the

12   defense obtaining the same data in this case, or, I mean,

13   the other is to require the plaintiffs' experts to disclose

14   all data that they have reviewed, including PacFIN data, to

15   the defendants.  I am just not sure how easy that would be

16   for the experts given the nondisclosure agreement that they

17   have entered into, whether they can physically download and

18   get you that information.

19        So I think you are going to get it ultimately.  I

20   don't think the experts can testify based on data that you

21   are not -- that is not being turned over to you.  I am just

22   not sure the mechanism quite yet of how we are going to get

23   it.

24        So let me hear from the defense first on that.

25        MR. SNIDER:  Well, thank you, Your Honor.  And,

1    you know, we also received, 30 minutes ago, this certificate

2    of understanding that we have been -- I asked for this weeks

3    ago.

4            So we are trying to understand why the states

5    aren't giving us access to things that plaintiffs' experts

6    apparently had access to.

7            And we were also told by the Washington Attorney

8    General, we provided you with the e-mail, they are saying

9    that Mr. Davis violated this authorization.

10           And so -- and then I see this document, and it

11   could be, Your Honor, this document gives him access for

12   20 -- 2009 through 2014, and we know that he went to 2005

13   through '08, and he also did '15 and '16, which this didn't

14   give him authority to do.  So maybe that's what they are

15   upset about.

16           This understanding agreement also says he won't

17   identify specific vessels or processors.  Well, that's the

18   entire exercise he engaged in, in part, was identifying

19   which processors were buying what from whom.  So maybe they

20   are upset about that.

21           So I don't know.  But what I do know, and I agree

22   with Your Honor, is Mr. Davis purportedly had unfettered

23   access to the PacFIN database.  He accessed it before this

24   court authorized him to do it for 2015 and '16.  His records

25   show that he accessed it in March.  And he did all of this

1    without permission.  And that's concerning, I think.

2         But more fundamentally, we need the same stuff.  I

3    mean, under the rules, Rule 26 and Rule 37, he's got to give

4    us what he considered, and we view that as he got to do

5    whatever searches he wanted to do in the PacFIN database to

6    reach the conclusions that he and Dr. Radtke reached.  And

7    thus far -- and it's very frustrating because we thought

8    when we got permission from you in early June this would be

9    a similar experience to the way it was in 2015 --

10             THE COURT:  Um-hmm.

11             MR. SNIDER:  -- where we would get the stuff in a

12   couple weeks, and it's turned into this -- you know, we have

13   got the State of Oregon filing motions.  Everybody's upset.

14   And we are just trying to get those -- the playing field

15   leveled.

16             And I guess my point would be if Your Honor is

17   going to -- if we get the same stuff that plaintiffs had and

18   we get time for our experts, which we contemplated under the

19   schedule, like 60 days, we'd have all this stuff for 60 days

20   for our experts just like they did -- they had longer -- to

21   do our reports.  If we do that, I think it's fair.

22             But if, for whatever reason, the states -- or we

23   don't get the same materials, I think you have got to strike

24   the reports or do -- I don't know what to do.

25             THE COURT:  I don't know if I have a great answer

1      for you.

2                Go ahead, Mr. Haglund.

3                MR. HAGLUND:  Yes.  Let me just respond to a

4      couple points.

5                Number one, we believe that this document that we

6      submitted after receiving it late this morning covered

7      Mr. Davis for this entire case.  The single project refers

8      to this litigation.  This litigation never ended.

9                Mr. Davis has been working for all three states

10     for nearly 30 years.  He is a person who always has had

11     access.  He does sign these specific project reports.

12               But as a practical matter, it doesn't work to --

13     when he has overlapping projects for different governmental

14     agencies, mostly the states, it doesn't work that you

15     just -- he's already got another project authorized at the

16     point where another ends, so he's never destroying the data.

17               If it were -- I mean, we are trying to work with

18     the states, and I am encouraging them to agree to let

19     Mr. Davis simply provide to Pacific the PacFIN data that he

20     accessed.  And we don't have a problem with that provided

21     they say it's okay and there's some indication that it's

22     okay provided it is done without the logbook data.

23               And I think that's an issue Your Honor is going to

24     have to -- that's not data that Mr. Davis accessed for

25     purposes of any of the compilations that he ran.

1    We did timely -- I think it was one day late.  We

2    got an extra day to provide all the work papers.  We did

3    provide all the work papers.

4    The database itself is not a work paper.  And

5    Mr. Davis has provided -- I am not an expert in computer

6    databases, but based upon my discussions with him, the

7    database itself just rests on a computer system pursuant to

8    a download.  It's not a work paper.

9    But if the states will ultimately approve him

10   downloading that to Pacific's experts, we are fine with

11   that, and we, earlier on until this controversy erupted with

12   the states, were open to doing that.

13   But we want Pacific to get the access it needs,

14   and we understand that the schedule will have to be extended

15   because of these unforeseen disruptions in the schedule.

16   THE COURT:  Okay.  Let's -- what if I go ahead

17   today and just order that the plaintiff turn over all PacFIN

18   data relied upon by their expert, understanding,

19   Mr. Haglund, that you might come back and just say, Judge,

20   we understand your order.  We have told the state that the

21   order exists, but they are refusing him access.  We can

22   certainly take up the issue at that time.

23   It may be that the defense can work out something

24   amiable with the -- with DOJ.

25   You know, did DOJ understand that the defense was

1   granted access to this data?

2           MR. HAGLUND:  Yes.  And I think what happened,

3   frankly, I don't know that Pacific made any effort before

4   this year to approach the Pacific States Fisheries

5   Information Commission.

6           And we -- in the prior case, Mr. Davis, just so

7   you have a little bit of background, Mr. Davis had a

8   conflict.  We were not able to engage Mr. Davis in the

9   *Whaley* case.

10          And so what happened was that we got, from Judge

11  Panner, an order pursuant to the Magnuson Act authorizing

12  our experts to get access to this information, and I made a

13  call to Brad Stenberg, who heads this local -- this

14  three-state commission that's here in Portland, told him

15  what had happened, got him a copy of the order, and then he

16  said, well, are you going to want to make requests?  I said

17  yes.  And then he said, well, what about the other side.

18  And I said I believe that there's no doubt they will be

19  asking too.  And he actually at that time asked us, well,

20  let's see if we can work out a joint approach.

21          And so what happened was, and it takes like half a

22  day to download this material, we -- John Stephens and I

23  worked out requests jointly and then the downloads were made

24  to both law firms.

25          In the next case because we had Mr. Davis, we knew

1    he could make his own approach.  Pacific had new counsel by

2    that time, and he could make his own approach to -- to --

3    because he's involved in these databases all the time.

4              And so it was then -- I believe what happened is

5    that then Pacific's making its own independent request of

6    Mr. Stenberg, and for whatever reason, it raised some

7    questions that got out to the states and we are where we are

8    now.

9              We are committed to trying to find a way to

10   resolve it.  We'd have no objection to you ordering us to

11   provide this, and then we'll try to be a catalyst for

12   getting the states to agree that Mr. Davis can provide it

13   to -- to Pacific's experts.

14             But given the circumstance and given the language

15   in this certificate of understanding, we need a court order

16   rather than having Mr. Davis just do it.

17             THE COURT:  All right.  Mr. Snider, are you

18   satisfied if we just do, at least today, a court order

19   requiring Mr. Davis to turn over all data relied upon, and

20   we'll kind of see where that goes?

21             It sounds like you are trying to work out issues

22   with DOJ, and maybe if they are aware of this and this order

23   that maybe -- maybe they are willing to withdraw their

24   motion to quash the subpoena.

25             We can certainly take up issues of privilege if we

1    have to at a hearing later with DOJ present.

2            MR. SNIDER:  Yeah.  So I think a federal court

3    order should mean something.  And I would hope that -- I

4    agree that that's a good first step.

5            I will raise one slight issue, which is

6    Mr. Davis -- there's no steps here.  There's the universe of

7    text and data, and then he made choices and downloaded

8    certain aspects of that, analyzed it, and then issued his

9    information.

10            And so what I understand, he will be able to give

11   us the post-making choices on what he was going to pull down

12   out of PacFIN and analyze.  And that's important to the

13   stuff he considered and relied upon and he needs to produce

14   it.

15            We may still get in an issue with the state on --

16   on -- we'd like to start where Mr. Davis started, which is

17   what do I want to pull here?  I am going to -- you know, he

18   made choices.  He apparently did not do -- chose not to look

19   at the logbooks' data that is electronically collected

20   showing where people fish.  He may not have.  I don't know

21   everything what he did.

22            We want to see that because we think it's very

23   relevant to -- and we have collated for you to see where

24   fishermen go so you can understand their options in

25   understanding where the true markets are here.

1          So we may still have an issue, but I think that

2     that at least crosses the first step, which is get us what

3     their expert looked at.

4          And then I would say right now we have got our

5     expert reports scheduled September 21, and that was off of

6     my motion where I thought this wasn't such a big deal and we

7     would be able to get this stuff, although delayed, but more

8     quickly.

9          We are at a point where we may be filing motions

10    to compel because we have got to get Washington, California

11    in front of you too.  And so we are trying to figure out the

12    best way to tee that up.  So --

13          THE COURT:  Okay.

14          MR. SNIDER:  -- as far as our expert deadline of

15    September 21, can we -- can we strike the deadline and then

16    as soon as we get it we will give you a status report?

17    Something to highlight that we need to get the case schedule

18    adjusted.  I am not sure -- I want to be mindful of that.

19          THE COURT:  That makes the most sense is to strike

20    the deadlines.

21          And Mr. Haglund, maybe you can answer this because

22    I don't understand the correlation between the various

23    states and PacFIN data, but did Mr. Davis have access to

24    just Oregon fishing issues or did the PacFIN data that he

25    reviewed include California and Washington?

1          MR. HAGLUND:  The latter, Your Honor.

2          THE COURT:  Okay.

3          MR. HAGLUND:  Once you get access to the database

4    from -- there's a time lag, '17 data isn't in it, for

5    example, yet, but you get access to all three.

6          Now, Mr. Snider has raised an issue that I have a

7    problem with, and that is he's asking, and I am not even

8    sure whether it's available or not, he's asking to get all

9    the queries that our expert made, many of which may not have

10   been germane to the opinions that our experts have

11   expressed.

12         And I don't -- given the changes in the federal

13   rules regarding expert witness disclosures, you are supposed

14   to provide the material on which you relied.  The fact that

15   a particular computer query might have been made I don't

16   think is covered by that.

17         What we envision they need is they need the

18   database that he accessed.  I don't believe they have a

19   right to learn every single query that he might have made.

20         THE COURT:  Well, I agree.  They have a right to

21   anything that he accessed on which he relied on in forming

22   his opinion.

23         At the same time I think Mr. Snider is correct in

24   that, you know, their experts shouldn't be bound by what

25   your expert thought was relevant.  And their experts may --

```
 1              MR. HAGLUND:  No.

 2              They are going to get the entire database.  I

 3    agree.

 4              THE COURT:  Okay.

 5              MR. HAGLUND:  Everything that he had access to

 6    they are going to get.

 7              THE COURT:  But I guess there are certain things

 8    that either he chose not to access or that he was not

 9    allowed, like talking maybe specifically of the logbooks

10    that were mentioned earlier.

11              MR. HAGLUND:  Well, I do know that he -- he has

12    had because of all these contracts and the specific

13    authorization in the document we filed today, he's had

14    access to everything, and that includes the logbooks.

15              THE COURT:  Okay.  All right.

16              MR. HAGLUND:  And whatever -- you know, whatever

17    he had access to we are going to turn over.

18              MR. SNIDER:  So Your Honor, I just wanted to

19    provide at this point -- I am sorry.  Go ahead.  I didn't

20    mean to interrupt.

21              THE COURT:  No.  Go ahead, Mr. Snider.

22              MR. SNIDER:  I was just going to say that there is

23    a slight issue there.  I mean, we have asked for expert work

24    papers, and under 26(a)(2)(B)(ii), you are supposed to

25    produce the factual data considered by the witness in
```

1     forming an opinion.

2          And if he considered a query, he ran a query and

3     decided to set it aside because he decided he didn't think

4     that was germane, he still considered it.

5          And so what I am picturing is a man sitting down

6     at a computer with access to a bunch of data downloading

7     different spreadsheets and information, choosing some to go

8     with, others not to go with, and then formulating his

9     opinions.

10         And the things he set aside I think he considered

11    and didn't go with, and that absolutely would be subject to

12    questioning as to why he chose, for example, to ignore this

13    species or this market or whatever that might show.

14         THE COURT:  But you will have all that data and be

15    able to use that in deposition to ask him why he didn't

16    consider these things.  And your experts are going to help

17    you formulate those questions.

18         I mean, I guess I don't understand the difference

19    between looking at what he didn't consider and asking him

20    about it versus looking at every query that he put forth in

21    bringing up data.  It seems to me it's all one and the same.

22         MR. SNIDER:  So I guess I see it different, Your

23    Honor.  If he runs Query A and relies on it, he runs Query

24    B, he looks through it and sets it aside and runs Query C

25    and relies on it, I'd like to know he ran Query B and set it

1    aside.  And if we don't know what queries he ran, we never

2    knew that.  We won't know that.  We will just know the ones

3    he chose.  And we can point out the ones he didn't choose,

4    but I would like to point out the ones he chose and then set

5    aside.  I think it's even more interesting maybe.

6              THE COURT:  It might be interesting.

7              Mr. Haglund, how difficult -- I mean, I don't know

8    how many queries an expert runs in these kind of cases in a

9    database.

10             MR. HAGLUND:  Well, I believe, and this is --

11   again, we are probing the limits of my computer knowledge,

12   but from what Mr. Davis has told me, this is not something

13   he can provide.

14             If you look at the rule, it's the facts or data

15   considered by the witness in forming the opinions.  I mean,

16   data -- queries that you make that go nowhere weren't

17   considered in forming your opinions.

18             I just think it's -- let's take it one step at a

19   time.  Let's get access to the information.  Let them take

20   their depositions.  Let's -- I just don't see how trying to

21   find -- I don't even know if it's available.  From what I am

22   told, it's not.

23             THE COURT:  Well --

24             MR. HAGLUND:  He has some pages of compilations.

25             THE COURT:  Well, if it's not available, it's not.

 1    That may be something we can take up at depositions about

 2    whether he has somehow saved these particular queries that

 3    haven't really formed any opinion that he thought relevant.

 4    But if they exist and they are accessible, let's -- let's at

 5    least find out, Mr. Haglund, specifically.  Ask Mr. Davis if

 6    separate database queries are accessible to him that he can

 7    turn those over.  It might be helpful in depositions.  So

 8    let's first find out if they exist.  If it's, you know,

 9    unduly burdensome, it may be that it's just not

10    proportionate to the needs of the case because I am allowing

11    depositions.

12         But let's find out first, and if it's -- if it's

13    easy to access, I will expect you to turn it over.  If it

14    looks like it's not accessible, you are just going to need

15    to inform the defense and we'll go from there.  And it may

16    be that we'll have to --

17         MR. HAGLUND:  Okay.

18         THE COURT:  -- seek more information at

19    depositions about that issue.

20         MR. HAGLUND:  Okay.  Understood, Your Honor.

21         THE COURT:  But my primary concern, Mr. Snider, is

22    that you get access to everything that their experts have

23    access to.  And I am hoping we can do that through this

24    order, and we'll kind of go from there and see what else we

25    need to do.

1          MR. SNIDER:  Thank you, Your Honor.

2          And we'll respond -- I think the states -- Oregon

3    filed a motion.  We'll respond to that, and if we need to

4    get other motions expeditedly set up for you, we want to

5    push this case and get this data and get our experts going.

6          THE COURT:  Okay.

7          MR. SNIDER:  Or they are going but get them the

8    data they need.

9          THE COURT:  We can set that on pretty short

10   notice, I think.

11         MR. SNIDER:  Okay.  Thank you, Your Honor.

12         THE CLERK:  When do you want the status report?

13         THE COURT:  We are going to have a status report

14   on which issue now?  Help me out.

15         THE CLERK:  The deadlines.

16         THE COURT:  Oh.  Yeah.  Well, maybe in terms of

17   just setting the new deadlines, status report maybe what?

18   30 days?  Or do we need more time?

19         MR. SNIDER:  I think in 30 days we should have

20   motions pending and know where we are at.

21         THE COURT:  Okay.  All right.  So status report

22   within 30 days.  If we need to set, you know, expedited

23   hearings on the issues that DOJ has raised, we can do that

24   on very short order.

25         MR. SNIDER:  Okay.  Thank you, Your Honor.

```
 1              THE COURT:  And Mr. Snider, I am assuming you will

 2    let DOJ know that this order now exists.  We'll get it filed

 3    quickly.  The defense is required to turn this information

 4    over, and if they had, I mean, seemingly unfettered access

 5    to the PacFIN database, it seems to me if DOJ knows that,

 6    they may rethink how they are -- their thoughts on providing

 7    it to you.

 8              MR. SNIDER:  We have said they had unfettered

 9    access and we have made these points, but I think an order,

10    and I assume this is on the record.  Maybe we'll get a quick

11    transcript too and see if we can shake this loose that way.

12              THE COURT:  Okay.  All right.  Okay.  Anything

13    else we need to discuss?

14              MR. HAGLUND:  Not for the plaintiffs.

15              MR. SNIDER:  No, Your Honor.  Thank you.

16              THE COURT:  Okay.  Thank you very much.

17              MR. SNIDER:  Okay.  Bye.

18              THE COURT:  Bye-bye.

19              MR. HAGLUND:  Bye.

20              (The proceedings were concluded this

21               28th day of August, 2017.)

22

23

24

25
```

1          I hereby certify that the foregoing is a true and

2     correct transcript of the oral proceedings had in the

3     above-entitled matter, to the best of my skill and ability,

4     dated this 29th day of August, 2017.

5

6     /s/Kristi L. Anderson
      _____
7     Kristi L. Anderson, Certified Realtime Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25