1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF OREGON

3                        Eugene Division

4    JEFF BOARDMAN, DENNIS      )
     RANKIN, ROBERT SEITZ,      )
5    TODD L. WHALEY, LLOYD D.   )  No. 1:15-cv-00108-MC
     WHALEY, SOUTH BAY WILD,    )
6    INC., MISS SARAH, LLC,     )
     and MY FISHERIES, INC.,    )
7                 Plaintiff,    )
           vs.                  )
8    PACIFIC SEAFOOD GROUP,     )
     et al.,                    )
9                 Defendant.    )

10

11

12

13          BE IT REMEMBERED THAT on the 22nd day of

14   March, 2018, the above-entitled matter came on for

15   hearing before the HONORABLE MICHAEL J. McSHANE,

16   District Court Judge.

17

18

19

20

21              DEBORAH COOK, RPR, CSR
               OFFICIAL COURT REPORTER
22              405 East 8th Avenue
                    Suite 2130
23             Eugene, Oregon 97401
                 (541) 431-4162
24         deb@cookcourtreporting.com
           Deborah_Cook@ord.uscourts.gov
25

1                    A P P E A R A N C E S

2        For the Plaintiffs:
                          MICHAEL HAGLUND
3                         MICHAEL KELLEY
                          ERIC BRICKENSTEIN
4                         Haglund Kelley, LLP
                          200 SW Market Street, #1777
5                         Portland, Oregon 97201
                          503.225.0777
6                         Mhaglund@hk-law.com

7      For the Defendant:  Pacific Seafood Group

8                         RANDOLPH FOSTER
                          TIMOTHY SNIDER
9                         RACHEL LEE
                          Stoel Rives, LLP
10                        760 SW 9th Avenue, Ste. 3000
                          Portland Oregon 97205
11                        503.294.9453
                          Randy.foster@stoel.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

Sunday, April 1, 2018, at 2:06 p.m.


1          THE COURT:  Please remain seated.  Thank
2   you, folks.  Good afternoon, everybody.  Let's go ahead
3   and go on the record, and we will call the case.
4          COURT CLERK:  United States District Court
5   for the District of Oregon is now in session; the
6   Honorable Michael J. McShane presiding.
7          Now is the time set for civil case
8   15-00108, Boardman, et al., versus Pacific Seafood, et
9   al., oral argument on a motion.
10         THE COURT:  If I could have the attorneys,
11  starting with plaintiff's counsel, please introduce
12  themselves for the record.
13         MR. HAGLUND:  Michael Haglund, and with me
14  is Mike Kelly, and my associate, Eric Brickenstein.
15         THE COURT:  Thank you, Mr. Haglund.
16         MR. FOSTER:  Your Honor, I am Randy Foster
17  from Stoel Rives, and to my immediate left is Tim
18  Snider, and to his left is Rachel Lee.
19         THE COURT:  It looks like a lot of people.
20  I have a number of clerks who have been helping me on
21  the various cases, so there's also some students from
22  the Anti-Trust Class, University of Oregon who have

DEBORAH COOK, OFFICIAL COURT REPORTER
deborah_cook@ord.uscourts.gov

 1  joined us today.

 2          So I am going to ask you to do a little

 3  old-school style, and that is begin your argument by

 4  describing, not in -- obviously, I've read much of your

 5  briefing.  But if you could describe a little bit, for

 6  the sake of some of our students, your claims, and it

 7  doesn't have to be a lengthy opening argument.  Maybe an

 8  overview of the case, but with regard to this case.

 9          I would like to start with plaintiffs.

10  Mr. Haglund.

11          MR. HAGLUND:  Thank you, Your Honor.  This

12  case originated in January of 2015, arose out of a

13  notice that we received from counsel for Pacific Seafood

14  Group that their client, Pacific Seafood, was

15  negotiating, or in the process of putting together a

16  transaction under which they would acquire Ocean Gold

17  Seafood, and all of its related companies.

18          Ocean Gold Seafoods is the largest seafood

19  processor on the West Coast, headquartered in West Port,

20  Washington.  Its affiliated companies include Ocean

21  Protein, which is the largest fish meal processing plant

22  that processes fish waste, head, guts, et cetera, tails,

23  into fish meal product.  And they also have the largest

24  capacity flash freezing and cold storage facility that's

25  owned by a company called Ocean Cold.

Page 5

1           Now, after receiving that notice, we

2    contacted a variety of our clients, who included the

3    five, I think, class representatives in the Whaley case.

4    We talked to other fishermen, ultimately learned that

5    our clients had grave concerns about the additional

6    concentration in the market that would occur from

7    Pacific Seafood acquiring Ocean Gold Seafood.  We had

8    secured a Temporary Restraining Order in the prior

9    Whaley case against the very same transaction, and

10   thought it was dead.

11           THE COURT:  In terms of transaction, we're

12   just talking about, in this case, the West Port

13   facilities of Ocean Gold?

14           MR. HAGLUND:  That's the entirety of their

15   facilities, I believe, Your Honor.  So we investigated,

16   told Pacific Seafood we objected.  We received

17   information through the fairly sieve-like, dock-talk

18   system that exists on the waterfront that the

19   transaction was about to close, to our surprise.

20           And we called up Pacific Seafood counsel.

21   This is also confirmed in the 9th Circuit opinion, but

22   we called up Pacific Seafood's counsel and asked for a

23   representation that the transaction was not going to

24   close at the end of that week in January -- or the

25   Friday was January 23rd in 2015, when the accounts of

Page 6

1   John Stephens, one of Pacific's lawyers -- or still one

2   of Pacific's lawyers said, No, I don't know.

3           So we then proceeded to file suit to

4   challenge that, or to stop that transaction from

5   occurring.  The very next day secured a TRO from Judge

6   Panner, and then briefed up the -- there were two

7   competing motions then briefed, Your Honor, or filed and

8   briefed; motion to dismiss on the part of Pacific

9   Seafood Group, a motion for preliminary injunction on

10  our part.  Both were heard in Medford before Judge

11  Panner.

12          And ultimately, in March, Judge Panner

13  issued a preliminary injunction.  That subsequently was

14  appealed to the 9th Circuit and argued nine months

15  later, and the case was stayed by Your Honor while it

16  proceeded up to the 9th Circuit.

17          Ultimately, as to the preliminary

18  injunction, the 9th Circuit, in a pretty comprehensive

19  opinion, affirmed the broad preliminary injunction in

20  its entirety.  The case then is back before Your Honor,

21  and we proceed with some discovery.

22          And what, I think, leads us here today is

23  the fact that when we made our expert witness

24  disclosures, our expert, our then-expert, Dr. Hans

25  Radtke, clarified his opinion slightly from that which

Page 7

1   he offered at the time of the preliminary injunction.

2          But before I shift to that part of our

3   argument, Your Honor, I would like to address some of

4   the briefing that came in just in the last ten days

5   where we are charged, I think, with a pretty serious

6   charge, my law firm and the plaintiffs in this case.

7   And I want to address that briefly before turning to the

8   merits of the Pacific Seafood motion.

9          In that briefing that they filed a week ago

10  Monday, they contend that the three plaintiffs in this

11  case are nothing more than straw men who have no

12  interest in what is occurring in this case, and that our

13  firm is colluding with third parties to try to force the

14  sale of the Ocean Gold company and its affiliates at a

15  depressed price.

16         And effectively, it's a very serious charge

17  that we're attempting to commit a fraud on the Court

18  through collusion with third parties disconnected from

19  our true plaintiffs.  And we filed a declaration from

20  every one of the remaining three plaintiffs in the case

21  last Friday, declaration from me, declaration from Ed

22  Backus and Richard Carroll who -- all of them stating --

23  completely rejecting this, I think, extraordinary

24  stretch of a theory by Pacific Seafood Group.  We take

25  our responsibility as officers of the court seriously.

Page 8

1              We -- this case began because -- we had

2      four of the class reps as plaintiffs in this case.  We

3      had three -- we have two remaining.

4              THE COURT:  You are left with three

5      plaintiffs who, quite frankly, it does seem like at

6      times you are a case in search of a plaintiff.  You have

7      three plaintiffs who don't fish for whiting.  That's one

8      of your markets.  You have got two plaintiffs who

9      haven't been to the West Port market in 20 years, and

10     you have one that's been six years.

11             So it is -- and I understand that these

12     allegations have been made about some sort of collusion,

13     but, I mean, that has to do with some counterclaims and

14     discovery on counterclaims that we will get to.

15             But one of the threshold matters is the

16     anti-trust standing and anti-trust injury.  That's where

17     I am starting to struggle with where you are at with

18     your plaintiffs.  Despite their good faith intentions of

19     helping competition in the fishing markets, have these

20     folks actually suffered any anti-trust injury?

21             MR. HAGLUND:  Yes, they have.  And let me

22     explain.  What Pacific Seafood is trying to do at this

23     point, in this case, is preemptively lock the plaintiffs

24     into the statement in Dr. Radtke's expert witness

25     disclosure that was filed -- or was tendered to them on

Page 9

1   June 30th where he states that there are six relevant

2   markets on the West Coast.  And his declarations in the

3   Whaley case, along with Professor Wyland in the Whaley

4   case.  And then his declaration in this case in February

5   of '15 he states the market is the whole West Coast,

6   from Fort Bragg to the Canadian border.

7                  But in his expert witness disclosure that

8   was filed or tendered to the other side on June 30th, he

9   says that there are six relevant geographic markets, but

10  he also says on page 37 of that roughly 50-page

11  disclosure that Pacific Seafood's dominance in the West

12  Port market is six -- or tied to port clusters and the

13  geography tributary to each port cluster.

14                 But he says in that very disclosure that

15  Pacific's dominance in the West Port market will impact

16  markets to the south, to the detriment of fishermen,

17  coastal communities, and the environment.  He also says

18  on the very same page that he reserves the right to

19  supplement his disclosure, based upon ongoing discovery

20  and in response to Pacific Seafood's own expert reports,

21  none of which have been produced yet.

22                 And we have a situation, Your Honor, where

23  in my experience the issue of market definition in an

24  anti-trust case is a very complex one.  And it's complex

25  in its nuance, because you are at the intersection of

1    anti-trust law and the field of economics.  And in the

2    typical case, and we handle quite a number of these, the

3    plaintiff generates its expert witness disclosure, then

4    the defendant does the same, and the plaintiff then

5    responds in some sort of rebuttal filing.

6              And between the time of the initial

7    disclosure by an expert and the final expert witness

8    statement that is generated before -- under the wave of

9    filings that precede an actual trial, you will see

10   clarification, modification, change based upon

11   discovery, and comment from the other side.  We never

12   got through that process.

13             THE COURT:  There's still a threshold

14   matter of anti-trust injury.  And if I am understanding

15   right, you seem to be conceding, maybe your three

16   plaintiffs, represented plaintiffs, may not be injured

17   in the West Port market, but under an umbrella theory --

18             MR. HAGLUND:  No, we're not -- we do not

19   concede that or take that position.  If you look at --

20   just under Dr. Radtke's report, and to the -- because if

21   you treat it as six markets, they still have involvement

22   because they all have Washington permits.  The two

23   fishermen, Lloyd Whaley and Dennis Rankin, who remain in

24   the case, who have Federally issued, through the

25   National Marine Fisheries Service IFQ, or Individual

1    Fishing Quota, share in each of the species, including

2    whiting.  The areas where one can fish as a holder of

3    that quota share for West Coast groundfish is the entire

4    Federally regulated zone where those species abound,

5    which is from the northern half of California to the

6    Canadian border.

7                So Mr. Whaley, for example, he leases out

8    his Federally regulated quota share, so a concentration

9    in one of six markets, or the entirety of the West

10   Coast, depending upon how it ultimately shakes out, as

11   we work through the balance of discovery and Dr. --

12   Professor Sexton issued his disclosure, we have got

13   involvement in those markets.  And the leasing

14   opportunity for both plaintiffs as to quota share is

15   very much impacted by a concentration in whatever market

16   you have got.

17                You also have changes, Your Honor, just in

18   the biological abundance and migration of the species.

19   Dr. Radtke points out that one of the reasons he doesn't

20   identify the Eureka port cluster in Northern California

21   as a whiting market is that it has been four or

22   five years since whiting were down that far south and

23   caught and delivered to Eureka.

24                So you can have changes in biological

25   abundance in the future that have a fisherman who was

1   concentrating in Central Oregon, off the Central Oregon

2   coast, is -- and we cite to the deposition of lead

3   plaintiff, Jeff Boardman, on this very point where he

4   makes the point that he's been -- he's caught shrimp.

5   He's a shrimp specialist off of West Port in the last

6   several years within ten miles of West Port, but steamed

7   south to deliver it to Newport.

8          The reality is that he's got a Washington

9   permit to shrimp, and the biological abundance is there.

10  And he says, I have delivered into West Port in the

11  past.  There's the potential he might deliver to West

12  Port in the future.

13         THE COURT:  How is that different than the

14  case where there's loss of potential for -- you know,

15  cinema owners, or the guy who developed some sort of

16  pest-control device where he planned on going into these

17  markets in the future, and he could certainly get into

18  the markets in the future but the activity wasn't

19  causing him any particular -- the plaintiff in this

20  case, any particular individualized anti-trust injury,

21  other than making it more difficult for his investments

22  in the future?

23         MR. HAGLUND:  Let me make this point, Your

24  Honor.  In this case, in Boardman, there's no claim for

25  damages.  We have had serious interest by the State of

Page 13

1    Oregon in this case with them having filed an amicus

2    brief in support of the injunction back in the spring of

3    2015.  A brief in which they said, This level of

4    additional concentration is presumptively unlawful under

5    the anti-trust laws.

6              But we are solely -- this is a very

7    important distinction going directly to the point you

8    just made.  We are not suing under Section 4 for treble

9    damages of the Clayton Act.  We're suing under Section

10   16, where you are only seeking injunctive relief under

11   Section 16, the standing requirement is much, much

12   lower.  In fact, it drops all the way to just general

13   standing.  Where if you are proximately hurt in any

14   way -- you don't have to be a market participant.

15             The cases you were just referencing are

16   cases where the courts say, if you are going to sue for

17   treble damages, you have to be a participant in the

18   market in which you are seeking damages.  And there are

19   cases that go down that road, but one also has to look

20   carefully at what the Supreme Court has said, especially

21   in this context of Section 16, and in Section 4, which

22   is more applicable to the Seawater case.  And I will get

23   into that in terms of the McCready case when we are

24   arguing that case.

25             But it's really important to recognize that

Page 14

1   all we have to do is show a potential impact on leasing

2   quota share, a potential to have the -- as professor or

3   Dr. Radtke says, concentration and lower prices in one

4   of the six markets, if we are locked into that

5   six-market notion, will negatively impact markets to the

6   south.  That is enough if all you are seeking is

7   injunctive relief.  And there's no question about that,

8   given the way the cases --

9               THE COURT:  How is that different than the

10  umbrella theory, which -- I mean, there's still a

11  question of whether it's applicable to injunctive

12  relief.

13              MR. HAGLUND:  Umbrella theory is one that

14  goes to damages.  And that's one of the issues we had in

15  Whaley.  The umbrella theory is that if competitors are

16  conspiring -- or in the Whaley case, the theory was that

17  Pacific is setting the price.  Everybody else is

18  following.  They have driven the prices down and they

19  are responsible to all fishermen, regardless of who they

20  deliver to, for that price suppression.  That was going

21  to be a major issue on appeal had the case not settled.

22              But the umbrella is that -- the umbrella

23  was Pacific's price setting, allegedly.  And regardless

24  of whether you are delivering to Pacific or somebody

25  else, they are responsible for the umbrella of impact

Page 15

1    that they have.  The umbrella issue has no relevance

2    here whatsoever, because we're not -- we are only

3    seeking to enjoin an illegal acquisition that could

4    impact the industry generally, which we -- our clients

5    participate in.  So the umbrella theory is not

6    applicable in this instance.

7            Now, even if -- the other point I would

8    like to make is that even if we're locked into this

9    six-market notion, which I don't think we are because --

10           THE COURT:  They are locking you in, but I

11   am looking at the language in my order:  New expert

12   witness may not testify in any manner that is contrary

13   to, or inconsistent with, Dr. Radtke's disclosure.

14           It does seems like you are trying to

15   bootstrap his disclosure into really having a new expert

16   testify about a whole new set of markets.  You did tell

17   me there wasn't any problem with Dr. Radtke when he put

18   together the report.  The question is whether he was

19   able to defend his report, if he had the mental acuity

20   to do it, and he said he did not.  And now it appears

21   you are going beyond using your new expert to defend

22   your expert disclosure.  He's doing his own work and

23   he's going to present an entirely different disclosure.

24           MR. HAGLUND:  No.  No, we don't take that

25   position.  And in fact, in your order you noted that

Page 16

1    Dr. Sexton was entitled to do his own work, write up his

2    report in his own way, and it just couldn't be

3    fundamentally inconsistent with Dr. Radtke's

4    conclusions.

5            And when you look at what -- at the total

6    context, which includes a declaration from Dr. Radtke in

7    Whaley, a declaration by Dr. Radtke in this very case.

8    In connection with the preliminary injunction, he was

9    the key declaration.  And he was saying it's a west

10   side market -- West Coast market.  Here, he says it's

11   six, but they influence each other.  And it's his

12   initial disclosure.  He's entitled to -- he would have

13   been entitled, if he stayed in the case, to respond to

14   discovery.

15           For example, just a practical example, when

16   the disclosure was prepared and tendered to the other

17   side, the depositions of the police officers had not

18   occurred, and certain information wasn't even known to

19   us until documentation was produced after that

20   disclosure and the deposition unfolded.  We learned that

21   Dennis Rankin goes significantly farther than 100 miles

22   from the place of his place of business, harvest to

23   deliver, in the wintertime when he has one of his two

24   commercial fishing vessels fishing for petrale and dover

25   sole way up near the Canadian border area, and

1  delivering into Bellingham.

2          Dr. Radtke had no market up there, based on

3  his initial report.  That was one of the areas that was

4  going to have to be addressed in his review of what

5  comes out in discovery.

6          We have to have some play in the works

7  associated with the fact that it was an initial

8  disclosure, subject to change based upon clarification,

9  based upon ongoing discovery, and what the defense

10  experts come up with.

11          So I think you are going to be able to

12  assess, down the road, when Dr. Sexton is in a position

13  to prepare his report, to see whether or not we have

14  somehow tried to take unfair advantage of a substitution

15  that had to take place for reasons over which we had no

16  control.

17          So the other point I would like to make

18  about the -- even if we're stuck with the -- with this

19  effort to handcuff us to six markets, without

20  recognizing the qualifying points made regarding impact

21  on neighboring markets that is in Dr. Radtke's report,

22  that we have a situation here where we have got the

23  impact on the potential leasing opportunity, which

24  Dr. Sexton speaks to.  You have got the changing

25  biological --

1          THE COURT:  But has your client spoken to

2    it?  I am having a hard time -- Rankin can go up

3    100 miles farther than you thought, but when it came to

4    Astoria, he said, I am happy where I am.  Boardman said

5    he would never leave.  So -- I mean, I am still trying

6    to figure out where their injury is, and maybe I am

7    having a harder time understanding the lease agreements

8    that they have, and these quotas that they have, and how

9    that fits into it.  And is discovery going to show us

10   something, that there's actual injury to these folks?

11         MR. HAGLUND:  I will make two points there.

12   If you look at our brief, we quote the statements by our

13   clients as to why they are pursuing this case.  And the

14   reason is that they are very concerned about excess

15   concentration, and it's their view that excess

16   concentration in one area impacts them to the south or

17   to the north.

18         And I think that makes good economic sense,

19   and it's supported by what is in the record now in terms

20   of what Dr. Radtke's disclosure says.  And it's

21   supported in the record now by what Dr. Sexton says

22   about leasing.  And Mr. -- Fisherman Lloyd Whaley

23   pointed -- there's a detailed paragraph in our brief

24   that describes what he does in connection with leasing

25   his quota share.  He can lease his -- he has whiting

Page 19

1    quota shares that he leases, along with all the

2    groundfish species to other fishermen, who then fish

3    that quota.  And they can -- he can lease it to anyone

4    within the West Coast-wide bounds of where that quota

5    share is valid.  So that makes him necessarily impacted

6    in West Port.  And that --

7                THE COURT:  How does the lease work?  Is he

8    leasing on a flat fee or on their catch?

9                MR. HAGLUND:  Basically what happens is

10   they lease on a value per pound.  So if you lease 10,000

11   pounds of your 180,000 pounds of quota share in a given

12   species or two, to a particular fisherman, maybe it's a

13   black cod or sable fish specialist, maybe it's a dover

14   sole, but you are -- there's an exchange.  And you can

15   go through that exchange.  You may find your own

16   lessees, but you basically are paying a fisherman who is

17   going to have that -- you have to assign that quota

18   share to a vessel under the NMFS system.

19                And a fisherman who then has to go out to

20   catch that has to have pounds himself, plus whatever

21   he's leased.  And he can't go over that total.  But it's

22   dollars per pound is how these are negotiated.

23                And if concentration in one market results

24   in a lowering of the average wholesale lease cost for

25   pounds in that particular species, that's how these two

Page 20

1    plaintiffs who can lease, and one of them is leasing all

2    of it, and has been for a few years now, are impacted

3    and suffer specific anti-trust injury backed up by what

4    Professor Sexton says in his declaration.

5                    The other point that I would like to make

6    on anti-trust injury, Your Honor, is that if you look at

7    the McCready case, the plaintiff, the Supreme Court

8    said, was qualified to pursue in that instance, a

9    Section 4 damages case, was not a participant in the

10   market.

11                   In the McCready case, the Blue Shield

12   versus McCready case, Blue Shield conspired with the

13   Psychiatric Society of Virginia to exclude from the

14   insured segments of the medical insurance market

15   psychotherapeutic services that were rendered by

16   clinical psychologists.  The participants in the

17   affected market are psychiatrists and psychologists.

18   The case wasn't brought by psychologists, it was brought

19   by a person who had insurance.

20                   THE COURT:  The consumer.

21                   MR. HAGLUND:  The consumer.  And they were

22   one step removed from the market participants.  And this

23   is more for Front Street in the next case, but it shows

24   that especially where you are -- you don't have to be an

25   actual participant if you are impacted.

Page 21

1          THE COURT:  What is the tuna fisherman case

2     where the fisherman had -- their wages are based on

3     anti-competitive --

4          MR. HAGLUND:  That's the Eagle case.  And

5     it's very distinguishable.  This was an issue in Whaley,

6     as well, Your Honor, because the question there was

7     within the class of Whaley plaintiffs, they clearly --

8     there's no question that whoever owned the boat and was

9     selling the fish to Pacific Seafood, or other processors

10    in that case, was a qualified plaintiff.

11         The Eagle issue is whether or not the

12    captain, who is a nonowner in some instances, and the

13    crew, who -- in the fishing industry everybody works on

14    a percentage of the catch basis.  In other words, you

15    are a joint venturer and that was going to be the

16    argument.  If you are a joint venturer getting, as the

17    captain, say, 40 percent and the crew gets 20 percent,

18    do you qualify as a plaintiff.

19         We don't have this issue in this case.

20    Every single one of these three plaintiffs is completely

21    outside of Eagle, because they are the owners of their

22    boats.  And they are the ones engaged in the sale of

23    these fish to processors on the West Coast.  So Eagle is

24    a nonissue.

25         I guess, in wrapping up, Your Honor, we

Page 22

1    filed this case -- these three fishermen filed this case

2    to stop Pacific Seafood from being able to achieve

3    company town status in West Port, Washington, which is

4    what will happen if they are successful in acquiring the

5    highest capacity processing plant, highest capacity

6    flash freezing and cold storage plant, and highest

7    capacity fish meal plant on the West Coast.

8            We have a significant, very recent decision

9    that we have been waiting -- we're waiting almost a year

10   to learn how it was going to turn out, and it shows that

11   our concerns are legitimate.  I am referring to Judge

12   Gilliam's decision in late February on a case where

13   cross-motions for summary judgment had been pending for

14   over 11 months.

15           That's the case where Pacific Seafood

16   challenged the entire quota system, or more specifically

17   challenged the limits on aggregate quota share holdings

18   as illegal.  And that case -- the opinion is

19   extraordinarily well-written.  We filed it as a status

20   report in connection with the Innovation Marine case,

21   but it also has relevance here.

22           What that record revealed was that Pacific

23   Seafood in Eureka, Northern California, has, according

24   to the paperwork that we have in this -- in the patent

25   data that's part of this case, has over 90 percent, I

1  think it's 96 or 97 percent share of all of the fish

2  deliveries in that Northern California zone.

3          The record in -- and it's in Judge

4  Gilliam's opinion, they were challenging the limits on

5  how much quota share they can own on the grounds that it

6  was impinging their ability to have -- to control as

7  much of their own catch as possible.

8          And that opinion, I think on page 5, notes

9  that Pacific Seafood's plant there, called Pacific

10 Choice, has over half of its groundfish deliveries from

11 just four vessels, every one of which they own.

12         Fortunately, that case came down as we had

13 hoped.  And Judge Gilliam rejected the challenges to the

14 quota share system, to the limits on it.  And upheld the

15 government's -- ruled in favor of the government's --

16 that's the Magnuson Act, which includes a provision that

17 the National Marine Fisheries Service takes steps to

18 ensure that there is not excessive concentration in the

19 quota share allocations.  All of that was affirmed.  The

20 regulations stand in place.

21         And one of the points that we make in our

22 complaint in this case is that one of the reasons this

23 transaction should not be able to go forward is that it

24 would result in Pacific Seafood acquiring additional

25 quota share.  They have had to divest down to -- by a

Page 24

1    very significant share of the amount that they were over

2    these caps.  They had almost five years to do that.

3    They did it just before the deadline and filed suit to

4    challenge the caps.  Those have now been upheld.  They

5    would move their share of the whiting harvest to over

6    21 percent if they were able to obtain the quota share

7    that comes with a purchase of Ocean Gold Seafoods.

8              At this stage of the case where they filed

9    this preemptive and premature motion for summary

10   judgment, where discovery is not yet done, where their

11   experts -- they have yet to prepare their own expert.

12             THE COURT:  Not premature.  I mean,

13   anti-trust injury is a threshold matter.  We're going to

14   be spending a lot of money on a lot of discovery if we

15   can't determine initially if your plaintiffs are the

16   appropriate plaintiffs bringing the suit.  It seems to

17   me now is a better time than later to figure that out.

18             MR. HAGLUND:  And I commend you to look at

19   the cases that I have referenced here in a Section 16

20   Clayton Act injunctive-relief-only case, we are so far

21   over the bar in terms of what we have to demonstrate in

22   order to have anti-trust injury here.

23             THE COURT:  Let me hear from the defense.

24   I would like the response to address anti-trust injury.

25   And not every practice that is going on in the fishing

Page 25

1    industry with regard to this particular -- it seems like

2    a focus really is on whether these are the appropriate

3    plaintiffs, and I would like to focus on that if you

4    could.

5                MR. FOSTER:  Your Honor, did you want me to

6    give a tiny bit of background?

7                THE COURT:  If you would.

8                MR. FOSTER:  Because of our audience, very

9    briefly, some things that aren't apparent from the

10   record.  So one of the things, somewhat interesting

11   facts, maybe, in light of the 9th Circuit opinion, there

12   never was any substantive response on the merits to the

13   motion for preliminary injunction, because the

14   transaction had been withdrawn and terminated,

15   effectively, but yet Judge Panner went ahead and issued

16   an injunction.

17               The primary issue -- and I am giving you

18   our perspective on this.  I am not really trying to

19   argue.  But from our perspective, the primary issue that

20   we were raising on appeal was the issue of the

21   arbitrability of the underlying dispute, and whether the

22   parties' Settlement Agreement in the prior Whaley case

23   compelled the parties to go to an arbitration process to

24   resolve any objections to the transaction, and thereby

25   avoiding where we are today.

1          So that gives you just a little bit of a

2    procedural background that may not be apparent from the

3    record.  So I will get to the heart of it now, Your

4    Honor.  You are correct, the relevant market definition

5    is an absolutely threshold issue that plaintiffs need to

6    address and define early on in the case, because that

7    sets the parameters by which the economic analysis and

8    anti-trust injury are assessed.

9          The definition of the relevant market is

10   not a negotiation between competing expert reports.

11   Plaintiffs file, and basically take a position with

12   respect to the relevant market that they allege, or in

13   this case relevant markets that they allege exist.

14         In this case, there were a myriad of

15   relevant markets defined by both products and geography.

16   The three products at issue are the sale by fishermen,

17   shore side to processors of whiting -- which is a white

18   fish in great abundance, but not all that popular in the

19   US to eat -- shrimp and groundfish, trawl-caught, a

20   specific way of catching groundfish.  And groundfish

21   includes a very wide range of species of fish, some more

22   valuable than others.

23         The plaintiffs, through discovery responses

24   and also in the expert report filed by their expert,

25   defined three product markets in the West Port area --

Page 27

1   West Port, Washington.  Again, those three products that

2   I just described, and they define the West Port market

3   as a separate, independent economic market.  And they

4   also define some other markets down the coast.

5            Now, contrary to what Mr. Haglund said, and

6   perhaps he misspoke, but I thought I heard him say that

7   for a plaintiff or plaintiffs that are only seeking

8   injunctive relief in a Clayton 7 Act claim, or a Section

9   2 claim -- in other words, only seeking relief under

10  Section 16 of the Clayton Act, all they have to prove is

11  just general standing.

12           Well, that isn't the law.  The law, and the

13  Cargo case speaks to this directly, is that anti-trust

14  injury, either direct or actual or threatened, is still

15  an element of a Clayton Act claim, even when the

16  plaintiffs are only seeking injunctive relief.

17           And that injury, anti-trust injury is

18  identical, whether it's a damage case or an injunction

19  case.  And in the injunction environment it simply added

20  threatened injury.  But you still have to prove the

21  presence of injury or the likelihood of injury.

22           Now the 9th Circuit lays out a test -- I

23  won't bore you with reciting it here.  It's in our

24  brief -- but a test and the requirements for proving

25  anti-trust injury.  And as we believe we have

Page 28

1    demonstrated, and frankly we didn't demonstrate it.  The

2    plaintiffs demonstrated it.  The plaintiffs are not

3    market participants in any of the product markets in the

4    defined economically distinct West Port, Washington,

5    market, and they haven't, obviously, been able to

6    identify any injury or threatened injury that they have

7    suffered in that market, because they are not in the

8    market.

9                THE COURT:  What about the leasing issue,

10   quota options?  Does that get them into the market

11   somehow?

12               MR. FOSTER:  Well, Your Honor, I think what

13   that gets is they are now -- and I think you have caught

14   this.  This is kind of a last-minute effort to try to

15   survive here.  There's an allegation that two of the

16   plaintiffs have some quota.  And the theory, I think,

17   that is being advanced is without any evidence in the

18   expert report, or anywhere else, defining what this is

19   all about, we're hearing about it for the first time

20   here, I think the theory is they own some quota.

21               And that quota, the price that they can get

22   in the quota market, which is in selling the quota to

23   somebody who wants to buy it, or leasing the quota for a

24   year or two years, that their ability to recover

25   economic benefits in the quota market will somehow be

1   adversely impacted by what is happening, or what they

2   claim will happen in the West Port product markets.

3           So let me rephrase that again. I think

4   their theory is if this merger acquisition were to go

5   forward, they believe that that will depress the price

6   for fish that is being sold shore side to processors in

7   West Port. And from there, they are claiming that there

8   is this derivative or pass-through impact of some kind

9   to what they might receive for whatever quota they have,

10  to whomever they might lease it, wherever that quota

11  might actually be used.

12          So my -- I apologize for that, that's a

13  little long-winded. But our response to that is that is

14  at best some derivative injury. It is certainly a

15  speculative injury, and it is not an injury that they

16  have produced any evidence of, described in any detail.

17  Most of what you heard today is not in the record when

18  Mr. Haglund was describing about this whole leasing

19  thing.

20          And if you recall some of the testimony in

21  the record from the plaintiffs, I think one of them --

22  it might have been Mr. Whaley, said, I got such little

23  quota, I really didn't pay any attention to it. It's of

24  no importance to me.

25          So none of them deliver to West Port. None

Page 30

1    of them indicated any desire to deliver to West Port --

2    excuse me.  There was, I believe, Mr. Boardman at the

3    preliminary injunction stage suggested that maybe he

4    might want to go to West Port, and that he had plans to

5    do something about going to West Port, but we know that

6    never happened.  And we know, based on their testimony,

7    not only did that never happen, but that these three

8    fishermen, the only fishermen remaining in the case,

9    have -- I will call it committed relationships with

10   specific processors.

11            One of the plaintiffs said, if Bornstein's

12   went out of business or stopped buying from me, I would

13   stop fishing and sell my boat.  The others sell to

14   Hallmark, or VC Fisheries.  And they indicated great

15   loyalty.  And, I mean, I understand that.  You have a

16   relationship with a processor.  You feel they have

17   treated you well.  You have a long-term business

18   relationship, and you work that relationship over the

19   long haul, and you fish for those processors.

20            But that certainly refutes any suggestion

21   that they are likely entrants, planning to enter the

22   West Port product markets that they defined.

23            Now Mr. Haglund mentioned the McCready

24   case.  And I think it's worth chatting about for a

25   little bit, with the Court's indulgence.

1          THE COURT:  These are the psychological

2    services?

3          MR. FOSTER:  It's the psychotherapy

4    services case.  It's the consumer, or the beneficiary

5    under the health insurance plan who wanted to use

6    psychologists for her psychotherapy treatment.  The

7    allegation was that the insurance company and

8    psychiatrists had conspired together to exclude

9    psychologists.

10               And contrary to the suggestion that

11   Mr. Haglund, I think, advanced, the plaintiff in that

12   case was a participant in the market.  She was a

13   consumer of psychotherapy services.  And if that is in

14   any way in doubt in the language of the McCready case, a

15   year later in the Associated General Contractors case,

16   the Supreme Court talked about McCready.

17               And they made it very clear that she was in

18   the market for those services.  She was a market

19   participant directly harmed by the defendant's unlawful

20   conduct.

21               There's some language in McCready that the

22   plaintiff speaks to in passing in its briefing, although

23   I didn't really hear Mr. Haglund talk much about it

24   today.  But I would like to address it, because I think

25   it's, at least maybe on the Court's mind.  And it's this

Page 32

1    language from McCready about inextricably intertwined.

2    I don't think any court -- and I don't think the Supreme

3    Court suggested in that language, that that is a sliding

4    door to open up anti-trust litigation to anyone who has

5    an interest in fisheries, likes fish, went on a boat

6    once.

7              The way that has worked out in terms of how

8    anti-trust injury has worked out in the courts is if you

9    are not a market participant, and you are not, like

10   McCready, a consumer of the services within the market

11   that is in dispute -- there have been a couple of cases

12   which the court, I am sure has seen, because we have

13   cited them, where courts have granted anti-trust

14   standing to very particular plaintiffs.  They are the

15   plaintiffs who have been used by the wrong-doers to

16   accomplish their ill deeds, if you will, in the relevant

17   market.

18             So you will remember the case involving the

19   employee who refused to execute the conspiracy to fix

20   prices.  What the Court found there was that he was a

21   necessary instrument to accomplish the conspiracy, the

22   effect of the conspiracy.  He was the tool by which the

23   conspirators were beating the competitors over the head.

24   And in that rare case the Court found anti-trust

25   standing for that individual because the means by which

Page 33

1    the anti-trust wrongdoing was accomplished.  He was

2    the -- I am trying to remember, there's some colorful

3    language in some of the cases.  But, effectively, he's

4    the fulcrum, or the device, the means by which -- the

5    necessary means by which the conspirators in those cases

6    were able to accomplish the results they were seeking to

7    accomplish, directed to competitors and others in the

8    relevant market.

9                So, I mean, Your Honor, I think that fairly

10   summarizes what we think the state of the law is with

11   respect to anti-trust injury for a Section 16 type

12   plaintiff, seeking injunctive relief only.

13               THE COURT:  What about an argument that --

14   Mr. Haglund's fall-back argument is, okay, maybe these

15   plaintiffs haven't been participating in this particular

16   market, but they participate in other markets.  And by

17   suppressing prices with this acquisition of the West

18   Port market, it will necessarily result in suppression

19   of prices along other markets on the West Coast?

20               MR. FOSTER:  There's a couple of problems

21   with that.  One is an economic problem.  They have

22   alleged independent, separate economic markets.  By

23   definition, those markets are unrelated to each other

24   from pricing influences.  They are separate economic

25   markets, separate participants, separate pricing demand

Page 34

1    and functions.  So it goes counter to the very notion of

2    separate and distinct relevant markets to turn around

3    and say, oh, yeah, but those relevant markets influence

4    each other from a price perspective.  That is how one

5    normally goes about defining a relevant market is

6    through the price effects within a given geography to

7    determine whether or not you have the normal supply and

8    demand and elasticity, and all the other economic

9    analysis that goes on to define that distinct economic

10   market.

11        So No. 1, they have a problem on the

12   economics.  No. 2, that kind of derivative impact has

13   been held not to be within the scope of anti-trust

14   injury; that it is not a direct impact, because of the

15   speculative nature, to some extent, the difficulties of

16   trying to determine --

17        THE COURT:  The response there is, well,

18   that's in the damage context, but we're looking for

19   injunctive relief.

20        MR. FOSTER:  It's the same for injunctive

21   relief, Your Honor.  It's not any different than that,

22   if it has to do with causation and the approximate

23   nature of the injury.  Within the distinct relevant

24   market you can assess direct injury to the participants

25   in those markets.

Page 35

1          When you talk about some markets, two or

2    three and there are multiple markets down the road, then

3    you are getting into this derivative impact that has not

4    been found to be within the scope of anti-trust injury

5    with the way the cases have analyzed them.

6                    THE COURT:  Thank you.  Mr. Haglund --

7                    MR. FOSTER:  Your Honor, I would cite you

8    to the American Ad Management case, which I think that

9    very point is addressed.

10                   MR. HAGLUND:  Couple of quick points in

11   response, Your Honor.

12         Mr. Foster is just not correct when he says

13   that this leasing issue is something that we're putting

14   in -- putting before you today.  On page 7 of our brief

15   we -- and Lloyd Whaley has a declaration we submitted in

16   response to the motion for summary judgment, is --

17   they're excerpts of his deposition -- it's not a small

18   amount.

19         He's earning an average of $110,000 a year

20   leasing his Federal quota share.  And we have this issue

21   covered directly in paragraph 13 of the Sexton

22   declaration, also submitted at that time, where he says,

23   and I quote, To the extent market concentration within

24   the processing sector on the West Coast results in

25   suppression of ex vessel prices for Pacific whiting and

Page 36

1   trawl-caught groundfish, there is no question the value

2   of leasing quota for these same species will be reduced.

3   So there's market participant status, even if we're

4   locked into the six separate and distinct markets, as

5   Mr. Foster emphasizes.

6               But the bottom line is, we're not through

7   discovery yet, Your Honor.  The Pac Fish unavailability,

8   which still hasn't happened, blew up the schedule, as

9   you know.  It would be inconsistent with fundamental

10  fairness here for us to not get the chance to continue

11  with the balance of discovery, finalize our expert

12  reports, and then let you consider whether or not we

13  failed to meet anti-trust injury.

14              On this record, summary judgment can't be

15  granted because we have these factual disputes related

16  to the leasing that is a coast-wide, including West

17  Port, situation.  But the case is still, in terms of

18  discovery, relatively young.  And we need the

19  opportunity to fully define these markets as precisely

20  as happens when you get the chance to have this

21  back-and-forth, the advocacy system --

22              THE COURT:  Haven't you been defining the

23  markets since the Whaley case?  Is it substantially

24  different?  Aren't we talking about the same

25  acquisition?  How much more discovery and litigation --

1          MR. HAGLUND:  Whaley was completely West

2     Coast.  The markets were defined as the West Coast in

3     Whaley.  And that's what Dr. Radtke put in his

4     declaration in this case.  They are claiming that we

5     have defined it clearly and cleanly as six separate

6     markets, and that's not really correct, because although

7     he says that, that's -- he says, Within the West Coast

8     there are these six port cluster dominant markets.  But

9     on another page he references the fact that they impact

10    each other.

11          Mr. Foster is right that the way the law

12    works, you have got to have separate -- you can't have

13    interactions between them.  This is a clarification that

14    will need to be made down the road, consistent with the

15    discovery.  What is happening here is Pacific is trying

16    to exploit -- they saw -- this is very unusual.  I have

17    never seen a situation, Your Honor, where defense

18    counsel asks to take your expert's deposition after

19    their first report, and before they issue their report.

20          This has been done because they saw an

21    opportunity, given what the case law says, on separate

22    and distinct.  You can only look at each one separately.

23    But that's not the totality of what Dr. Radtke says, and

24    it's inconsistent with the record that he has in his

25    first declaration in this very case.

1          With the substitution that has occurred, we

2    can't veer significantly away from what he said, but we

3    have -- we need to have the opportunity, with the

4    benefit of discovery and the benefit of what their

5    experts are going to say, to get our final report done.

6    It's only then that you will be in a position to really

7    assess this anti-trust injury issue.  Thank you.

8          MR. FOSTER:  Your Honor, may I --

9          THE COURT:  Let me ask you a question,

10   Mr. Foster.  You know, if I rule today, I don't let them

11   reopen discovery, and let's say I grant your motion, in

12   terms of litigation strategy, don't you think the 9th

13   Circuit is more likely to get hung up on the discovery

14   issue than they might on the anti-trust, and look at

15   this that the judge didn't look enough at what the

16   extent of this market was?  They didn't have enough

17   information, they should have waited, and then we're

18   going to be back here?

19          MR. FOSTER:  I don't.  I hope that wasn't a

20   surprising answer.

21          THE COURT:  Well, your prediction last time

22   on the 9th Circuit wasn't so great.  And now we're

23   arguing the 9th Circuit over whether Judge Russo or

24   Judge Hogan is deciding the arbitration.

25          I guess, I am asking, is there a reason --

Page 39

1    Courts like to be safe, and we like to, maybe we should

2    let discovery go, and maybe we will be exactly where we

3    are, and I am going to be unconvinced as to market

4    injury.

5              MR. FOSTER:  A little history, and I know

6    you will remember this.  But after Dr. Radtke's report

7    was served, we asked the Court to compel the plaintiffs

8    to respond to discovery, which asked them to define

9    these markets.  And they did so, only after you ordered

10   them to do that.  And these are the markets that they

11   defined, and we are now litigating.  And those are the

12   markets that I believe your order with respect to

13   substitution means that those are the markets that we

14   are litigating.

15             What Mr. Haglund apparently would like to

16   do, and you get a sense of it, he would like a do-over.

17   And the Court hasn't allowed him to do that.  So I don't

18   think any more discovery is needed, because the

19   plaintiffs have defined their markets, and those are

20   what we're litigating.

21             With respect to an anti-trust injury, I

22   have to say I am a bit perplexed, because all the things

23   that we're hearing about today is information that has

24   been exclusively within the purview of the plaintiffs:

25   We were surprised to learn that our client fishes

Page 40

1    100 miles away and travels.  We were surprised to learn

2    that our client has leases and may lease some quota to

3    people.

4              All of this information has been in the

5    control of the plaintiffs.  There's nothing here that

6    has been withheld from them.  And by the way, Your

7    Honor, you may recall on this leasing issue, we had a

8    big discovery fight.  I am trying to remember when it

9    was, but it was awhile ago.  And we asked for production

10   of the plaintiff's leasing quota information, and

11   Mr. Haglund said that is absolutely irrelevant.  And our

12   request for that discovery was denied.

13             THE COURT:  Right.  I do remember that now

14   that you have reminded me.  I think I found it was not

15   necessarily --

16             MR. FOSTER:  None of these details are in

17   the record.  All of them should have been available to

18   Mr. Radtke.  None of them are in his report.  There's

19   nothing in the interrogatory responses that speak to any

20   of these issues.

21             So I think this record is -- this has been

22   expensive to date, Your Honor.  No doubt about it.  And

23   there's nothing more that is going to be developed in

24   this record, I think, that would assist you in

25   understanding whether or not these plaintiffs are

Page 41

1    participants in the marketplace.  And they clearly

2    aren't, based on their own testimony, and very detailed

3    testimony at that.  Thank you.

4              THE COURT:  Thank you both.  I appreciate

5    it.  I will -- I am hoping on all of these cases to get

6    decisions really relatively quickly.  So maybe within

7    days, some may take a week or two.

8              All right.  Which case are we going to move

9    to next?  And if people need to take a break in between,

10   that's perfectly fine.

11             Mr. Haglund.

12             MR. FOSTER:  I will move to the back of the

13   courtroom.

14             (END OF PROCEEDINGS AT 3:06 P.M.)

15

16

17

18

19

20

21

22

23

24

25

Page 42

1    STATE OF OREGON  )

2                          )ss

3    COUNTY OF YAMHILL)

4

5             I, Deborah L. Cook, RPR, Certified Shorthand

6    Reporter in and for the State of Oregon, hereby

7    certify that at said time and place I reported in

8    stenotype all testimony adduced and other oral

9    proceedings had in the foregoing hearing; that

10   thereafter my notes were transcribed by computer-aided

11   transcription by me personally; and that the foregoing

12   transcript contains a full, true and correct record of

13   such testimony adduced and other oral proceedings had,

14   and of the whole thereof.

15             Witness my hand and seal at Dundee, Oregon,

16   this 1st day of April, 2018.

17

18                          /s/ Deborah L. Cook

19                          _____

20                          DEBORAH L. COOK, RPR
                            Certified Shorthand Reporter
21                          OREGON CSR #04-0389
                            CALIFORNIA CSR #12886
22                          WASHINGTON CSR #2992

23

24

25

# #

**#1777** [1] - 2:4

# $

**$110,000** [1] - 35:19

# '

**'15** [1] - 9:5

# 1

**1** [1] - 3:2, 34:11
**10,000** [1] - 19:10
**100** [3] - 16:21, 18:3, 40:1
**11** [1] - 22:14
**13** [1] - 35:21
**15-00108** [1] - 3:11
**16** [6] - 13:10, 13:11, 13:21, 24:19, 27:10, 33:11
**180,000** [1] - 19:11

# 2

**2** [2] - 27:9, 34:12
**20** [2] - 8:9, 21:17
**200** [1] - 2:4
**2015** [3] - 4:12, 5:25, 13:3
**2018** [1] - 3:2
**21** [1] - 24:6
**23rd** [1] - 5:25
**2:06** [1] - 3:2

# 3

**3000** [1] - 2:10
**30th** [2] - 9:1, 9:8
**37** [1] - 9:10
**3:06** [1] - 41:14

# 4

**4** [3] - 13:8, 13:21, 20:9
**40** [1] - 21:17

# 5

**5** [1] - 23:8
**50-page** [1] - 9:10
**503.225.0777** [1] - 2:5
**503.294.9453** [1] - 2:11

# 7

**7** [2] - 27:8, 35:14
**760** [1] - 2:10

# 9

**90** [1] - 22:25
**96** [1] - 23:1
**97** [1] - 23:1
**97201** [1] - 2:5
**97205** [1] - 2:10
**9th** [10] - 2:10, 5:21, 6:14, 6:16, 6:18, 25:11, 27:22, 38:12, 38:22, 38:23

# A

**ability** [2] - 23:6, 28:24
**able** [7] - 15:19, 17:11, 22:2, 23:23, 24:6, 28:5, 33:6
**abound** [1] - 11:4
**absolutely** [2] - 26:5, 40:11
**abundance** [4] - 11:18, 11:25, 12:9, 26:18
**accomplish** [4] - 32:16, 32:21, 33:6, 33:7
**accomplished** [1] - 33:1
**according** [1] - 22:23
**accounts** [1] - 5:25
**achieve** [1] - 22:2
**acquire** [1] - 4:16
**acquiring** [3] - 5:7, 22:4, 23:24
**acquisition** [4] - 15:3, 29:4, 33:17, 36:25
**Act** [6] - 13:9, 23:16, 24:20, 27:8, 27:10, 27:15
**activity** [1] - 12:18
**actual** [4] - 10:9, 18:10, 20:25, 27:14
**acuity** [1] - 15:19
**Ad** [1] - 35:8
**added** [1] - 27:19
**additional** [3] - 5:5, 13:4, 23:24
**address** [5] - 7:3, 7:7, 24:24, 26:6, 31:24
**addressed** [2] - 17:4, 35:9
**advanced** [2] - 28:17,

31:11
**advantage** [1] - 17:14
**adversely** [1] - 29:1
**advocacy** [1] - 36:21
**affected** [1] - 20:17
**affiliated** [1] - 4:20
**affiliates** [1] - 7:14
**affirmed** [2] - 6:19, 23:19
**afternoon** [1] - 3:5
**aggregate** [1] - 22:17
**ago** [2] - 7:9, 40:9
**Agreement** [1] - 25:22
**agreements** [1] - 18:7
**ahead** [2] - 3:5, 25:15
**al** [2] - 3:11, 3:12
**allegation** [2] - 28:15, 31:7
**allegations** [1] - 8:12
**allege** [2] - 26:12, 26:13
**alleged** [1] - 33:22
**allegedly** [1] - 14:23
**allocations** [1] - 23:19
**allowed** [1] - 39:17
**almost** [2] - 22:9, 24:2
**American** [1] - 35:8
**amicus** [1] - 13:1
**amount** [2] - 24:1, 35:18
**analysis** [2] - 26:7, 34:9
**analyzed** [1] - 35:5
**answer** [1] - 38:20
**anti** [30] - 8:16, 8:20, 9:24, 10:1, 10:14, 12:20, 13:5, 20:3, 20:6, 21:3, 24:13, 24:22, 24:24, 26:8, 27:13, 27:17, 27:25, 32:4, 32:8, 32:13, 32:24, 33:1, 33:11, 34:13, 35:4, 36:13, 38:7, 38:14, 39:21
**Anti** [1] - 3:25
**anti-competitive** [1] - 21:3
**anti-trust** [29] - 8:16, 8:20, 9:24, 10:1, 10:14, 12:20, 13:5, 20:3, 20:6, 24:13, 24:22, 24:24, 26:8, 27:13, 27:17, 27:25, 32:4, 32:8, 32:13, 32:24, 33:1, 33:11, 34:13, 35:4, 36:13, 38:7, 38:14,

39:21
**Anti-Trust** [1] - 3:25
**apologize** [1] - 29:12
**apparent** [2] - 25:9, 26:2
**appeal** [2] - 14:21, 25:20
**appealed** [1] - 6:14
**applicable** [2] - 13:22, 14:11, 15:6
**appreciate** [1] - 41:4
**appropriate** [2] - 24:16, 25:2
**approximate** [1] - 34:22
**April** [1] - 3:2
**arbitrability** [1] - 25:21
**arbitration** [2] - 25:23, 38:24
**area** [3] - 16:25, 18:16, 26:25
**areas** [2] - 11:2, 17:3
**argue** [1] - 25:19
**argued** [1] - 6:14
**arguing** [2] - 13:24, 38:23
**argument** [7] - 3:12, 4:3, 4:7, 7:3, 21:16, 33:13, 33:14
**arose** [1] - 4:12
**assess** [3] - 17:12, 34:24, 38:7
**assessed** [1] - 26:8
**assign** [1] - 19:17
**assist** [1] - 40:24
**associate** [1] - 3:17
**Associated** [1] - 31:15
**associated** [1] - 17:7
**Astoria** [1] - 18:4
**AT** [1] - 41:14
**attempting** [1] - 7:17
**attention** [1] - 29:23
**attorneys** [1] - 3:13
**audience** [1] - 25:8
**available** [1] - 40:17
**Avenue** [1] - 2:10
**average** [2] - 19:24, 35:19
**avoiding** [1] - 25:25
**awhile** [1] - 40:9

# B

**back-and-forth** [1] - 36:21
**backed** [1] - 20:3

**background** [2] - 25:6, 26:2
**Backus** [1] - 7:22
**balance** [2] - 11:11, 36:11
**bar** [1] - 24:21
**based** [8] - 9:19, 10:10, 17:2, 17:8, 17:9, 21:2, 30:6, 41:2
**basis** [1] - 21:14
**beating** [1] - 32:23
**began** [1] - 8:1
**begin** [1] - 4:3
**Bellingham** [1] - 17:1
**beneficiary** [1] - 31:4
**benefit** [2] - 38:4
**benefits** [1] - 28:25
**best** [1] - 29:14
**better** [1] - 24:17
**between** [4] - 10:6, 26:10, 37:13, 41:9
**beyond** [1] - 15:21
**big** [1] - 40:8
**biological** [4] - 11:18, 11:24, 12:9, 17:25
**bit** [5] - 4:5, 25:6, 26:1, 30:25, 39:22
**black** [1] - 19:13
**blew** [1] - 36:8
**Blue** [2] - 20:11, 20:12
**boardman** [1] - 30:2
**Boardman** [4] - 3:11, 12:3, 12:24, 18:4
**boat** [3] - 21:8, 30:13, 32:5
**boats** [1] - 21:22
**bootstrap** [1] - 15:15
**border** [3] - 9:6, 11:6, 16:25
**bore** [1] - 27:23
**Bornstein's** [1] - 30:11
**bottom** [1] - 36:6
**bounds** [1] - 19:4
**Bragg** [1] - 9:6
**break** [1] - 41:9
**BRICKENSTEIN** [1] - 2:3
**Brickenstein** [1] - 3:17
**brief** [6] - 13:2, 13:3, 18:12, 18:23, 27:24, 35:14
**briefed** [3] - 6:6, 6:7, 6:8
**briefing** [4] - 4:5, 7:4, 7:9, 31:22
**briefly** [2] - 7:7, 25:9

**bringing** [1] - 24:16
**broad** [1] - 6:19
**brought** [2] - 20:18
**business** [3] - 16:22, 30:12, 30:17
**buy** [1] - 28:23
**buying** [1] - 30:12

## C

**California** [4] - 11:5, 11:20, 22:23, 23:2
**Canadian** [2] - 9:6, 11:6, 16:25
**capacity** [4] - 4:24, 22:5, 22:7
**caps** [2] - 24:2, 24:4
**captain** [2] - 21:12, 21:17
**carefully** [1] - 13:20
**Cargo** [1] - 27:13
**Carroll** [1] - 7:22
**case** [79] - 3:6, 3:10, 4:8, 4:12, 5:3, 5:9, 5:12, 6:15, 6:20, 7:6, 7:11, 7:12, 7:20, 8:1, 8:2, 8:6, 8:23, 9:3, 9:4, 9:24, 10:2, 10:24, 12:14, 12:20, 12:24, 13:1, 13:22, 13:23, 13:24, 14:16, 14:21, 16:7, 16:13, 18:13, 20:7, 20:9, 20:11, 20:12, 20:18, 20:23, 21:1, 21:4, 21:10, 21:19, 22:1, 22:12, 22:15, 22:18, 22:20, 22:25, 23:12, 23:22, 24:8, 24:20, 25:22, 26:6, 26:13, 26:14, 27:13, 27:18, 27:19, 30:8, 30:24, 31:4, 31:12, 31:14, 31:15, 32:18, 32:24, 35:8, 36:17, 36:23, 37:4, 37:21, 37:25, 41:8
**cases** [11] - 3:24, 13:15, 13:16, 13:19, 14:8, 24:19, 32:11, 33:3, 33:5, 35:5, 41:5
**catch** [4] - 19:8, 19:20, 21:14, 23:7
**catching** [1] - 26:20
**caught** [5] - 11:23, 12:4, 26:19, 28:13, 36:1
**causation** [1] - 34:22
**causing** [1] - 12:19

**Central** [2] - 12:1
**certain** [1] - 16:18
**certainly** [3] - 12:17, 29:14, 30:20
**cetera** [1] - 4:22
**challenge** [2] - 6:4, 24:4
**challenged** [2] - 22:16, 22:17
**challenges** [1] - 23:13
**challenging** [1] - 23:4
**chance** [2] - 36:10, 36:20
**change** [2] - 10:10, 17:8
**changes** [2] - 11:17, 11:24
**changing** [1] - 17:24
**charge** [2] - 7:6, 7:16
**charged** [1] - 7:5
**chatting** [1] - 30:24
**Choice** [1] - 23:10
**cinema** [1] - 12:15
**Circuit** [9] - 5:21, 6:14, 6:16, 6:18, 25:11, 27:22, 38:13, 38:22, 38:23
**cite** [2] - 12:2, 35:7
**cited** [1] - 32:13
**civil** [1] - 3:10
**claim** [5] - 12:24, 27:8, 27:9, 27:15, 29:2
**claiming** [1] - 29:7, 37:4
**claims** [1] - 4:6
**clarification** [3] - 10:10, 17:8, 37:13
**clarified** [1] - 6:25
**class** [3] - 5:3, 8:2, 21:7
**Class** [1] - 3:25
**Clayton** [5] - 13:9, 24:20, 27:8, 27:10, 27:15
**cleanly** [1] - 37:5
**clear** [1] - 31:17
**clearly** [3] - 21:7, 37:5, 41:1
**CLERK** [1] - 3:7
**clerks** [1] - 3:23
**client** [4] - 4:14, 18:1, 39:25, 40:2
**clients** [4] - 5:2, 5:5, 15:4, 18:13
**clinical** [1] - 20:16
**close** [2] - 5:19, 5:24

**cluster** [3] - 9:13, 11:20, 37:8
**clusters** [1] - 9:12
**coast** [3] - 12:2, 27:4, 36:16
**Coast** [14] - 4:19, 9:2, 9:5, 11:3, 11:10, 16:10, 19:4, 21:23, 22:7, 33:19, 35:24, 37:2, 37:7
**coast-wide** [1] - 36:16
**Coast-wide** [1] - 19:4
**coastal** [1] - 9:17
**cod** [1] - 19:13
**cold** [2] - 4:24, 22:6
**Cold** [1] - 4:25
**colluding** [1] - 7:13
**collusion** [2] - 7:18, 8:12
**colorful** [1] - 33:2
**commend** [1] - 24:18
**comment** [1] - 10:11
**commercial** [1] - 16:24
**commit** [1] - 7:17
**committed** [1] - 30:9
**communities** [1] - 9:17
**companies** [2] - 4:17, 4:20
**company** [4] - 4:25, 7:14, 22:3, 31:7
**compel** [1] - 39:7
**compelled** [1] - 25:23
**competing** [2] - 6:7, 26:10
**competition** [1] - 8:19
**competitive** [1] - 21:3
**competitors** [3] - 14:15, 32:23, 33:7
**complaint** [1] - 23:22
**completely** [3] - 7:23, 21:20, 37:1
**complex** [1] - 9:24
**comprehensive** [1] - 6:18
**concede** [1] - 10:19
**conceding** [1] - 10:15
**concentrating** [1] - 12:1
**concentration** [10] - 5:6, 11:8, 11:15, 13:4, 14:3, 18:15, 18:16, 19:23, 23:18, 35:23
**concerned** [1] - 18:14
**concerns** [2] - 5:5, 22:11
**conclusions** [1] - 16:4
**conduct** [1] - 31:20

**confirmed** [1] - 5:21
**connection** [3] - 16:8, 18:24, 22:20
**consider** [1] - 36:12
**consistent** [1] - 37:14
**conspiracy** [3] - 32:19, 32:21, 32:22
**conspirators** [2] - 32:23, 33:5
**conspired** [2] - 20:12, 31:8
**conspiring** [1] - 14:16
**consumer** [5] - 20:20, 20:21, 31:4, 31:13, 32:10
**contacted** [1] - 5:2
**contend** [1] - 7:10
**context** [3] - 13:21, 16:6, 34:18
**continue** [1] - 36:10
**Contractors** [1] - 31:15
**contrary** [3] - 15:12, 27:5, 31:10
**control** [4] - 12:16, 17:16, 23:6, 40:5
**correct** [3] - 26:4, 35:12, 37:6
**cost** [1] - 19:24
**counsel** [5] - 3:14, 4:13, 5:20, 5:22, 37:18
**counter** [1] - 34:1
**counterclaims** [2] - 8:13, 8:14
**couple** [3] - 32:11, 33:20, 35:10
**COURT** [28] - 3:4, 3:7, 3:13, 3:18, 3:22, 5:11, 8:4, 10:13, 12:13, 14:9, 15:10, 18:1, 19:7, 20:20, 21:1, 24:12, 24:23, 25:7, 28:9, 31:1, 33:13, 34:17, 35:6, 36:22, 38:9, 38:21, 40:13, 41:4
**court** [3] - 7:25, 32:2, 32:12
**Court** [10] - 3:7, 7:17, 13:20, 20:7, 31:16, 32:3, 32:20, 32:24, 39:7, 39:17
**Court's** [2] - 30:25, 31:25
**courtroom** [1] - 41:13
**courts** [3] - 13:16, 32:8, 32:13
**Courts** [1] - 39:1

**covered** [1] - 35:21
**crew** [2] - 21:13, 21:17
**cross** [1] - 22:13
**cross-motions** [1] - 22:13

## D

**damage** [2] - 27:18, 34:18
**damages** [6] - 12:25, 13:9, 13:17, 13:18, 14:14, 20:9
**data** [1] - 22:25
**date** [1] - 40:22
**days** [2] - 7:4, 41:7
**dead** [1] - 5:10
**deadline** [1] - 24:3
**deciding** [1] - 38:24
**decision** [2] - 22:8, 22:12
**decisions** [1] - 41:6
**declaration** [12] - 7:19, 7:21, 9:4, 16:6, 16:7, 16:9, 20:4, 35:15, 35:22, 37:4, 37:25
**declarations** [1] - 9:2
**deeds** [1] - 24:3
**defend** [2] - 15:19, 15:21
**Defendant** [1] - 2:7
**defendant** [1] - 10:4
**defendant's** [1] - 31:19
**defense** [2] - 17:9, 24:23, 37:17
**define** [6] - 26:6, 27:2, 27:4, 34:9, 36:19, 39:8
**defined** [8] - 26:15, 26:25, 28:4, 30:22, 37:2, 37:5, 39:11, 39:19
**defining** [3] - 28:18, 34:5, 36:22
**definition** [4] - 9:23, 26:4, 26:9, 33:23
**deliver** [6] - 12:7, 12:11, 14:20, 16:23, 29:25, 30:1
**delivered** [2] - 11:23, 12:10
**deliveries** [2] - 23:2, 23:10
**delivering** [2] - 14:24, 17:1
**demand** [2] - 33:25, 34:8
**demonstrate** [2] -

24:21, 28:1
**demonstrated** [2] - 28:1, 28:2
**denied** [1] - 40:12
**Dennis** [2] - 10:23, 16:21
**deposition** [4] - 12:2, 16:20, 35:17, 37:18
**depositions** [1] - 16:17
**depress** [1] - 29:5
**depressed** [1] - 7:15
**derivative** [4] - 29:8, 29:14, 34:12, 35:3
**describe** [1] - 4:5
**described** [2] - 27:2, 29:16
**describes** [1] - 18:24
**describing** [2] - 4:4, 29:18
**desire** [1] - 30:1
**despite** [1] - 8:18
**detail** [1] - 29:16
**detailed** [2] - 18:23, 41:2
**details** [1] - 40:16
**determine** [3] - 24:15, 34:7, 34:16
**detriment** [1] - 9:16
**developed** [2] - 12:15, 40:23
**device** [2] - 12:16, 33:4
**different** [5] - 12:13, 14:9, 15:23, 34:21, 36:24
**difficult** [1] - 12:21
**difficulties** [1] - 34:15
**direct** [3] - 27:14, 34:14, 34:24
**directed** [1] - 33:7
**directly** [4] - 13:7, 27:13, 31:19, 35:21
**disclosure** [17] - 8:25, 9:7, 9:11, 9:14, 9:19, 10:3, 10:7, 11:12, 15:13, 15:15, 15:22, 15:23, 16:12, 16:16, 16:20, 17:8, 18:20
**disclosures** [1] - 6:24
**disconnected** [1] - 7:18
**discovery** [25] - 6:21, 8:14, 9:19, 10:11, 11:11, 16:14, 17:5, 17:9, 18:9, 24:10, 24:14, 26:23, 36:7, 36:11, 36:18, 36:25,

37:15, 38:4, 38:11, 38:13, 39:2, 39:8, 39:18, 40:8, 40:12
**dismiss** [1] - 6:8
**dispute** [2] - 25:21, 32:11
**disputes** [1] - 36:15
**distinct** [6] - 28:4, 34:2, 34:9, 34:23, 36:4, 37:22
**distinction** [1] - 13:7
**distinguishable** [1] - 21:5
**District** [2] - 3:7, 3:8
**divest** [1] - 23:25
**do-over** [1] - 39:16
**dock** [1] - 5:17
**dock-talk** [1] - 5:17
**documentation** [1] - 16:19
**doers** [1] - 32:15
**dollars** [1] - 19:22
**dominance** [2] - 9:11, 9:15
**dominant** [1] - 37:8
**done** [2] - 24:10, 37:20, 38:5
**door** [1] - 32:4
**doubt** [2] - 31:14, 40:22
**dover** [2] - 16:24, 19:13
**down** [9] - 11:22, 13:19, 14:18, 17:12, 23:12, 23:25, 27:4, 35:2, 37:14
**Dr** [21] - 6:24, 8:24, 10:20, 11:11, 11:19, 14:3, 15:13, 15:17, 16:1, 16:3, 16:6, 16:7, 17:2, 17:12, 17:21, 17:24, 18:20, 18:21, 37:3, 37:23, 39:6
**driven** [1] - 14:18
**drops** [1] - 13:12

---

## E

**Eagle** [4] - 21:4, 21:11, 21:21, 21:23
**early** [1] - 26:6
**earning** [1] - 35:19
**eat** [1] - 26:19
**economic** [9] - 18:18, 26:7, 27:3, 28:25, 33:21, 33:22, 33:24, 34:8, 34:9

**economically** [1] - 28:4
**economics** [2] - 10:1, 34:12
**Ed** [1] - 7:21
**effect** [1] - 32:22
**effectively** [3] - 7:16, 25:15, 33:3
**effects** [1] - 34:6
**effort** [2] - 17:19, 28:14
**either** [1] - 27:14
**elasticity** [1] - 34:8
**element** [1] - 27:15
**emphasizes** [1] - 36:5
**employee** [1] - 32:19
**end** [1] - 5:24
**END** [1] - 41:14
**engaged** [1] - 21:22
**enjoin** [1] - 15:3
**ensure** [1] - 23:18
**enter** [1] - 30:21
**entire** [2] - 11:3, 22:16
**entirely** [1] - 15:23
**entirety** [3] - 5:14, 6:20, 11:9
**entitled** [3] - 16:1, 16:12, 16:13
**entrants** [1] - 30:21
**environment** [2] - 9:17, 27:19
**ERIC** [1] - 2:3
**Eric** [1] - 3:17
**especially** [2] - 13:20, 20:24
**et** [3] - 3:11, 4:22
**Eureka** [1] - 11:20, 11:23, 22:23
**evidence** [2] - 28:17, 29:16
**ex** [1] - 35:25
**exactly** [1] - 39:2
**example** [3] - 11:7, 16:15
**excerpts** [1] - 35:17
**excess** [2] - 18:14, 18:15
**excessive** [1] - 23:18
**exchange** [2] - 19:14, 19:15
**exclude** [1] - 20:13, 31:8
**exclusively** [1] - 39:24
**excuse** [1] - 30:2
**execute** [1] - 32:19
**exist** [1] - 26:13
**exists** [1] - 5:18

**expensive** [1] - 40:22
**experience** [1] - 9:23
**expert** [19] - 6:23, 6:24, 8:24, 9:7, 9:20, 10:3, 10:7, 15:11, 15:15, 15:21, 15:22, 24:11, 26:10, 26:24, 28:18, 36:11
**expert's** [1] - 37:18
**experts** [3] - 17:10, 24:11, 38:5
**explain** [1] - 8:22
**exploit** [1] - 37:16
**extent** [3] - 34:15, 35:23, 38:16
**extraordinarily** [1] - 22:19
**extraordinary** [1] - 7:23

---

## F

**facilities** [2] - 5:13, 5:15
**facility** [1] - 4:24
**fact** [5] - 6:23, 13:12, 15:25, 17:7, 37:9
**facts** [1] - 25:11
**factual** [1] - 36:15
**failed** [1] - 36:13
**fairly** [2] - 5:17, 33:9
**fairness** [1] - 36:10
**faith** [1] - 8:18
**fall** [1] - 33:14
**fall-back** [1] - 33:14
**far** [2] - 11:22, 24:20
**favor** [1] - 23:15
**February** [2] - 9:4, 22:12
**Federal** [1] - 35:20
**Federally** [3] - 10:24, 11:4, 11:8
**fee** [1] - 19:8
**few** [1] - 20:2
**field** [1] - 10:1
**fight** [1] - 40:8
**figure** [2] - 18:6, 24:17
**file** [2] - 6:3, 26:11
**filed** [12] - 6:7, 7:9, 7:19, 8:25, 9:8, 13:1, 22:1, 22:19, 24:3, 24:8, 26:24
**filing** [1] - 10:5
**filings** [1] - 10:9
**final** [2] - 10:7, 38:5
**finalize** [1] - 36:11

**fine** [1] - 41:10
**firm** [2] - 7:6, 7:13
**first** [3] - 28:19, 37:19, 37:25
**fish** [16] - 4:21, 4:22, 4:23, 8:7, 11:2, 19:2, 19:13, 21:9, 21:23, 22:7, 23:1, 26:18, 26:21, 29:6, 30:19, 32:5
**Fish** [1] - 36:7
**Fisheries** [3] - 10:25, 23:17, 30:14
**fisheries** [1] - 32:5
**Fisherman** [1] - 18:22
**fisherman** [6] - 11:25, 19:12, 19:16, 19:19, 21:1, 21:2
**fishermen** [9] - 5:4, 9:16, 10:23, 14:19, 19:2, 22:1, 26:16, 30:8
**fishes** [1] - 29:25
**Fishing** [1] - 11:1
**fishing** [6] - 8:19, 16:24, 21:13, 24:25, 30:13
**fits** [1] - 18:9
**five** [3] - 5:3, 11:22, 24:2
**fix** [1] - 32:19
**flash** [2] - 4:24, 22:6
**flat** [1] - 19:8
**focus** [3] - 25:2, 25:3, 8:20, 18:10
**folks** [3] - 3:5, 8:20, 18:10
**following** [1] - 14:18
**force** [1] - 7:13
**Fort** [1] - 9:6
**forth** [1] - 36:21
**fortunately** [1] - 23:12
**forward** [2] - 23:23, 29:5
**Foster** [1] - 3:19
**FOSTER** [14] - 2:8, 3:19, 25:5, 25:8, 28:12, 31:3, 33:20, 34:20, 35:7, 38:8, 38:19, 39:5, 40:16, 41:12
**foster** [4] - 35:12, 36:5, 37:11, 38:10
**four** [3] - 8:2, 11:21, 23:11
**frankly** [2] - 8:5, 28:1
**fraud** [1] - 7:17
**freezing** [2] - 4:24, 22:6
**Friday** [2] - 5:25, 7:21

**Front** [1] - 20:23
**fulcrum** [1] - 33:4
**fully** [1] - 36:19
**functions** [1] - 34:1
**fundamental** [1] - 36:9
**fundamentally** [1] - 16:3
**future** [5] - 11:25, 12:12, 12:17, 12:18, 12:22

## G

**General** [1] - 31:15
**general** [2] - 13:12, 27:11
**generally** [1] - 15:4
**generated** [1] - 10:8
**generates** [1] - 10:3
**geographic** [1] - 9:9
**geography** [2] - 9:13, 26:15, 34:6
**Gilliam** [1] - 23:13
**Gilliam's** [2] - 22:12, 23:4
**given** [4] - 14:8, 19:11, 34:6, 37:21
**Gold** [6] - 4:16, 4:18, 5:7, 5:13, 7:14, 24:7
**government's** [2] - 23:15
**grant** [1] - 38:11
**granted** [2] - 32:13, 36:15
**grave** [1] - 5:5
**great** [3] - 26:18, 30:14, 38:22
**groundfish** [7] - 11:3, 19:2, 23:10, 26:19, 26:20, 36:1
**grounds** [1] - 23:5
**Group** [4] - 2:7, 4:14, 6:9, 7:24
**guess** [1] - 21:25, 38:25
**guts** [1] - 4:22
**guy** [1] - 12:15

## H

**HAGLUND** [16] - 2:2, 3:16, 4:11, 5:14, 8:21, 10:18, 12:23, 14:13, 15:24, 18:11, 19:9, 20:21, 21:4, 24:18, 35:10, 37:1
**Haglund** [13] - 2:4,

3:16, 3:18, 4:10, 27:5, 29:18, 30:23, 31:11, 31:23, 35:6, 39:15, 40:11, 41:11
**Haglund's** [1] - 33:14
**half** [2] - 11:5, 23:10
**Hallmark** [1] - 30:14
**handcuff** [1] - 17:19
**handle** [1] - 10:2
**Hans** [1] - 6:24
**happy** [1] - 18:4
**hard** [1] - 18:2
**harder** [1] - 18:7
**harmed** [1] - 31:19
**harvest** [1] - 16:22, 24:5
**haul** [1] - 30:19
**head** [2] - 4:22, 32:23
**headquartered** [1] - 4:19
**health** [1] - 31:5
**hear** [2] - 24:23, 31:23
**heard** [3] - 6:10, 27:6, 29:17
**hearing** [2] - 28:19, 39:23
**heart** [1] - 26:3
**held** [1] - 34:13
**helping** [2] - 3:23, 8:19
**highest** [3] - 22:5, 22:6
**himself** [1] - 19:20
**history** [1] - 39:5
**Hogan** [1] - 38:24
**holder** [1] - 11:2
**holdings** [1] - 22:17
**Honor** [25] - 3:19, 4:11, 5:15, 6:7, 6:15, 6:20, 7:3, 9:22, 11:17, 12:24, 20:6, 21:6, 21:25, 25:5, 26:4, 28:12, 33:9, 34:21, 35:7, 35:11, 36:7, 37:17, 38:8, 40:7, 40:22
**Honorable** [1] - 3:9
**hope** [1] - 38:19
**hoped** [1] - 23:13
**hoping** [1] - 41:5
**hung** [1] - 38:13
**hurt** [1] - 13:13

## I

**identical** [1] - 27:18
**identify** [2] - 11:20, 28:6
**IFQ** [1] - 10:25

**ill** [1] - 32:16
**illegal** [2] - 15:3, 22:18
**immediate** [1] - 3:20
**impact** [12] - 9:15, 14:1, 14:5, 14:25, 15:4, 17:20, 17:23, 29:8, 34:12, 34:14, 35:3, 37:9
**impacted** [2] - 11:15, 19:5, 20:2, 20:25, 29:1
**impacts** [1] - 18:16
**impinging** [1] - 23:6
**importance** [1] - 29:24
**important** [2] - 13:7, 13:25
**include** [1] - 4:20
**included** [1] - 5:2
**includes** [3] - 16:6, 23:16, 26:21
**including** [2] - 11:1, 36:16
**inconsistent** [4] - 15:13, 16:3, 36:9, 37:24
**independent** [2] - 27:3, 33:22
**indicated** [2] - 30:1, 30:14
**Individual** [1] - 10:25
**individual** [1] - 32:25
**individualized** [1] - 12:20
**indulgence** [1] - 30:25
**industry** [3] - 15:4, 21:13, 25:1
**inextricably** [1] - 32:1
**influence** [2] - 16:11, 34:3
**influences** [1] - 33:24
**information** [6] - 5:17, 16:18, 38:17, 39:23, 40:4, 40:10
**initial** [4] - 10:6, 16:12, 17:3, 17:7
**injunction** [12] - 6:9, 6:13, 6:18, 6:19, 7:1, 13:2, 16:8, 25:13, 25:16, 27:18, 27:19, 30:3
**injunctive** [9] - 13:10, 14:7, 14:11, 14:20, 27:8, 27:16, 33:12, 34:19, 34:20
**injunctive-relief-only** [1] - 24:20
**injured** [1] - 10:16
**injury** [34] - 8:16, 8:20, 10:14, 12:20, 18:6,

18:10, 20:3, 20:6, 24:13, 24:22, 24:24, 26:8, 27:14, 27:17, 27:20, 27:21, 27:25, 28:6, 29:14, 29:15, 32:8, 33:11, 34:14, 34:23, 34:24, 35:4, 36:13, 38:7, 39:4, 39:21
**Innovation** [1] - 22:20
**instance** [2] - 15:6, 20:8
**instances** [1] - 21:12
**instrument** [1] - 32:21
**insurance** [4] - 20:14, 20:19, 31:5, 31:7
**insured** [1] - 20:14
**intentions** [1] - 8:18
**interactions** [1] - 37:13
**interest** [3] - 7:12, 12:25, 32:5
**interesting** [1] - 25:10
**interrogatory** [1] - 40:19
**intersection** [1] - 9:25
**intertwined** [1] - 32:1
**introduce** [1] - 3:14
**investigated** [1] - 5:15
**investments** [1] - 12:21
**involvement** [2] - 10:21, 11:13
**involving** [1] - 32:18
**irrelevant** [1] - 40:11
**issue** [18] - 9:23, 14:21, 15:1, 21:5, 21:11, 21:19, 25:17, 25:19, 25:20, 26:5, 26:16, 28:9, 35:13, 35:20, 37:19, 38:7, 38:14, 40:7
**issued** [4] - 6:13, 10:24, 11:12, 25:15
**issues** [2] - 14:14, 40:20

## J

**January** [3] - 4:12, 5:24, 5:25
**Jeff** [1] - 12:3
**John** [1] - 6:1
**joined** [1] - 4:1
**joint** [2] - 21:15, 21:16
**judge** [1] - 38:15
**Judge** [9] - 6:5, 6:10, 6:12, 22:11, 23:3, 23:13, 25:15, 38:23,

38:24
**judgment** [4] - 22:13, 24:10, 35:16, 36:14
**June** [2] - 9:1, 9:8

## K

**KELLEY** [1] - 2:3
**Kelley** [1] - 2:4
**Kelly** [1] - 3:17
**key** [1] - 16:9
**kind** [3] - 28:14, 29:8, 34:12
**known** [1] - 16:18

## L

**language** [6] - 15:11, 31:14, 31:21, 32:1, 32:3, 33:3
**largest** [3] - 4:18, 4:21, 4:23
**last** [5] - 7:4, 7:21, 12:5, 28:14, 38:21
**last-minute** [1] - 28:14
**late** [1] - 22:12
**law** [7] - 7:6, 10:1, 27:12, 33:10, 37:11, 37:21
**law.com** [1] - 2:6
**laws** [1] - 13:5
**lawyers** [2] - 6:1, 6:2
**lays** [1] - 27:22
**lead** [1] - 12:2
**leads** [1] - 6:22
**learn** [2] - 22:10, 39:25, 40:1
**learned** [2] - 5:4, 16:20
**lease** [10] - 18:7, 18:25, 19:3, 19:7, 19:10, 19:24, 20:1, 29:10, 40:2
**leased** [1] - 19:21
**leases** [3] - 11:7, 19:1, 40:2
**leasing** [16] - 11:13, 14:1, 17:23, 18:22, 18:24, 19:8, 20:1, 28:9, 28:23, 29:18, 35:13, 35:20, 36:2, 36:16, 40:7, 40:10
**least** [1] - 31:25
**leave** [1] - 18:5
**Lee** [1] - 3:21
**LEE** [1] - 2:9
**left** [3] - 3:20, 3:21, 8:4
**legitimate** [1] - 22:11

**lengthy** [1] - 4:7
**lessees** [1] - 19:16
**level** [1] - 13:3
**light** [1] - 25:11
**likelihood** [1] - 27:21
**likely** [2] - 30:21, 38:13
**limits** [3] - 22:17, 23:4, 23:14
**line** [1] - 36:6
**litigating** [3] - 39:11, 39:14, 39:20
**litigation** [3] - 32:4, 36:25, 38:12
**Lloyd** [3] - 10:23, 18:22, 35:15
**LLP** [2] - 2:4, 2:9
**lock** [1] - 8:23
**locked** [3] - 14:4, 15:8, 36:4
**locking** [1] - 15:10
**long-term** [1] - 30:17
**long-winded** [1] - 29:13
**look** [9] - 10:19, 13:19, 16:5, 18:12, 20:6, 24:18, 37:22, 38:14, 38:15
**looking** [2] - 15:11, 34:18
**looks** [1] - 3:22
**loss** [1] - 12:14
**lower** [2] - 13:12, 14:3
**lowering** [1] - 19:24
**loyalty** [1] - 30:15

**M**

**Magnuson** [1] - 23:16
**major** [1] - 14:21
**Management** [1] - 35:8
**manner** [1] - 15:12
**March** [1] - 6:12
**Marine** [3] - 10:25, 22:20, 23:17
**market** [49] - 5:6, 8:9, 9:5, 9:12, 9:15, 9:23, 10:17, 11:15, 11:21, 13:14, 13:18, 14:5, 15:9, 16:10, 17:2, 19:23, 20:10, 20:14, 20:17, 20:22, 26:4, 26:9, 26:12, 27:2, 27:3, 28:3, 28:5, 28:7, 28:8, 28:10, 28:22, 28:25, 31:12, 31:18, 32:9, 32:10, 32:17, 33:8,

33:16, 33:18, 34:5, 34:10, 34:24, 35:23, 36:3, 38:16, 39:3
**Market** [1] - 2:4
**marketplace** [1] - 41:1
**markets** [43] - 8:8, 8:19, 9:2, 9:9, 9:16, 10:21, 11:9, 11:13, 12:17, 12:18, 14:4, 14:5, 15:16, 17:19, 17:21, 26:13, 26:15, 26:25, 27:4, 28:3, 29:2, 30:22, 33:16, 33:19, 33:22, 33:23, 33:25, 34:2, 34:3, 34:25, 35:1, 35:2, 36:4, 36:19, 36:23, 37:2, 37:6, 37:8, 39:9, 39:10, 39:12, 39:13, 39:19
**matter** [2] - 10:14, 24:13
**matters** [1] - 8:15
**McCready** [10] - 13:23, 20:7, 20:11, 20:12, 30:23, 31:14, 31:16, 31:21, 32:1, 32:10
**McShane** [1] - 3:9
**meal** [3] - 4:21, 4:23, 22:7
**mean** [6] - 8:13, 14:10, 18:5, 24:12, 30:15, 33:9
**means** [4] - 32:25, 33:4, 33:5, 39:13
**Medford** [1] - 6:10
**medical** [1] - 20:14
**meet** [1] - 36:13
**men** [1] - 7:11
**mental** [1] - 15:19
**mentioned** [1] - 30:23
**merger** [1] - 29:4
**merits** [2] - 7:8, 25:12
**mhaglund@hk** [1] - 2:6
**mhaglund@hk-law.com** [1] - 2:6
**Michael** [2] - 3:9, 3:16
**MICHAEL** [2] - 2:2, 2:3
**might** [7] - 12:11, 29:9, 29:10, 29:11, 29:22, 30:4, 38:14
**migration** [1] - 11:18
**Mike** [1] - 3:17
**miles** [4] - 12:6, 16:21, 18:3, 40:1
**mind** [1] - 31:25
**minute** [1] - 28:14

**misspoke** [1] - 27:6
**modification** [1] - 10:10
**Monday** [1] - 7:10
**money** [1] - 24:14
**months** [2] - 6:14, 22:14
**most** [1] - 29:17
**motion** [8] - 3:12, 6:8, 6:9, 7:8, 24:9, 25:13, 35:16, 38:11
**motions** [2] - 6:7, 22:13
**move** [3] - 24:5, 41:8, 41:12
**MR** [28] - 3:16, 3:19, 4:11, 5:14, 8:21, 10:18, 12:23, 14:13, 15:24, 18:11, 19:9, 20:21, 21:4, 24:18, 25:5, 25:8, 28:12, 31:3, 33:20, 34:20, 35:7, 35:10, 37:1, 38:8, 38:19, 39:5, 40:16, 41:12
**multiple** [1] - 35:2
**myriad** [1] - 26:14

**N**

**National** [2] - 10:25, 23:17
**nature** [2] - 34:15, 34:23
**near** [1] - 16:25
**necessarily** [3] - 19:5, 33:18, 40:15
**necessary** [2] - 32:21, 33:5
**need** [5] - 26:5, 36:18, 37:14, 38:3, 41:9
**needed** [1] - 39:18
**negatively** [1] - 14:5
**negotiated** [1] - 19:22
**negotiating** [1] - 4:15
**negotiation** [1] - 26:10
**neighboring** [1] - 17:21
**never** [6] - 10:11, 18:5, 25:12, 30:6, 30:7, 37:17
**new** [4] - 15:11, 15:15, 15:16, 15:21
**Newport** [1] - 12:7
**next** [3] - 6:5, 20:23, 41:9
**nine** [1] - 6:14
**NMFS** [1] - 19:18

**none** [5] - 9:21, 29:25, 40:16, 40:18
**nonissue** [1] - 21:24
**nonowner** [1] - 21:12
**normal** [1] - 34:7
**normally** [1] - 34:5
**north** [1] - 18:17
**northern** [1] - 11:5
**Northern** [3] - 11:20, 22:23, 23:2
**noted** [1] - 15:25
**notes** [1] - 23:8
**nothing** [4] - 7:11, 40:5, 40:19, 40:23
**notice** [2] - 4:13, 5:1
**notion** [3] - 14:5, 15:9, 34:1
**nuance** [1] - 9:25
**number** [2] - 3:23, 10:2

**O**

**objected** [1] - 5:16
**objections** [1] - 25:24
**obtain** [1] - 24:6
**obviously** [2] - 4:4, 28:5
**occur** [1] - 5:6
**occurred** [2] - 16:18, 38:1
**occurring** [2] - 6:5, 7:12
**Ocean** [8] - 4:16, 4:18, 4:20, 4:25, 5:7, 5:13, 7:14, 24:7
**OF** [1] - 41:14
**offered** [1] - 7:1
**officers** [2] - 7:25, 16:17
**old** [1] - 4:3
**old-school** [1] - 4:3
**once** [1] - 32:6
**one** [30] - 6:1, 7:20, 8:7, 8:10, 8:15, 9:24, 11:2, 11:9, 11:19, 13:19, 14:3, 14:13, 14:14, 16:23, 17:3, 18:16, 19:23, 20:1, 20:22, 21:20, 23:11, 23:21, 23:22, 25:10, 29:21, 30:11, 33:21, 34:4, 37:22
**ones** [1] - 21:22
**ongoing** [2] - 9:19, 17:9
**open** [1] - 32:4

**opening** [1] - 4:7
**opinion** [7] - 5:21, 6:19, 6:25, 22:18, 23:4, 23:8, 25:11
**opportunity** [5] - 11:14, 17:23, 36:19, 37:21, 38:3
**options** [1] - 28:10
**oral** [1] - 3:12
**order** [4] - 15:11, 15:25, 24:22, 39:12
**Order** [1] - 5:8
**ordered** [1] - 39:9
**Oregon** [7] - 2:5, 2:10, 3:8, 3:25, 12:1, 13:1
**originated** [1] - 4:12
**outside** [1] - 21:21
**overview** [1] - 4:8
**own** [11] - 9:20, 15:22, 16:1, 16:2, 19:15, 23:5, 23:7, 23:11, 24:11, 28:20, 41:2
**owned** [2] - 4:25, 21:8
**owners** [2] - 12:15, 21:21

**P**

**p.m** [1] - 3:2
**P.M** [1] - 41:14
**Pac** [1] - 36:7
**Pacific** [25] - 2:7, 3:11, 4:13, 4:14, 5:7, 5:16, 5:20, 5:22, 6:8, 7:8, 7:24, 8:22, 9:11, 9:20, 14:17, 14:24, 21:9, 22:2, 22:15, 22:22, 23:9, 23:24, 35:25, 37:15
**Pacific's** [4] - 6:1, 6:2, 9:15, 14:23
**page** [5] - 9:10, 9:18, 23:8, 35:14, 37:9
**Panner** [4] - 6:6, 6:11, 6:12, 25:15
**paperwork** [1] - 22:24
**paragraph** [2] - 18:23, 35:21
**parameters** [1] - 26:7
**part** [4] - 6:8, 6:10, 7:2, 22:25
**participant** [8] - 13:14, 13:17, 20:9, 20:25, 31:12, 31:19, 32:9, 36:3
**participants** [6] - 20:16, 20:22, 28:3, 33:25, 34:24, 41:1

**participate** [2] - 15:5, 33:16
**participating** [1] - 33:15
**particular** [7] - 12:19, 12:20, 19:12, 19:25, 25:1, 32:14, 33:15
**parties** [3] - 7:13, 7:18, 25:23
**parties'** [1] - 25:22
**pass** [1] - 29:8
**pass-through** [1] - 29:8
**passing** [1] - 31:22
**past** [1] - 12:11
**patent** [1] - 22:24
**pay** [1] - 29:23
**paying** [1] - 19:16
**pending** [1] - 22:13
**people** [3] - 3:22, 40:3, 41:9
**per** [2] - 19:10, 19:22
**percent** [5] - 21:17, 22:25, 23:1, 24:6
**percentage** [1] - 21:14
**perfectly** [1] - 41:10
**perhaps** [1] - 27:6
**permit** [1] - 12:9
**permits** [1] - 10:22
**perplexed** [1] - 39:22
**person** [1] - 20:19
**perspective** [3] - 25:18, 25:19, 34:4
**pest** [1] - 12:16
**pest-control** [1] - 12:16
**petrale** [1] - 16:24
**place** [4] - 16:22, 17:15, 23:20
**plaintiff** [12] - 8:6, 10:3, 10:4, 12:3, 12:19, 20:7, 21:10, 21:18, 27:7, 31:11, 31:22, 33:12
**plaintiff's** [2] - 3:14, 40:10
**plaintiffs** [38] - 4:9, 7:6, 7:10, 7:19, 7:20, 8:2, 8:5, 8:7, 8:8, 8:18, 8:23, 10:16, 11:14, 20:1, 21:7, 21:20, 24:15, 24:16, 25:3, 26:5, 26:11, 26:23, 27:7, 27:16, 28:2, 28:16, 29:21, 30:11, 32:14, 32:15, 33:15,

39:7, 39:19, 39:24, 40:5, 40:25
**Plaintiffs** [1] - 2:2
**plan** [1] - 31:5
**planned** [1] - 12:16
**planning** [1] - 30:21
**plans** [1] - 30:4
**plant** [4] - 4:21, 22:5, 22:6, 22:7, 23:9
**play** [1] - 17:6
**plus** [1] - 29:8
**point** [9] - 8:23, 12:3, 12:4, 12:23, 13:7, 15:7, 17:17, 20:5, 35:9
**pointed** [1] - 18:23
**points** [5] - 11:19, 17:20, 18:11, 23:21, 35:10
**police** [1] - 16:17
**popular** [1] - 26:18
**Port** [25] - 4:19, 5:12, 8:9, 9:12, 9:15, 10:17, 12:5, 12:6, 12:10, 12:12, 19:6, 22:3, 26:25, 27:1, 27:2, 28:4, 29:2, 29:7, 29:25, 30:1, 30:4, 30:5, 30:22, 33:18, 36:17
**port** [4] - 9:12, 9:13, 11:20, 37:8
**Portland** [2] - 2:5, 2:10
**position** [5] - 10:19, 15:25, 17:12, 26:11, 38:6
**possible** [1] - 23:7
**potential** [5] - 12:11, 12:14, 14:1, 14:2, 17:23
**pound** [2] - 19:10, 19:22
**pounds** [4] - 19:11, 19:20, 19:25
**practical** [1] - 16:15
**practice** [1] - 24:25
**precede** [1] - 10:9
**precisely** [1] - 36:19
**prediction** [1] - 38:21
**preemptive** [1] - 24:9
**preemptively** [1] - 8:23
**preliminary** [8] - 6:9, 6:13, 6:17, 6:19, 7:1, 16:8, 25:13, 30:3
**premature** [2] - 24:9, 24:12
**prepare** [2] - 17:13, 24:11
**prepared** [1] - 16:16

**presence** [1] - 27:21
**present** [1] - 15:23
**presiding** [1] - 3:9
**presumptively** [1] - 13:4
**pretty** [2] - 6:18, 7:5
**price** [8] - 7:15, 14:17, 14:20, 14:23, 28:21, 29:5, 34:4, 34:6
**prices** [6] - 14:3, 14:18, 32:20, 33:17, 33:19, 35:25
**pricing** [2] - 33:24, 33:25
**primary** [2] - 25:17, 25:19
**problem** [3] - 15:17, 33:21, 34:11
**problems** [1] - 33:20
**procedural** [1] - 26:2
**proceed** [1] - 6:21
**proceeded** [2] - 6:3, 6:16
**PROCEEDINGS** [2] - 3:1, 41:14
**process** [3] - 4:15, 10:12, 25:23
**processes** [1] - 4:22
**processing** [3] - 4:21, 22:5, 35:24
**processor** [2] - 4:19, 30:16
**processors** [6] - 21:9, 21:23, 26:17, 29:6, 30:10, 30:19
**produced** [3] - 9:21, 16:19, 29:16
**product** [5] - 4:23, 26:25, 28:3, 29:2, 30:22
**production** [1] - 40:9
**products** [3] - 26:15, 26:16, 27:1
**Professor** [3] - 9:3, 11:12, 20:4
**professor** [1] - 14:2
**Protein** [1] - 4:21
**prove** [2] - 27:10, 27:20
**proving** [1] - 27:24
**provision** [1] - 23:16
**proximately** [1] - 13:13
**Psychiatric** [1] - 20:13
**psychiatrists** [2] - 20:17, 31:8
**psychological** [1] - 31:1

**psychologists** [5] - 20:16, 20:17, 20:18, 31:6, 31:9
**psychotherapeutic** [1] - 20:15
**psychotherapy** [3] - 31:3, 31:6, 31:13
**purchase** [1] - 24:7
**pursue** [1] - 20:8
**pursuing** [1] - 18:13
**purview** [1] - 39:24
**put** [2] - 15:17, 37:3
**putting** [3] - 4:15, 35:13, 35:14

## Q

**qualified** [2] - 20:8, 21:10
**qualify** [1] - 21:18
**qualifying** [1] - 17:20
**quick** [1] - 35:10
**quickly** [1] - 41:6
**quite** [2] - 8:5, 10:2
**Quota** [1] - 11:1
**quota** [32] - 11:3, 11:8, 11:14, 11:12, 18:25, 19:1, 19:3, 19:4, 19:11, 19:17, 22:16, 22:17, 23:5, 23:14, 23:19, 23:25, 24:6, 28:10, 28:16, 28:20, 28:21, 28:22, 28:23, 28:25, 29:9, 29:10, 29:23, 35:20, 36:2, 40:2, 40:10
**quotas** [1] - 18:8
**quote** [2] - 18:12, 35:23

## R

**RACHEL** [1] - 2:9
**Rachel** [1] - 3:21
**radtke** [1] - 15:17
**Radtke** [9] - 6:25, 11:19, 14:3, 16:6, 16:7, 17:2, 37:3, 37:23, 40:18
**Radtke's** [7] - 8:24, 10:20, 15:13, 16:3, 17:21, 18:20, 39:6
**raising** [1] - 25:20
**RANDOLPH** [1] - 2:8
**Randy** [1] - 3:19
**randy.foster@stoel. com** [1] - 2:11
**range** [1] - 26:21
**Rankin** [3] - 10:23,

**16:21, 18:2
**rare** [1] - 32:24
**read** [1] - 4:4
**reality** [1] - 12:8
**really** [9] - 13:25, 15:15, 25:2, 25:18, 29:23, 31:23, 37:6, 38:6, 41:6
**reason** [2] - 18:14, 38:25
**reasons** [3] - 11:19, 17:15, 23:22
**rebuttal** [1] - 10:5
**receive** [1] - 29:9
**received** [2] - 4:13, 5:16
**receiving** [1] - 5:1
**recent** [1] - 22:8
**reciting** [1] - 27:23
**recognize** [1] - 13:25
**recognizing** [1] - 17:20
**record** [15] - 3:6, 3:15, 18:19, 18:21, 22:22, 23:3, 25:10, 26:3, 29:17, 29:21, 36:14, 37:24, 40:17, 40:21, 40:24
**recover** [1] - 28:24
**reduced** [1] - 36:2
**referenced** [1] - 24:19
**references** [1] - 37:9
**referencing** [1] - 13:15
**referring** [1] - 22:11
**refused** [1] - 32:19
**refutes** [1] - 30:20
**regard** [2] - 4:8, 25:1
**regarding** [1] - 17:20
**regardless** [2] - 14:19, 14:23
**regulated** [2] - 11:4, 11:8
**regulations** [1] - 23:20
**rejected** [1] - 23:13
**rejecting** [1] - 7:23
**related** [2] - 4:17, 36:15
**relationship** [3] - 30:16, 30:18
**relationships** [1] - 30:9
**relatively** [1] - 36:18, 41:6
**relevance** [2] - 15:1, 22:21
**relevant** [13] - 9:1, 9:9, 26:4, 26:9, 26:12, 26:13, 26:15, 32:16,

33:8, 34:2, 34:3, 34:5, 34:23
**relief** [10] - 13:10, 14:7, 14:12, 24:20, 27:8, 27:9, 27:16, 33:12, 34:19, 34:21
**remain** [2] - 3:4, 10:23
**remaining** [3] - 7:20, 8:3, 30:8
**remember** [5] - 32:18, 33:2, 39:6, 40:8, 40:13
**reminded** [1] - 40:14
**removed** [1] - 20:22
**rendered** [1] - 20:15
**reopen** [1] - 38:11
**rephrase** [1] - 29:3
**report** [15] - 10:20, 15:18, 15:19, 16:2, 17:3, 17:13, 17:21, 22:20, 26:24, 28:18, 37:19, 38:5, 39:6, 40:18
**reports** [3] - 9:20, 26:10, 36:12
**representation** [1] - 5:23
**representatives** [1] - 5:3
**represented** [1] - 10:16
**reps** [1] - 8:2
**request** [1] - 40:12
**requirement** [1] - 13:11
**requirements** [1] - 27:24
**reserves** [1] - 9:18
**resolve** [1] - 25:24
**respect** [4] - 26:12, 33:11, 39:12, 39:21
**respond** [2] - 16:13, 39:8
**responds** [1] - 10:5
**response** [7] - 9:20, 24:24, 25:12, 29:13, 34:17, 35:11, 35:16
**responses** [2] - 26:23, 40:19
**responsibility** [1] - 7:25
**responsible** [2] - 14:19, 14:25
**Restraining** [1] - 5:8
**result** [2] - 23:24, 33:18
**results** [3] - 19:23, 33:6, 35:24
**revealed** [1] - 22:22

**review** [1] - 17:4
**Richard** [1] - 7:22
**Rives** [2] - 2:9, 3:20
**road** [4] - 13:19, 17:12, 35:2, 37:14
**roughly** [1] - 9:10
**rule** [1] - 38:10
**ruled** [1] - 23:15
**Russo** [1] - 38:23

## S

**sable** [1] - 19:13
**safe** [1] - 39:1
**sake** [1] - 4:6
**sale** [3] - 7:14, 21:22, 26:16
**saw** [2] - 37:16, 37:20
**schedule** [1] - 36:8
**school** [1] - 4:3
**scope** [2] - 34:13, 35:4
**seafood** [1] - 4:18
**Seafood** [18] - 2:7, 3:11, 4:13, 4:14, 4:17, 5:7, 5:16, 5:20, 6:9, 7:8, 7:24, 8:22, 21:9, 22:2, 22:15, 22:23, 23:24
**Seafood's** [4] - 5:22, 9:11, 9:20, 23:9
**Seafoods** [2] - 4:18, 24:7
**search** [1] - 8:6
**seated** [1] - 3:4
**Seawater** [1] - 13:22
**Section** [10] - 13:8, 13:9, 13:11, 13:21, 20:9, 24:19, 27:8, 27:10, 33:11
**sector** [1] - 35:24
**secured** [2] - 5:8, 6:5
**see** [2] - 10:9, 17:13
**seeking** [9] - 13:10, 13:18, 14:6, 15:3, 27:7, 27:9, 27:16, 33:6, 33:12
**seem** [2] - 8:5, 10:15
**segments** [1] - 20:14
**sell** [2] - 30:13
**selling** [2] - 21:9, 28:22
**sense** [2] - 18:18, 39:16
**separate** [10] - 27:3, 33:22, 33:24, 33:25, 34:2, 36:4, 37:5, 37:12, 37:21
**separately** [1] - 37:22
**serious** [3] - 7:5, 7:16,

12:25
**seriously** [1] - 7:25
**served** [1] - 39:7
**Service** [2] - 10:25, 23:17
**services** [6] - 20:15, 31:2, 31:4, 31:13, 31:18, 32:10
**session** [1] - 3:8
**set** [2] - 3:10, 15:16
**sets** [1] - 26:7
**setting** [2] - 14:17, 14:23
**settled** [1] - 14:21
**Settlement** [1] - 25:22
**several** [1] - 12:6
**Sexton** [7] - 11:12, 16:1, 17:12, 17:24, 18:21, 20:4, 35:21
**shakes** [1] - 11:10
**share** [19] - 11:1, 11:3, 11:8, 11:14, 14:2, 18:25, 19:5, 19:11, 19:18, 22:17, 23:1, 23:5, 23:14, 23:19, 23:25, 24:1, 24:5, 24:6, 35:20
**shares** [1] - 19:1
**Shield** [2] - 20:11, 20:12
**shift** [1] - 7:2
**shore** [2] - 26:17, 29:6
**show** [2] - 14:1, 18:9
**shows** [2] - 20:23, 22:10
**shrimp** [4] - 12:4, 12:5, 12:9, 26:19
**side** [6] - 9:8, 10:11, 16:10, 16:17, 26:17, 29:6
**sieve** [1] - 5:17
**sieve-like** [1] - 5:17
**significant** [2] - 22:8, 24:1
**significantly** [2] - 16:21, 38:2
**simply** [1] - 27:19
**single** [1] - 21:20
**situation** [4] - 9:22, 17:22, 36:17, 37:17
**six** [14] - 8:10, 9:1, 9:9, 9:12, 10:21, 11:9, 14:4, 14:5, 15:9, 16:11, 17:19, 36:4, 37:5, 37:8
**six-market** [2] - 14:5, 15:9

**sliding** [1] - 32:3
**slightly** [1] - 6:25
**small** [1] - 35:17
**Snider** [1] - 3:21
**SNIDER** [1] - 2:8
**Society** [1] - 20:13
**sold** [1] - 29:6
**sole** [2] - 16:25, 19:14
**solely** [1] - 13:6
**somewhat** [1] - 25:10
**sort** [3] - 8:12, 10:5, 12:15
**south** [5] - 9:16, 11:22, 12:7, 14:6, 18:16
**speaks** [3] - 17:24, 27:13, 31:22
**specialist** [2] - 12:5, 19:13
**species** [8] - 11:1, 11:4, 11:18, 19:2, 19:12, 19:25, 26:21, 36:2
**specific** [3] - 20:3, 26:20, 30:10
**specifically** [1] - 22:16
**speculative** [2] - 29:15, 34:15
**spending** [1] - 24:14
**spoken** [1] - 18:1
**spring** [1] - 13:2
**stage** [2] - 24:8, 30:3
**stand** [1] - 23:20
**standing** [6] - 8:16, 13:11, 13:13, 27:11, 32:14, 32:25
**start** [1] - 4:9
**starting** [2] - 3:14, 8:17
**State** [1] - 12:25
**state** [1] - 33:10
**statement** [2] - 8:24, 10:8
**statements** [1] - 18:12
**States** [1] - 3:7
**states** [2] - 9:1, 9:5
**stating** [1] - 7:22
**status** [3] - 22:3, 22:19, 36:3
**stayed** [2] - 6:15, 16:13
**Ste** [1] - 2:10
**steamed** [1] - 12:6
**step** [1] - 20:22
**Stephens** [1] - 6:1
**steps** [1] - 23:17
**still** [9] - 6:1, 10:13, 10:21, 14:10, 18:5, 27:14, 27:20, 36:8,

36:17
**Stoel** [2] - 2:9, 3:20
**stop** [3] - 6:4, 22:2, 30:13
**stopped** [1] - 30:12
**storage** [2] - 4:24, 22:6
**strategy** [1] - 38:12
**straw** [1] - 7:11
**Street** [2] - 2:4, 20:23
**stretch** [1] - 7:24
**struggle** [1] - 8:17
**stuck** [1] - 17:18
**students** [2] - 3:24, 4:6
**style** [1] - 4:3
**subject** [1] - 17:8
**submitted** [2] - 35:15, 35:22
**subsequently** [1] - 6:13
**substantially** [1] - 36:23
**substantive** [1] - 25:12
**substitution** [3] - 17:14, 38:1, 39:13
**successful** [1] - 22:4
**sue** [1] - 13:16
**suffer** [1] - 20:3
**suffered** [2] - 8:20, 28:7
**suggested** [2] - 30:3, 32:3
**suggestion** [2] - 30:20, 31:10
**suing** [2] - 13:8, 13:9
**suit** [3] - 6:3, 24:3, 24:16
**summarizes** [1] - 33:10
**summary** [4] - 22:13, 24:9, 35:16, 36:14
**Sunday** [1] - 3:2
**supplement** [1] - 9:19
**supply** [1] - 34:7
**support** [1] - 13:2
**supported** [2] - 18:19, 18:21
**suppressing** [1] - 33:17
**suppression** [3] - 14:20, 33:18, 35:25
**Supreme** [4] - 13:20, 20:7, 31:16, 32:2
**surprise** [1] - 5:19
**surprised** [2] - 39:25, 40:1
**surprising** [1] - 38:20

**survive** [1] - 28:15
**SW** [2] - 2:4, 2:10
**system** [5] - 5:18, 19:18, 22:16, 23:14, 36:21

## T

**tails** [1] - 4:22
**Temporary** [1] - 5:8
**ten** [2] - 7:4, 12:6
**tendered** [3] - 8:25, 9:8, 16:16
**term** [1] - 30:17
**terminated** [1] - 25:14
**terms** [7] - 5:11, 13:23, 18:19, 24:21, 32:7, 36:17, 38:12
**test** [2] - 27:22, 27:24
**testify** [2] - 15:12, 15:16
**testimony** [4] - 29:20, 30:6, 41:2, 41:3
**THE** [27] - 3:4, 3:13, 3:18, 3:22, 5:11, 8:4, 10:13, 12:13, 14:9, 15:10, 18:1, 19:7, 20:20, 21:1, 24:12, 24:23, 25:7, 28:9, 31:1, 33:13, 34:17, 35:6, 36:22, 38:9, 38:21, 40:13, 41:4
**themselves** [1] - 3:15
**then-expert** [1] - 6:24
**theory** [10] - 7:24, 10:17, 14:10, 14:13, 14:15, 14:16, 15:5, 28:16, 28:20, 29:4
**thereby** [1] - 25:24
**third** [2] - 7:13, 7:18
**threatened** [3] - 27:14, 27:20, 28:6
**three** [13] - 7:10, 7:20, 8:3, 8:4, 8:7, 10:15, 21:20, 22:1, 26:16, 26:25, 27:1, 30:7, 35:2
**threshold** [4] - 8:15, 10:13, 24:13, 26:5
**tied** [1] - 9:12
**Tim** [1] - 3:20
**TIMOTHY** [1] - 2:8
**tiny** [1] - 25:6
**today** [6] - 4:1, 6:22, 25:25, 29:17, 31:24, 35:14, 38:10, 39:23
**together** [3] - 4:15, 15:18, 31:8

**tool** [1] - 32:22
**total** [2] - 16:5, 19:21
**totality** [1] - 37:23
**town** [1] - 22:3
**transaction** [9] - 4:16, 5:9, 5:11, 5:19, 5:23, 6:4, 23:23, 25:14, 25:24
**travels** [1] - 40:1
**trawl** [2] - 26:19, 36:1
**trawl-caught** [2] - 26:19, 36:1
**treat** [1] - 10:21
**treated** [1] - 30:17
**treatment** [1] - 31:6
**treble** [2] - 13:8, 13:17
**trial** [1] - 10:9
**tributary** [1] - 9:13
**tried** [1] - 17:14
**TRO** [1] - 6:5
**true** [1] - 7:19
**Trust** [1] - 3:25
**trust** [29] - 8:16, 8:20, 9:24, 10:1, 10:14, 12:20, 13:5, 20:3, 20:6, 24:13, 24:22, 24:24, 26:8, 27:13, 27:17, 27:25, 32:4, 32:8, 32:13, 32:24, 33:1, 33:11, 34:13, 35:4, 36:13, 38:7, 38:14, 39:21
**try** [2] - 7:13, 28:14
**trying** [8] - 8:22, 15:14, 18:5, 25:18, 33:2, 34:16, 37:15, 40:8
**tuna** [1] - 21:1
**turn** [2] - 22:10, 34:2
**turning** [1] - 7:7
**two** [12] - 6:6, 8:3, 8:8, 10:22, 16:23, 18:11, 19:12, 19:25, 28:15, 28:24, 35:1, 41:7
**type** [1] - 33:11
**typical** [1] - 10:2

## U

**ultimately** [4] - 5:4, 6:12, 6:17, 11:10
**umbrella** [9] - 10:17, 14:10, 14:13, 14:15, 14:22, 14:25, 15:1, 15:5
**unavailability** [1] - 36:7
**unconvinced** [1] - 39:3
**under** [11] - 4:16, 10:8,

10:17, 10:20, 13:4, 13:8, 13:9, 13:10, 19:18, 27:9, 31:5
**underlying** [1] - 25:21
**unfair** [1] - 17:14
**unfolded** [1] - 16:20
**United** [1] - 3:7
**University** [1] - 3:25
**unlawful** [2] - 13:4, 31:19
**unrelated** [1] - 33:23
**unusual** [1] - 37:16
**up** [14] - 5:20, 5:22, 6:6, 6:16, 16:1, 16:25, 17:2, 17:10, 18:2, 20:3, 21:25, 32:4, 36:8, 38:13
**upheld** [2] - 23:14, 24:4
**US** [1] - 26:19

## V

**valid** [1] - 19:5
**valuable** [1] - 26:22
**value** [2] - 19:10, 36:1
**variety** [1] - 5:2
**various** [1] - 3:24
**VC** [1] - 30:14
**veer** [1] - 38:2
**venturer** [2] - 21:15, 21:16
**versus** [2] - 3:11, 20:12
**vessel** [2] - 19:18, 35:25
**vessels** [2] - 16:24, 23:11
**view** [1] - 18:15
**Virginia** [1] - 20:13

## W

**wages** [1] - 21:2
**waited** [1] - 38:17
**waiting** [2] - 22:9
**wants** [1] - 28:23
**Washington** [6] - 4:20, 10:22, 12:8, 22:3, 27:1, 28:4
**waste** [1] - 4:22
**waterfront** [1] - 5:18
**wave** [1] - 10:8
**week** [3] - 5:24, 7:9, 41:7
**well-written** [1] - 22:19
**west** [1] - 16:9
**West** [39] - 4:19, 5:12,

8:9, 9:2, 9:5, 9:11, 9:15, 10:17, 11:3, 11:9, 12:5, 12:6, 12:10, 12:11, 16:10, 19:4, 19:6, 21:23, 22:3, 22:7, 26:25, 27:1, 27:2, 28:4, 29:2, 29:7, 29:25, 30:1, 30:4, 30:5, 30:22, 33:17, 33:19, 35:24, 36:16, 37:1, 37:2, 37:7
**Whaley** [18] - 5:3, 5:9, 9:3, 10:23, 11:7, 14:15, 14:16, 16:7, 18:22, 21:5, 21:7, 25:22, 29:22, 35:15, 36:23, 37:1, 37:3
**whatsoever** [1] - 15:2
**white** [1] - 26:17
**whiting** [8] - 8:7, 11:2, 11:21, 11:22, 18:25, 24:5, 26:17, 35:25
**whole** [3] - 9:5, 15:16, 29:18
**wholesale** [1] - 19:24
**wide** [3] - 19:4, 26:21, 36:16
**winded** [1] - 29:13
**wintertime** [1] - 16:23
**withdrawn** [1] - 25:14
**withheld** [1] - 40:6
**witness** [6] - 6:23, 8:24, 9:7, 10:3, 10:7, 15:12
**words** [2] - 21:14, 27:9
**works** [3] - 17:6, 21:13, 37:12
**worth** [1] - 30:24
**wrapping** [1] - 21:25
**write** [1] - 16:1
**written** [1] - 22:19
**wrong-doers** [1] - 32:15
**wrongdoing** [1] - 33:1
**Wyland** [1] - 9:3

## Y

**year** [4] - 22:9, 28:24, 31:15, 35:19
**years** [7] - 8:9, 8:10, 11:22, 12:6, 20:2, 24:2, 28:24
**young** [1] - 36:18

## Z

**zone** [2] - 11:4, 23:2