IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

JEFF BOARDMAN, et al.,

    Plaintiffs,

v.

PACIFIC SEAFOOD GROUP, et al.,

    Defendants.

No. 1:15-cv-108-MC

**OPINION AND ORDER**

**McShane, District Judge**:

Plaintiffs[1] Jeff Boardman, Dennis Rankin, Lloyd D. Whaley, and MV Fisheries, Inc. bring this antitrust action against Defendants Pacific Seafood Group (Pacific Seafood) and more than 50 other businesses owned in whole or part by Defendants Frank Dulcich and Dulcich, Inc. Plaintiffs, who are commercial fishermen, seek a permanent injunction prohibiting Pacific Seafood from acquiring any additional ownership interest in Ocean Gold Seafoods and its affiliates, including Ocean Protein, LLC and Hoquiam Riverview Properties, LLC (Ocean Gold). Pacific Seafood currently owns about a third of Ocean Gold. Mot. Intervene 1, ECF No. 220.

---

[1] Plaintiffs Todd Whaley, Miss Sarah LLC, Robert Seitz, and South Bay Wild, Inc., have settled with Defendants. The parties have agreed that these Plaintiffs should be dismissed with prejudice. ECF No. 243.

OPINION AND ORDER -Page | 1

Francis Miller, Sherry Miller, Jacquelyn Rydman, and Mark Rydman, who collectively own about 48% of Ocean Gold, have intervened as Defendants.

Pacific Seafood moves for summary judgment, contending that Plaintiffs have not shown antitrust standing to bring this action because they do not participate in the relevant markets. Plaintiffs respond that they have antitrust standing, and alternatively that Pacific Seafood's motion for summary judgment should be stayed to allow additional discovery.

Because the Plaintiffs do not participate in the relevant markets, Plaintiffs lack antitrust standing. Pacific Seafood's motion for summary judgment is GRANTED. Plaintiffs' request for further discovery is denied.

## PROCEDURAL BACKGROUND

Plaintiffs filed this action in January 2015 after Pacific Seafood notified Plaintiffs' counsel of the proposed acquisition of Ocean Gold. The settlement agreement in a prior action, *Whaley v. Pacific Seafood Group*, No. 10-cv-3057-MC, required that Pacific Seafood notify Plaintiff's counsel about any proposed acquisition of Ocean Gold. *See* Pls.' Mem. Opp'n 13 n.6, ECF No. 211.

Plaintiffs bring claims against Pacific Seafood for monopolization and attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2, and for unlawful merger in violation of the Clayton Act, 15 U.S.C. § 18. Plaintiffs seek only injunctive relief, not damages.

Plaintiffs assert that Pacific Seafood's proposed acquisition of Ocean Gold would cause a "substantial lessening of competition and the enhancement of an existing monopoly held by Pacific Seafood Group in the West Coast seafood input markets for trawl-caught groundfish, Pacific onshore whiting and Pacific coldwater shrimp." Second Am. Compl. ¶ 63, ECF No. 52.

Plaintiffs claim that "[t]his resulting increased concentration in these West Coast seafood input markets will result in ex vessel price suppression to the detriment of plaintiffs." *Id.*

Shortly after filing their complaint, Plaintiffs moved for a preliminary injunction prohibiting Pacific Seafood from acquiring full ownership of Ocean Gold. Pls.' Mot. Prelim. Inj., ECF No. 22. In March 2015, this court granted Plaintiffs' motion for a preliminary injunction. *Boardman v. Pacific Seafood Group*, 2015 WL 13357739 (D. Or. Mar. 6, 2015), ECF No. 55.

Pacific Seafood moved to compel arbitration, based on the terms of the settlement agreement in *Whaley*. Defs.' Mot. Compel Arbitration, ECF No. 71. In June 2015, this court denied Pacific Seafood's motion to compel arbitration. *Boardman v. Pacific Seafood Group,* 2015 WL 13358335 (D. Or. June 8, 2015), ECF No. 83. In August 2015, this court granted Pacific Seafood's motion to stay proceedings pending its appeal of this court's rulings. Order, ECF No. 103. On appeal, the Ninth Circuit affirmed. *Boardman v. Pacific Seafood Group*, 822 F.3d 1011 (9th Cir. 2016). The preliminary injunction remains in place.

After remand from the Ninth Circuit, the parties resumed discovery, which has been ongoing since the fall of 2016. Plaintiffs served Dr. Radtke's expert report on June 30, 2017. Pacific Seafood deposed Dr. Radtke on October 25, 2017. Pacific Seafood filed the current motion for summary judgment on December 5, 2017. On December 19, 2017, Plaintiffs moved to replace Dr. Radtke after he stated that he was no longer able to testify due to his age and concerns about his ability to testify at trial. Pls.' Mot. Substitute Testifying Expert Witness, ECF No. 196. I granted Plaintiffs' motion to substitute, and Plaintiffs named Dr. Richard Sexton, a professor of agricultural and resource economics at University of California, Davis, to replace

Dr. Radtke as an expert witness. *See* Sexton Decl. 3, ECF No. 212. **PLAINTIFFS' REQUEST FOR A STAY TO ALLOW ADDITIONAL DISCOVERY**

## I. Plaintiffs' Request for a Stay

In their response to Pacific Seafood's motion for summary judgment, Plaintiffs seek a stay for additional discovery based on Federal Rule of Civil Procedure 56(d). Pls.' Mem. Opp'n 22, ECF No. 211. Rule 56(d) allows this court to defer ruling on a pending motion for summary judgment "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."

Plaintiffs contend that they need additional discovery to respond to Pacific Seafood's motion for summary judgment. For example, they seek "documents and depositions necessary to assess the relative market shares of Pacific Seafood and Ocean Gold in Westport." Pls.' Mem. Opp'n 15. Plaintiffs state that although Dr. Radtke defined the relevant geographic markets based on his finding that commercial fishermen were willing to travel from 60 to 100 miles to sell their catch, Plaintiffs learned that Plaintiff Dennis Rankin has traveled more than 100 miles from the point of harvest to deliver his catch. Pls.' Mem. Opp'n 21.

Plaintiffs also contend that their substitute expert witness, Dr. Sexton, should be given time to formulate his own market definitions, arguing that Dr. Sexton "has not had a reasonable opportunity to review the evidence or form his own opinions on relevant subjects," including geographic markets. Pls.' Mem. Opp'n 20. Dr. Sexton states that "insufficient analysis has been conducted to render a definitive opinion on the correct geographic market or markets for the acquisition of Pacific whiting, Pacific coldwater pink shrimp, and trawl-caught groundfish." Sexton Decl. ¶ 9.

## II. Legal Standards for a Stay of Summary Judgment Proceedings

Rule 56(d)[2] provides:

**(d) When Facts Are Unavailable to the Nonmovant.** If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
**(1)** defer considering the motion or deny it;
**(2)** allow time to obtain affidavits or declarations or to take discovery; or
**(3)** issue any other appropriate order.

Rule 56(d) "provides a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence." *United States v. Kitsap Physicians Serv.,* 314 F.3d 995, 1000 (9th Cir. 2002). To justify a stay, the requesting party must establish that "(1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Family Home and Fin. Ctr., Inc.v.Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008) "Failure to comply with these requirements 'is a proper ground for denying discovery and proceeding to summary judgment.'" *Id.* (citation omitted). This court has discretion in ruling on a motion to stay under Rule 56(d). *Morton v. Hall*, 599 F.3d 942, 945 (9th Cir. 2010).

## III. Discussion

Plaintiffs have not met their burden under Rule 56(d) that would support this court allowing additional discovery before ruling on Pacific Seafood's motion for summary judgment. Some of the evidence Plaintiffs claim they need to obtain through additional discovery is clearly within Plaintiffs' own knowledge. For example, Plaintiffs should know "where, when, and to whom [Plaintiffs] have delivered their seafood." Defs.' Reply 30, ECF No. 215. Other evidence

---
[2] Formerly designated as Rule 56(f) until Rule 56 was amended in 2010.

Plaintiffs claim that they need, such as the relative market shares of Pacific Seafood and Ocean Gold in the Westport market, is not relevant in determining whether Plaintiffs are participants in the Westport market.

Plaintiffs also argue that Pacific Seafood's motion for summary judgment is premature. Plaintiffs' counsel, who is very experienced in antitrust litigation, stated at the hearing that

> in the typical case, . . . the plaintiff generates its expert witness disclosure, then the defendant does the same, and the plaintiff then responds in some sort of rebuttal filing. . . . . [U]nder the wave of filings that precede the actual trial, you will see clarification, modification, change based upon discovery, and comment from the other side. We never got through that process.

Tr. 10, ECF No. 242. Plaintiffs imply that Pacific Seafood has improperly short-circuited the expert discovery process by using Plaintiffs' own expert opinions to support Pacific Seafood's motion for summary judgment. However, a defendant may challenge a plaintiff's antitrust standing as early as possible to avoid needless expense. Antitrust standing requirements "are often disputed and resolved early in the litigation when they can be decided 'as a matter of law' without the need for full discovery, trial or any determination of what the defendant did and whether it constituted an antitrust violation." IIA Phillip E. Areeda et al., *Antitrust Law* ¶ 335e2 (4th ed. 2014). Here, Plaintiffs should have not have been surprised by Pacific Seafood's challenge to Plaintiffs' antitrust standing in light of the information it sought in discovery. Plaintiffs' expert defined the market. Plaintiffs are hard pressed now to argue that they are being unfairly bound by their own expert's findings.

Plaintiffs also argue that a stay is necessary to allow their new expert, Dr. Sexton, to draft a report, which presumably would include his own definitions of the relevant markets. In the order allowing Plaintiffs to replace Dr. Radtke, I limited the permissible scope of the new expert's opinions:

> I find that Defendants are entitled to strict limits on the new expert witness's report and testimony, and that Defendants may use Dr. Radtke's expert report and deposition testimony for impeachment. Plaintiffs do not contend that Dr. Radtke was incompetent when he drafted his expert report, but rather that he is no longer competent to testify in support of its conclusions. I conclude that to minimize the prejudice to Defendants, *Plaintiffs' new expert witness "may not testify in any manner that is contrary to or inconsistent" with Dr. Radtke's disclosure. Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-cv-03587-WHO, 2014 WL 8094582, at *2 (N.D. Cal. Nov. 19, 2014). In other words, *the new expert's opinions must be "substantially similar" to Dr. Radtke's opinions*. See *In re Northrop Grumman Corp. ERISA Litig.*, 2016 WL 6826171, at *4. *Plaintiffs' new expert may, however, perform his or her own analysis and calculations so long as the results are not contrary to or inconsistent with Dr. Radtke's conclusions. See id.* As one court explained, the substitute expert "should have the opportunity to express his opinions in his own language after reviewing the evidence and performing whatever tests prior experts on both sides were allowed to perform." *Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, Nos. 1:04-cv-396, 1:06-CV-317, 2010 WL 3892860, at *3 (N.D. Ind. Sept. 30, 2010) (further quotation marks and citation omitted).

Order at 7 (emphasis added), ECF No. 214.

I agree with Pacific Seafood that allowing Dr. Sexton to formulate market definitions that are inconsistent with Dr. Radtke's market definitions would violate the limits imposed by the order. Plaintiffs have had ample time to formulate their market definitions, which are crucial to evaluating antitrust claims. *See Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir. 1995); *United States v. Marine Bancorporation, Inc.*, 418 U.S. 487, 618 (1974) ("Determination of the relevant product and geographic markets is 'a necessary predicate' to deciding whether a merger contravenes the Clayton Act.") (quoting *United States v. E.I. Du Pont De Nemours & Co.*, 353 U.S. 294, 324 (1962)). Plaintiffs have not shown that summary judgment proceedings should be stayed to allow further discovery.

# FACTUAL BACKGROUND

## I. Plaintiffs' Market Definitions

For purposes of the current motion for summary judgment, Pacific Seafood accepts Plaintiffs' market definitions. Plaintiffs allege three product markets: trawl-caught groundfish; whiting delivered onshore (i.e., whiting sold to an onshore processor rather than a vessel-based processor); and cold-water shrimp. Snider Am. Decl., Ex. 5, at 3, ECF No. 193. Plaintiffs define the following geographic markets for each of the three products at issue as follows:

1) For trawl-caught groundfish, Plaintiffs allege six economically distinct geographic markets: the Ft. Bragg market, off the north California coast at Mendocino County; the Eureka market, off the north California coast at Del Norte and Humboldt counties; the Charleston/Coos Bay market, off the south Oregon coast; the Newport market, off the central Oregon coast; the Astoria/Ilwaco market, offshore of the mouth of the Columbia River; and, most importantly here, the Westport, Washington market, drawing from fishing grounds north of the entrance to the Columbia River to the Canadian border north of the western tip of the Olympic Peninsula. Snider Am. Decl., Ex. 6, at 3. Because Ocean Gold operates only in Westport, the Westport market is the focus of Plaintiffs' antitrust claims.

2) For onshore whiting, Plaintiffs allege three economically distinct geographic markets: the Newport market, the Astoria/Ilwaco market, and the Westport market.

3) For cold-water shrimp, Plaintiffs allege five economically distinct geographic markets: the Eureka market, the Charleston/Coos Bay market, the Newport market, the Astoria/Ilwaco market, and the Westport market.

## II. Plaintiffs Do Not Participate in the Westport Market or Sell to Pacific Seafood

Ocean Gold operates seafood processing facilities only in Westport. Since 2011, Ocean Gold has been purchasing whiting almost exclusively, accounting for 98% of Ocean Gold's seafood purchases. Defs.' Mot. Summ. J. 5-6. Trawl-caught groundfish and cold-water shrimp account for the remainder of Ocean Gold's purchases. For example, in 2016, Ocean Gold purchased 72,570,000 pounds of whiting, 730,000 pounds of trawl-caught groundfish, and 45,000 pounds of shrimp. Defs.' Mot. Summ. J. 6.

Pacific Seafood's Westport facility purchases the vast majority of cold-water shrimp sold there. Ocean Gold processes most of the shrimp purchased by Pacific Seafood.

None of the Plaintiffs delivers his harvest to the Westport market. For Boardman, it has been 25 or 30 years since he delivered to Westport; for Rankin, it has been 20 years; and for Whaley, it has been 6 years.

Nor have Plaintiffs presented credible evidence that they are prepared to deliver seafood to the Westport market in the future. Boardman, who harvests only shrimp, testified that he would not leave his long-time processor, Hallmark Fisheries. Snider Am. Decl., Ex. 1, at 179 (Boardman Depo.) Rankin, who harvests only groundfish, has not considered ports other than Astoria for the last six years, stating that he is "happy where I am." Snider Am. Decl., Ex. 2, at 95 (Rankin Depo.). Whaley, who harvests only shrimp, has not reached out to any processors in Westport for the last six years. Snider Am. Decl., Ex. 3, at 169 (Whaley Depo.).

None of the Plaintiffs has delivered to Pacific Seafood at any of its West Coast facilities since 2012. Boardman delivers his shrimp only to Hallmark Fisheries in Newport and Coos Bay, Oregon. Rankin delivers his groundfish only to Bornstein's facilities in Astoria, Oregon. Whaley has delivered shrimp and groundfish to processors in Newport, Oregon, and ports south of Newport. None of the Plaintiffs fish for whiting.

In response to the undisputed evidence that Plaintiffs do not participate in the Westport market, Plaintiffs state, "Every single plaintiff annually renews permits that allow them to deliver to Washington ports." Pls.' Mem. Opp'n 29. Plaintiffs state that Whaley and Boardman hold Washington shrimp permits and own vessels that could range along the entire West Coast. Plaintiffs also note that Whaley and Rankin own federal fishing quotas that they lease to other fishermen on an open exchange.

## LEGAL STANDARDS FOR SUMMARY JUDGMENT MOTIONS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party and may not credibility determinations or weigh evidence. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

> Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial. This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence. The non-moving party must do more than show there is some "metaphysical doubt" as to the material facts at issue.

*In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citations omitted).

## DISCUSSION

### I. Antitrust Standing and Antitrust Injury

"To prove an unlawful merger claim under § 7 of the Clayton Act, a plaintiff must show that the effect of the challenged acquisition 'may be substantially to lessen competition, or to

tend to create a monopoly.'" *Boardman v. Pacific Seafood Group*, 822 F.3d 1011, 1021 (9th Cir. 2016) (quoting 15 U.S.C. § 18). An antitrust plaintiff does not need to prove that the challenged acquisition "has altered prices in the relevant market; rather, '[a]ll that is necessary is that the merger create an appreciable danger of such consequences in the future.'" *Id.* (quoting *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788 (9th Cir. 2015) (further citation and quotation marks omitted; alteration in *Boardman*)).

As Plaintiffs emphasize, antitrust plaintiffs who seek only injunctive relief are subject to less stringent standards to prove standing than antitrust plaintiffs who seek damages. *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 966 (9th Cir. 1999) (*Oregon Laborers*) (citing *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 110-11 & nn.5-6 (1986)); *Cargill*, 479 U.S. at 111 n.6 (in determining whether a plaintiff seeking damages has antitrust standing, courts examine factors in addition to antitrust injury, including "the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that have been more directly harmed"). At the hearing, Plaintiffs argued that because they do not seek damages, "the standing requirement . . . drops all the way to just general standing." Tr. 13. That is not correct. As I recently noted in separate antitrust action brought by Plaintiffs' counsel on behalf of other plaintiffs, "Plaintiffs appear to confuse the requirements for Article III standing with the 'more demanding standard for antitrust standing.'" *Innovation Marine Protein, LLC v. Pacific Seafood Group*, No. 6:17-cv-00815-MC, 2018 WL 1461501, at *7 (D. Or. Mar. 23, 2018) (quoting *Lucas Automotive Eng'g v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir. 1998) (further citation omitted)). An antitrust plaintiff who seeks only injunctive relief "still [must] show antitrust injury-- either real or threatened." *Oregon Laborers*, 185 F.3d at 966. The antitrust injury requirement "'ensures

that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place.'" *Id.* (quoting *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 342 (1990)). An antitrust injury is defined as "an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999) (quoting *Atlantic Richfield Co.,* 495 U.S. at 334 (internal quotation marks omitted)). In holding that a plaintiff seeking only injunctive relief must show an antitrust injury, the Supreme Court has explained that "[i]t would be incongruous . . . to read the Clayton Act to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred." *Cargill,* 479 U.S. at 112.

To establish an antitrust injury, the plaintiff must show "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *American Ad Mgmt. v. General Tel. Co. of Cal.,* 190 F.3d 1051, 1055 (9th Cir. 1999). "Antitrust injury requires the plaintiff to have suffered its injury in the market where the competition is being restrained. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Id.* at 1057 (footnote omitted). Antitrust standing "is a question of law." *Id.* at 1054.

## II. Plaintiffs Lack Antitrust Standing

Pacific Seafood argues that Plaintiffs lack antitrust standing to bring this action because they do not participate in the relevant geographic market, and because Plaintiffs do not sell to Pacific Seafood or Ocean Gold. I agree.

### A. Plaintiffs Do Not Participate in the Westport Market

The record here shows that Plaintiffs do not participate in the Westport market and are not likely to do so in the future. A plaintiff cannot show an antitrust injury if the plaintiff does not participate in the market where the allegedly anticompetitive merger would occur. For example, in *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301 (S.D.N.Y. 2003), the court held that the owner, operator, and landlord of a movie theater had not shown an antitrust injury caused by the defendant exhibitors' acquisitions of theaters outside of the "relevant geographic product market." *Id.* at 311. The court noted that courts addressing this issue generally hold that "to have standing, a plaintiff must be a participant in some capacity in the market in which the merger occurs." *Id.* at 312. The court found no decision "that has recognized antitrust standing where the defendant's horizontal acquisitions took place in a geographic market in which the plaintiff was not a consumer or an actual or potential competitor." *Id.* The court held, "The relevant inquiry, therefore, is not whether dominance in one geographic market could be used to create pressure in another, which it very well might, but whether the plaintiff was a market participant (or potential entrant) in *both* geographic areas for the relevant product." *Id.* (footnote omitted); *see also Killian Pest Control, Inc. v. HomeTeam Pest Defense, Inc.*, No. 14-cv-05239-VC, 2015 WL 13385918, at *3 (N.D. Cal. Dec. 21, 2015) (the plaintiff lacked antitrust standing as to geographic markets where it did not participate or intend to participate).

Here, even if Pacific Seafood's proposed acquisition of Ocean Gold would suppress prices paid to fishermen who deliver to Westport, these Plaintiffs are not the proper parties to challenge the proposed merger. There is no evidence to support that they participate in the Westport market. More than 800 individual fishing vessels deliver seafood to Pacific Seafood at

its facilities along the West Coast, but none of those fishing vessels or their owners are plaintiffs here. None of the fishing vessels or owners that deliver to Westport have joined this action.

Plaintiffs have not cited any authority to support their argument that a plaintiff whose most recent participation in the relevant market occurred more than six years before a proposed merger could qualify as a market participant. Nor have Plaintiffs shown that they are likely to sell in Westport, although they may have the hypothetical ability to do so. Plaintiffs have longstanding business relationships with their seafood processors and have shown no inclination to seek new processors or markets. I conclude as a matter of law that Plaintiffs are not participants in the Westport market, and will not be participants in the foreseeable future, and therefore lack antitrust standing to bring this action.

Plaintiffs argue that they have standing under the "inextricably intertwined" doctrine, which is a "narrow exception" to the market participation requirement. *American Ad Mgmt.,* 190 F.3d at 1057 n.5. The inextricably intertwined exception originated with *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 483-84 (1982), in which the defendant group health plan refused to reimburse subscribers for psychotherapy performed by psychologists, while reimbursing subscribers for psychotherapy provided by psychiatrists. The plaintiff was not a provider of psychotherapy services but rather was a consumer of such services who was denied reimbursement because of the defendant's alleged unlawful conspiracy to restrain competition in the market for psychotherapy services. The *McCready* Court held that the plaintiff had antitrust standing to bring an antitrust action because she was "within that area of the economy . . . endangered by that breakdown of competitive conditions." *Id.* at 480 (quotation marks and citation omitted). The injury in *McCready*, the failure to reimburse, was caused directly by the

anti-competitive method employed by the defendant to suppress competition between psychologists and psychiatrists.

Here, Plaintiffs argue that Pacific Seafood's acquisition of Ocean Gold would injure Plaintiffs "by creating a monopsony that enables Pacific Seafood to suppress ex vessel prices it pays its own suppliers, and, in turn, compel other processors to follow suit." Pls.' Mem. Opp'n 23. Unlike the plaintiff in *McCready,* however, Plaintiffs here have not shown that they would be harmed as a direct result of the allegedly anti-competitive merger. Plaintiffs do not sell in the Westport market, so their alleged injuries would be derivative of the harm to fishermen who do sell in the Westport market. The "inextricably intertwined" exception does not apply under these circumstances.

Plaintiffs also contend that they should be allowed to pursue a new theory of liability based on their participation in the market for leasing shares of their annual federal groundfish quotas to other fishermen.[3] Plaintiffs contend Pacific Seafood's proposed acquisition of Ocean Gold would reduce the revenue they earn from leasing quota shares because the merger would result in the suppression of ex vessel prices paid to the fishermen who lease from Plaintiffs. Plaintiffs have not previously asserted standing based on their participation in the market for leasing quotas. In May 2017, when Defendants sought to compel discovery on Plaintiffs' Individual Fishing Quotas and Individual Transfer Quotas, Plaintiffs insisted that this very information ("what [Plaintiffs] have . . . done in terms of holding or transferred quota share") was "not an issue in this case." Tr. 10 (transcript of hearing on discovery), ECF No. 135. Based on Plaintiffs' statement, I denied Pacific Seafood's motion to compel Plaintiffs to produce information about the fishing quotas. *See* Order, ECF No. 132. At this stage of the litigation,

---

[3] Rankin and Whaley apparently hold quotas, while Boardman does not. *See* Defs.' Reply 15.

and after Plaintiffs previously asserted that the fishing quotas were not relevant, it is too late for Plaintiffs to introduce a new theory of liability based on a market not alleged in the operative complaint. Even if Plaintiffs timely raised this theory, they have not shown that they would suffer a direct antitrust injury based on the possible loss of revenue from leasing quotas. I agree with Pacific Seafood that the market for quota leases is separate from the markets for ex vessel whiting or trawl-caught groundfish. *See American Ad Mgmt.*, 190 F.3d at 1057 (plaintiffs "whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury").

Plaintiffs also argue that Pacific Seafood's proposed acquisition of Ocean Gold "will eliminate both actual and potential competition <u>in</u> Westport, resulting in suppressed ex vessel prices in adjacent ports." Pls.' Mem. 27. But geographic markets, by definition, are economically independent, so lowered prices in one market should not affect prices in an adjacent market. *See Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir. 1979). I note that at the hearing, Plaintiffs disclaimed reliance on an umbrella theory of liability, which posits that price suppression by one buyer in a market may cause other buyers to lower their prices as well. *See Boardman*, 2015 WL 13357739, at *3 (describing umbrella theory).

Plaintiffs also argue that they have antitrust standing based on their interest in preserving the economic health of the fishing industry. Plaintiffs state, "Fishermen are stewards of their unique industry, charged with caring for its biological and economic sustainability. Plaintiffs have a long history of performing that obligation, and this case is a continuation of their commitment." Pls.' Mem. Opp'n 29. This creative argument stretches the concept of antitrust standing and antitrust injury well beyond their current boundaries. The Ninth Circuit has explained that

>Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation. Some injuries caused by an antitrust violation may thus be left unremedied for lack of a proper plaintiff. As we recognized in *Exhibitors' Serv., Inc. v. American Multi-Cinema, Inc.,* 788 F.2d 574, 580 n.7 (9th Cir. 1986): "The fact that injury has occurred and that other claims have failed does not permit this court to expand the coverage of [antitrust law]."

*Oregon Laborers*,185 F.3d at 964 (additional citation and quotation marks omitted). However well-intentioned Plaintiffs are in trying to protect the fishing industry from Pacific Seafood's allegedly anti-competitive conduct, to bring an antitrust action Plaintiffs still must show that they will suffer an antitrust injury.

Pacific Seafood also contends that Plaintiffs lack antitrust standing because they do not sell to Pacific Seafood or Ocean Gold, and have not done so since at least 2012. Plaintiffs respond that because they seek only injunctive relief, they have standing even as an indirect purchaser. Plaintiffs cite dicta from *Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1234 (9th Cir. 1998), in which the court stated, "To maintain an antitrust divestiture suit, a private plaintiff must generally meet all the requirements that apply to the damages plaintiff, except that the injury itself need only be threatened, and *occasionally a party too remote for damages might be granted an injunction*." (Emphasis added.) Plaintiffs have not cited any decision issued since *Lucas Automotive* that applied this hypothetical exception to grant injunctive relief. I conclude that Plaintiffs cannot show a threatened antitrust injury caused by the proposed merger both because they do not participate in the Westport market and because they do not sell to either Pacific Seafood or Ocean Gold.

### B. Market Conditions After Pacific Seafood's Proposed Acquisition of Ocean Gold

Pacific Seafood argues that Plaintiffs cannot show that they would be harmed by Pacific Seafood's acquisition of Ocean Gold because the market situation as to fishermen selling their

catch in Westport would not change after the proposed merger. Pacific Seafood argues that because it currently purchases nearly all of the shrimp delivered to Westport, and because Ocean Gold purchases nearly all of the whiting and most of the groundfish delivered to Westport, fishermen delivering to the merged entity would face the same market conditions as before the merger. Plaintiffs contend that further discovery is required to determine the effect of a proposed merger on the Westport market. Because I conclude that Pacific Seafood has shown that Plaintiffs lack antitrust standing based on their failure to participate in the relevant markets, I need not address this issue.

### III. Pacific Seafood's Motion to Strike

Pacific Seafood moves to strike Dr. Sexton's declaration; portions of Dr. Radtke's disclosure that were not adopted by Plaintiffs in their responses to interrogatories; a 2015 declaration by Dr. Radtke; and three declarations submitted by another expert witness, Dr. James Wilen, in the *Whaley* litigation.

A motion to strike "is an extreme and drastic remedy" that "is heavily disfavored." *Novva Ausrustung Group, Inc. v. Kajioka*, No. 2:17-cv-01293-RFB-VCF, 2017 WL 2990850, at *2 (D. Nev. July 13, 2017). I deny Pacific Seafood's motion to strike as moot in light of my decision to grant summary judgment.

/ / /

/ / /

/ / /

/ / /

## CONCLUSION

Defendants' Motion for Summary Judgment, ECF No. 190, is GRANTED. Defendants' Motion to Strike, ECF No. 217, is DENIED.

IT IS SO ORDERED.

DATED this 15th day of May, 2018.

                                                          /s/Michael J. McShane  
                                                          MICHAEL MCSHANE  
                                                          U.S. DISTRICT JUDGE